# EXHIBIT 1
# PART 1

Page 1

1

2                    UNITED STATES DISTRICT COURT

3                  SOUTHERN DISTRICT OF NEW YORK

4      -----------------------------------------x

5      EVA LEE,

6                              Plaintiff,

7           -against-                    Civil Action No.

8      NYP HOLDING INC. and              07 CIV 6475(JSR)

9      RAYMOND WALSH JR.,

10                             Defendants.

11     -----------------------------------------x

12

13


14               DEPOSITION OF:  EVA SIU-SAN LEE

15              Tuesday, November 13, 2007

16                   New York, New York

17

18

19

20

21

22

23

24

25     Reported in stenotype by:
       Rich Germosen, CCR, CRCR, RPR, CRR, CLR

Eva Siu-San Lee                                                                    11/13/2007

1              EVA SIU-SAN LEE
2        A.    Paperwork I believe it was
3    finalized November of '06.
4        Q.    And do you have any children?
5        A.    Two.
6        Q.    And what are their names?
7        A.    Winnie Yen and Brian Yen.
8        Q.    And when were they born?
9        A.    Winnie, October 3rd, 1993.  Brian,
10   April 6th, 1995.
11       Q.    And they were born in New York?
12       A.    Yes.
13       Q.    And they live with you?
14       A.    Yes.
15       Q.    Do you have any education?  Did
16   you go to high school?
17       A.    I dropped out of tenth grade.
18       Q.    So tenth grade is the highest
19   level of education that you have?
20       A.    Yes.
21       Q.    Okay.
22             Do you have any other degrees?
23   Have you ever gone to any kind of certifications?
24       A.    Not to what I know of.
25       Q.    Okay.

1              EVA SIU-SAN LEE
2              When did you start working at The
3    Post?
4        A.    I believe it was 2002 July.
5        Q.    And where, where at The Post did
6    you start working in July of 2002?
7        A.    Mailroom.
8        Q.    And do you work anywhere else at
9    The Post?
10       A.    In the pressroom.
11       Q.    Okay.
12             And when did you start working at
13   the pressroom?
14       A.    I started shaping May of 2000 -- I
15   believe it was 2004.
16       Q.    Okay.
17             By shaping what was your position?
18       A.    Provisional.
19       Q.    You were provisional.
20             And when -- are you provisional
21   now?
22       A.    I'm a casual now.
23       Q.    When did you become a casual?
24       A.    I believe it was January 25th of
25   '05.

1              EVA SIU-SAN LEE
2        Q.    So when you became a provisional
3    in May 2004 were you still working in the
4    mailroom?
5        A.    Yes.
6        Q.    Okay.
7              So you've been working at The Post
8    in the mailroom and the pressroom since about
9    2004 July?
10       A.    Yes.
11       Q.    Okay.
12             And do you -- when you started
13   working in the mailroom at The Post did you still
14   work at The Times?
15       A.    Yes.
16       Q.    And do you still work there?
17       A.    Yes.
18       Q.    So since about 2002 you've been
19   working at The Post and at The Times, at The Post
20   in the mailroom and the pressroom?
21       A.    Yes.
22       Q.    And what position do you have at
23   The Times?
24       A.    I am a sub in the mailroom.
25       Q.    What position are you in the

1              EVA SIU-SAN LEE
2    mailroom at The Post?
3        A.    A shaper or outside card man I
4    will call it.  Outside card man I will call it.
5    That's what they use --
6              MS. EISNER:  Person.
7              MS. GOLDSMITH:  Yeah, person.
8        A.    Person.
9
10   BY MS. GOLDSMITH:
11       Q.    Okay.
12             So you're an outside card person
13   at the mailroom.  You're a casual at the
14   pressroom?
15       A.    Yes.
16       Q.    Who is your supervisor as an
17   outside card man at, card person, sorry, at the
18   mailroom?
19       A.    Who is my supervisor?  I
20   believe -- the highest one, right, you're talking
21   about?  I think it's Whit Sutherland.
22       Q.    Okay.
23             Do you have any other supervisors?
24       A.    Yes, there's Mike Guzzi.
25       Q.    I'm sorry?

Eva Siu-San Lee                                                    11/13/2007

Page 34

EVA SIU-SAN LEE
1
2    A.    There's Mike Guzzi.  There's --
3    Q.    I'm sorry, Mike?
4    A.    Mike Guzzi.
5    Q.    Guzzi?
6    A.    Yes.  And there's Mike Granito.
7  Joe Vazzano, Nicky Vazzano, Jimmy Valentine,
8  Charlie Cuchiara.
9    Q.    These are all your supervisors in
10  the mailroom?
11    A.    There is more.  Paul Losito, Guy
12  Losito, I think that's it.  I might have -- I
13  think that's it.
14    Q.    Okay.
15    A.    I think.
16    Q.    If you think of any more later
17  you'll let me know.
18    A.    Okay.
19    Q.    What about in the pressroom?
20    A.    Yes.  Raymond Walsh.
21    Q.    Uh-huh.
22    A.    Brian Walsh.
23    Q.    Uh-huh.
24    A.    Mr. Billy Bogan here.
25          Jimmy, I don't know his last name.

Page 35

EVA SIU-SAN LEE
1
2    Q.    That's okay.
3    A.    Jimmy, I don't know his last name.
4          MS. EISNER:  If you want to leave a
5  space if she remembers we can always put it in.
6          MS. GOLDSMITH:  That's fine.
7
8  BY MS. GOLDSMITH:
9    Q.    So you're saying these people that
10  you're giving me their names, are they foremen?
11    A.    Yes.
12    Q.    Okay, so the foreman in the
13  mailroom and the foreman in the pressroom?
14    A.    Yes.
15    Q.    And Ray Walsh and Whit Sutherland?
16    A.    Yeah, but there's also more
17  foremens in the pressroom.
18    Q.    Okay.
19    A.    Steve Mcillinis.
20    Q.    Uh-huh.
21    A.    Jack.  I don't know his last name
22  also.  Bill Schmidt.  I think his name is John
23  Pearce.  I'm not sure.  I think so.  And Tom, I
24  believe Tom Carew.  Tom Carew.
25    Q.    What was the last name?

Page 36

EVA SIU-SAN LEE
1
2    A.    Carew.  I think that's what they
3  call it.
4    Q.    Okay.
5    A.    I don't know how to spell it.
6    Q.    Okay.  We'll get it.
7          So the mailroom and the pressroom
8  are run by different people?
9    A.    Yes.
10    Q.    Okay.
11          You had said that you were an
12  outside cardholder at the mailroom.
13          Is there any other name for that?
14    A.    No.
15    Q.    Have you ever heard the phrase to
16  list employee?
17    A.    I thought that was always used in
18  driver's end.
19    Q.    So you --
20    A.    We don't -- I don't think I hear
21  anybody use it in the mailroom.  I don't think I
22  heard anybody use that term in the mailroom.
23    Q.    Okay, but you don't know?
24    A.    Don't know.
25    Q.    Okay.  Are you a member of a

Page 37

EVA SIU-SAN LEE
1
2  union?
3    A.    Yes.
4    Q.    And what union are you a member
5  of?
6    A.    Mailer union Number 6.
7    Q.    So does that mean that you have a
8  union card with the mailers?
9    A.    Yes.
10    Q.    And since when have you had that
11  card?
12    A.    I would say 2001 or 2002.
13  Somewhere there.  I'm not too sure when.
14    Q.    Do you have a card with any other
15  union holder, any other union?
16    A.    Any other union?  I don't think
17  so.
18    Q.    You don't know?
19    A.    I don't know.  No, I -- no.  I'm
20  not a union.  Besides the mailer union I'm not a
21  union.
22    Q.    You're not a member of any other
23  union but the mailers?
24    A.    Yes.
25    Q.    Yes.

One Penn Plaza, NYC                    Toby Feldman, Inc.                tel (212) 244.3990
email@tobyfeldman.com        NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS    tel (800) 246.4950

Eva Siu-San Lee                                                     11/13/2007

Page 38

1              EVA SIU-SAN LEE
2         And are you still a member of the
3    Mailers Union?
4         A.    Yes.
5         Q.    Okay.
6              So going back to the foremen and
7    the supervisors in the mailroom you mentioned
8    first Whit Sutherland, is that correct?
9         A.    Yes.
10        Q.    Okay.
11             Do you have any reason to believe
12   that Whit Sutherland has discriminated against
13   you because you're a woman?
14        A.    I would say, I would say I don't
15   think so.
16        Q.    You don't think that he's
17   discriminated --
18        A.    I don't think so because I don't
19   have much contact with him.
20        Q.    What about Mike Guzzi?  Do you
21   have any reason to believe that he's
22   discriminated against you because you're a woman?
23        A.    I don't think so.
24        Q.    Is that a no?
25        A.    Yes, that's a no.

Page 39

1              EVA SIU-SAN LEE
2         Q.    Joe Vazzano, do you have any
3    reason to believe that he's discriminated against
4    you because you're a woman?
5         A.    No.
6         Q.    Nick Vazzano, any reason to
7    believe that he's discriminated against you
8    because you're a woman?
9         A.    I don't think so.
10        Q.    This is your day to tell --
11        A.    I know, I know, I know.
12        Q.    -- to tell me who's discriminated
13   against you.
14        A.    I know, I know.
15        Q.    And you've brought this lawsuit to
16   say that you've been discriminated against.
17             COURT REPORTER:  I need one at a
18   time, please.
19             THE WITNESS:  Sorry.
20             MS. GOLDSMITH:  Oh, okay.  Okay.
21   Thanks.
22
23   BY MS. GOLDSMITH:
24        Q.    Jimmy Valentine, is that what you
25   said his name was?

Page 40

1              EVA SIU-SAN LEE
2         A.    Yes.
3         Q.    My notes are not so great.
4              Any reason to believe that
5    Mr. Valentine has discriminated against you
6    because of your gender?
7         A.    I don't know is it because of my
8    gender, but sometimes he would place me on the
9    stack down even though that there are people
10   behind me that don't have the stack down.
11        Q.    And you believe that's because
12   you're a woman?
13        A.    Yes, I will say so.
14        Q.    And why do you -- do you know how
15   people get put on the stack down?
16        A.    At one time they say that us as
17   outside card men have no priority.  That's why we
18   have to be on the stack down.
19        Q.    Outside -- so outside card men
20   people do not have priority.  So they are on the
21   stack down?
22        A.    Yes, but last week I went to the
23   chairman Nicky Vazzano, Sr. and I asked him there
24   are people behind me that -- non-cards that who
25   doesn't have to stack down.  Why am I on the

Page 41

1              EVA SIU-SAN LEE
2    stack down because someone bumped me and I have
3    to be on the stack down.  I asked him there is
4    non-card feeding, can I feed and he said that
5    there is no priority if there is no money
6    involved.  That means if that job does not have
7    overtime that comes with it that you don't have a
8    priority.  There is no priority.  They can pretty
9    much put anybody, anybody -- you don't get to --
10   I don't know how to say it.  He said if there is
11   no money involved there is no priority.  If there
12   is no priority why am I put in the stack down?
13        Q.    And why do you believe that -- if
14   there is no priority why do you believe that you
15   were put on the stack down?
16        A.    I don't know.  I'm a female.
17        Q.    You think it's because you're a
18   female?
19        A.    Yes.
20        Q.    And what basis do you have for
21   that belief?
22             MS. EISNER:  Objection.
23             Answer if you know.
24             MS. GOLDSMITH:  It's her lawsuit.
25        A.    I am --

11 (Pages 38 to 41)

Eva Siu-San Lee                                                        11/13/2007

<table>
<tr><td>

Page 42

EVA SIU-SAN LEE
1
2    Q.    You don't have -- do you have --
3    A.    Do I have what?
4    Q.    I'm sorry. You answered the
5 question.
6          My question was what basis is your
7 belief that it's because you're a female that
8 you're put on the stack down? It's just your
9 subjective belief?
10   A.    I don't think so because I'm not
11 the only female on the stack down. A lot of
12 times I'm working with another female on the
13 stack down.
14   Q.    So it's your belief that there is
15 other women on the stack down?
16   A.    Yes.
17   Q.    Anything else, any other reason to
18 believe that it's because you're a female?
19   A.    I don't think so.
20   Q.    Okay. Are there men on the stack
21 down?
22   A.    Yes.
23   Q.    So both men and women work on the
24 stack down?
25   A.    Yes.

</td><td>

Page 44

EVA SIU-SAN LEE
1
2          Right after that it was Dave
3 Kaufman.
4    Q.    I'm sorry?
5    A.    Dave Kaufman who went to the
6 bathroom without telling Paul Losito and Paul
7 Losito did not say a word to him.
8    Q.    And how do you know that Paul --
9 that Dave Kaufman --
10   A.    I was working with -- he told me
11 to cover him. He was by the buffer I believe.
12 He was by the buffer and he told me -- I believe
13 that day I was a material handler.
14         Part of my job is to give relief
15 as a material handler. If they have to go to the
16 bathroom they will come to me and tell me to
17 cover that. He told me to go cover him and he
18 went to the bathroom and I saw him. He did not
19 tell Paul.
20   Q.    So you saw him and you believe
21 that he didn't tell Paul?
22   A.    (Indicating.)
23   Q.    But --
24   A.    And that day when he left, Paul
25 came and asked me -- wait. Because there was

</td></tr>
<tr><td>

Page 43

EVA SIU-SAN LEE
1
2    Q.    Okay.
3          Has anyone ever told you you were
4 put on the stack down because you're a woman?
5    A.    No, but -- no.
6    Q.    Do you have any documents that say
7 that you were put on the stack down because
8 you're a woman?
9    A.    No.
10   Q.    Okay. All right.
11         I think we were up to Paul Losito?
12   A.    Yes.
13   Q.    Do you have any basis to believe
14 that Paul Losito discriminated against you
15 because you're a woman?
16   A.    I think so.
17   Q.    Are you guessing?
18   A.    I'm not guessing. I would say so.
19 At sometimes I will say so.
20   Q.    And on what basis?
21   A.    On what basis? For instance, I
22 went to the bathroom because my pocket was out
23 and he wasn't around and I -- when I came back he
24 told me that if I had to walk off the machine let
25 him know, if not he will send me home.

</td><td>

Page 45

EVA SIU-SAN LEE
1
2 also part of my job is to -- when the paper falls
3 off the shoot, when paper comes out the machine
4 I'm supposed to pick it up and put them together
5 in a pile and he asked me why am I not --
6    Q.    Wait. Wait. Wait. This is a
7 second thing about Paul that you're saying now?
8    A.    It's the same thing.
9    Q.    It's the same thing?
10   A.    It's the same thing. It's the
11 same incident that night and he asked me what am
12 I doing on the buffer and why am I not as a
13 profiler, we call that job the profile job to
14 clean, and I told him Dave went to the bathroom.
15   Q.    And Dave was on a different job
16 than you were on?
17   A.    Dave was on the buffer.
18   Q.    And you were on -- when you asked
19 to go to the bathroom you were on a different
20 job?
21   A.    I was on that day my pocket ran
22 out and I believe I was an extra on the machine.
23 I wasn't a material handler on that. I remember.
24   Q.    You were what? I'm sorry?
25   A.    I wasn't a material handler.

</td></tr>
</table>

12 (Pages 42 to 45)

Eva Siu-San Lee                                              11/13/2007

Page 50

EVA SIU-SAN LEE

1
2    A.    To the bathroom, ladies room.
3    Q.    This is Jay Losito we're talking
4    about now?
5    A.    Oh, no, no, no, Jay Losito go
6    around. He says we don't go around meaning we
7    don't go around until I say so.
8    Q.    And why do you believe that that
9    was on the basis of your being a woman?
10    A.    I don't know.
11    Q.    Well, you just said you have a --
12    it's just your -- so it's just your subjective
13    belief?
14    A.    I think so.
15    Q.    You have no facts or anything else
16    that support that?
17    A.    I think so.
18    Q.    You think you do have facts?
19    A.    No.
20    Q.    Or you don't have any facts?
21    A.    I don't think so.
22    Q.    No facts? Just your belief?
23         MS. EISNER: Can I have a minute
24    with my client just to settle her nerves a little
25    bit?

Page 51

EVA SIU-SAN LEE

1
2         MS. GOLDSMITH: I'm sorry?
3         MS. EISNER: Can I just have a
4    minute with my client?
5         MR. LIPPNER: A question is
6    pending.
7         MS. EISNER: Oh.
8         MR. LIPPNER: She has to answer the
9    question.
10         MS. EISNER: I apologize. I
11    thought she answered the question.
12         MS. GOLDSMITH: Well, we're in the
13    middle of talking about Jay Losito. Let's just
14    finish up Jay Losito, okay?
15
16    BY MS. GOLDSMITH:
17    Q.    So any other incidence that makes
18    you think that Jay Losito discriminated against
19    you because you're a woman?
20    A.    Last week.
21    Q.    Last week.
22         What happened last week?
23    A.    I was feeding and he pulled me off
24    to stack down and he brought a male over to
25    replace me and then after that it was an extra

Page 52

EVA SIU-SAN LEE

1
2    guy on the stack down. So Andre told me to go
3    back to feed and later on he put another guy to
4    replace -- another male to replace me and told
5    me -- I was feeding, as I was feeding. He
6    brought another male over and told me to go to
7    the stack down again.
8    Q.    And did he tell you why he was
9    pulling you off the stack down?
10    A.    They don't tell you any reason.
11    Q.    So he didn't tell you any reason?
12    A.    (Indicating.)
13    Q.    So why do you believe it was
14    because of your gender?
15    A.    I don't know why. They had --
16    there were so many other males there that he
17    could have pulled, but he pulled me twice.
18    Q.    So it's because he pulled you
19    twice and not any of the other male employees?
20    A.    Yes.
21    Q.    That's why you believe it's
22    because of your gender?
23    A.    Yes.
24    Q.    Do you know why people get pulled
25    off the stack down?

Page 53

EVA SIU-SAN LEE

1
2    A.    You mean pulled to the stack down,
3    right?
4    Q.    Pulled to the stack down. Excuse
5    me.
6    A.    No.
7    Q.    And is it -- you had said before
8    there is no priority. So is it basically the
9    foreman's discretion who can work on the stack
10    down?
11    A.    I went to the chairman beside
12    Nicky Vazzano, I went to Kevin Dowd and I asked
13    him. They said no priority then, what Nicky
14    said. I asked Kevin is there no priority and
15    Kevin told me that if he run it his way it goes
16    by priority. I don't know how do they determine
17    that. I get different answers. I can't tell
18    you.
19    Q.    Who is Kevin?
20    A.    I think he is the assistant
21    chairman in the mailroom. Not exactly sure of
22    his title.
23    Q.    Is he management?
24    A.    No, he is a union rep, part of a
25    union.

14 (Pages 50 to 53)

One Penn Plaza, NYC
email@tobyfeldman.com

Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS

tel (212) 244.3990
tel (800) 246.4950

Eva Siu-San Lee                                                11/13/2007

Page 54

```
 1              EVA SIU-SAN LEE
 2      Q.    Okay.
 3            Did you -- did this -- so you were
 4    pulled to the stack down from the feeder, is that
 5    what you were saying before?
 6      A.    I was pulled off as a feeder
 7    and --
 8      Q.    And put on the stack down?
 9      A.    Yes.
10      Q.    Did that affect your pay in any
11    way?
12      A.    No.
13      Q.    No. Just a different job?
14      A.    Yes.
15      Q.    Okay.
16            Were there any other foremen in
17    the mailroom that you claim discriminated against
18    you because you're a woman?
19      A.    Mike Granito.
20      Q.    Mike Granito.
21      MR. LIPPNER: G-r-a-n-i-t-o.
22      MS. GOLDSMITH: Sorry.
23
24    BY MS. GOLDSMITH:
25      Q.    And what basis do you have to
```

Page 55

```
 1              EVA SIU-SAN LEE
 2    believe that Mike Granito discriminated against
 3    you because you're a woman?
 4      A.    He does the assignment on work at
 5    nights. There was a stack down back in 2004 and
 6    at one point my sisters and I were all placed on
 7    one stack down every time we worked pretty much,
 8    I think every time.
 9      Q.    And anything -- is there any other
10    reason?
11      A.    Is there any other reason?
12      Q.    Besides him putting you in the
13    stack down in 2004?
14      A.    He fired my sister.
15      Q.    He fired your sisters. When did
16    he fire your sisters?
17      A.    2004. I believe it's August.
18      Q.    August 2004?
19      A.    Yes.
20      Q.    Any other reason that you believe
21    Mike Granito discriminated against you because
22    you're a woman?
23      A.    I'm trying to think, but I don't
24    recall it right now.
25      Q.    Okay.
```

Page 56

```
 1              EVA SIU-SAN LEE
 2            If you think of it later you'll
 3    let me know.
 4      MS. GOLDSMITH: Do you want to --
 5      MS. EISNER: Yes, just a minute.
 6      MS. GOLDSMITH: Uh-huh.
 7            (Whereupon, a short recess is
 8    taken.)
 9      MS. GOLDSMITH: Let's go back on
10    the record.
11      A.    I just remember something.
12
13    BY MS. GOLDSMITH:
14      Q.    And did you remember this based on
15    your conversation with your attorney outside?
16      A.    No.
17      Q.    So you just remembered this out of
18    nowhere?
19      A.    I was thinking about Paul Losito
20    and there is one time by copy stack when it all
21    messed up and then all the papers were coming out
22    and he pretty much said this fucking cock sucker.
23    That's what he said in front of my face.
24      Q.    Now, is this what you just asked
25    your attorney if you should be telling me?
```

Page 57

```
 1              EVA SIU-SAN LEE
 2      A.    Yes.
 3      Q.    So you just asked her is this
 4    what -- should I tell them this?
 5      A.    Yes.
 6      MS. EISNER: She -- I wanted to
 7    know what she was going to tell you guys before
 8    she told you in case it was attorney/client
 9    privilege. That's all that -- that's all that --
10      MS. GOLDSMITH: Well, I mean she --
11    I've been asking her everything that has she
12    against these people. So it's not really --
13    reasons that she believed people discriminated
14    against her are not attorney/client privilege.
15      MS. EISNER: I understand that and
16    that's what the purpose of our conversation was.
17    It was not a basis of our conversation out in the
18    hallway if that's what you're thinking.
19      MS. GOLDSMITH: Okay.
20
21    BY MS. GOLDSMITH:
22      Q.    So he said -- he said someone was
23    a fucking cock sucker.
24            Who did he say that to?
25      A.    I guess he was yelling at himself,
```

15 (Pages 54 to 57)

Page 58

EVA SIU-SAN LEE
1   EVA SIU-SAN LEE
2   but I was right in front of him clearing out the
3   papers with him and he said that right in front
4   of me.
5       Q.    So he said it in front of you, but
6   he was talking to himself?
7       A.    I believe so.
8       Q.    Was anyone else there?
9       A.    I don't recall.
10      Q.    And when did this happen?
11      A.    I would say last year.  I would
12  say last year.
13      Q.    2006?
14      A.    Yes.
15      Q.    Anything -- this is Losito, oh,
16  Paul Losito?
17      A.    Yes, Paul Losito.
18      Q.    Anything else?
19      A.    Not right now.
20      Q.    Okay.
21          Let's move on to the foremen that
22  you talked about in the pressroom.
23          Okay.
24          Ray Walsh, any reason that you
25  have to believe that Ray Walsh discriminated

Page 59

EVA SIU-SAN LEE
1   EVA SIU-SAN LEE
2   against you because you're a woman?
3       A.    Yes.
4       Q.    And what's the basis for that?
5       A.    I was turned away once when
6   everybody was hired at the shape.  I went up to
7   sign the payroll.  He won't let me sign in and he
8   won't let me work.
9       Q.    When was this?
10      A.    October 6th, 2004.
11      Q.    October 6th, 2004?
12      A.    (Indicating.)
13      Q.    Anything else?
14      A.    He -- he -- he is in charge of the
15  pressroom.  He is in charge of the hiring
16  practice, right.  They didn't hire me -- let's
17  see.
18      Q.    So they didn't hire you?
19      A.    I wouldn't say didn't because I
20  did work a couple of times after Joe Vincent said
21  it was okay, but during the time of September,
22  middle of September to --
23      Q.    What year?
24      A.    '04.  Middle of September to --
25  from middle of September to November, I believe

Page 60

EVA SIU-SAN LEE
1   EVA SIU-SAN LEE
2   November I not worked --
3       Q.    November?
4       A.    2004.
5       Q.    So for those two months you were
6   not hired --
7       A.    I believe I was not hired because
8   of -- I would say since October 6th on I would
9   say that I was not hired because of Ray turning
10  me away.  If he turned me away other foremens
11  would not hire me.
12      Q.    Okay.
13          And why do you think Ray turned
14  you away?
15      A.    He told me, in the middle of
16  September he told me that I am not allowed to
17  work in two department.  I told him I would give
18  up the mailroom and I would stay with the
19  pressroom at that time.
20          And then what happened was on
21  October 6th when he did not let me sign I told
22  him then we speak that earlier back in September
23  saying that I was going to give up the mailroom.
24  Then he tells me that I hold a union card and I
25  work at The Times.  I cannot work in the

Page 61

EVA SIU-SAN LEE
1   EVA SIU-SAN LEE
2   pressroom.
3       Q.    Okay.
4           So he told you you couldn't work
5   in the pressroom because you have a union card.
6   Your union card is with the mailers?
7       A.    Yes.
8       Q.    So because you have a union card
9   with the mailers?
10      A.    Yes.
11      Q.    And is there any reason that you
12  don't believe that to be the true reason why he
13  wouldn't let you work?
14      A.    Is there any other reason?  I
15  don't think that's the true reason.
16      Q.    You don't think that's the truth?
17      A.    I don't think so.
18      Q.    Why would Mr. Walsh lie?
19          MS. EISNER:  Objection to form.
20      Q.    Do you have any basis for
21  believing that Mr. Walsh would lie about this
22  reason?
23      A.    Yes.  Yes.  Because in September
24  he told me that I cannot work in two departments
25  and that never came up as until October 6th.  He

One Penn Plaza, NYC                    Toby Feldman, Inc.                    tel (212) 244.3990
email@tobyfeldman.com    NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS    tel (800) 246.4950

Eva Siu-San Lee                                                           11/13/2007

Page 62

EVA SIU-SAN LEE

1               EVA SIU-SAN LEE
2 told me that now that I hold a union card I
3 cannot work. What is a general shape? It's open
4 to general public, right? Anyone -- I couldn't
5 shape. I wouldn't be able to allow -- I wouldn't
6 be allowed to sign the shape sheet.
7         After I signed the shape sheet you
8 tell me I cannot work?
9     Q.    The shape sheet at the pressroom?
10     A.    Yes.
11     Q.    At the pressroom at The Post?
12     A.    (Indicating.)
13     Q.    So he told you that you couldn't
14 sign the -- that you couldn't work because you
15 had a mailer's card and you don't believe that
16 because it's a general shape?
17     A.    Yes. I was allowed to -- if it is
18 why didn't you stop me from signing the shape
19 sheet?
20     Q.    Do you have any reason to believe
21 that they knew that you had a mailers card?
22     A.    They knew, yes. I work in the
23 mailroom and they know that also.
24     Q.    Okay.
25     So in September he told you you

Page 63

EVA SIU-SAN LEE

1               EVA SIU-SAN LEE
2 couldn't work in the pressroom because you can't
3 work in two departments?
4     A.    Yes.
5     MS. EISNER: Let her finish her
6 question.
7     THE WITNESS: Okay.
8
9 BY MS. GOLDSMITH:
10     Q.    And you don't believe that to be
11 true because other people work in other -- I'm
12 sorry. Scratch that.
13     You don't believe that because of
14 the shape list and that you signed -- you've been
15 signing the shape list, is that correct?
16     A.    Yes.
17     Q.    Do you -- what basis do you have
18 to believe that it's because of your gender,
19 because you're a woman?
20     A.    I'm not the only one who is
21 working in two departments. There is other males
22 that work in two departments also.
23     Q.    Okay.
24     And besides the other men working
25 in two departments, and we're going to talk about

Page 64

EVA SIU-SAN LEE

1               EVA SIU-SAN LEE
2 that, but besides that is there any other reason
3 why you believe that you were told you couldn't
4 work in the pressroom because you're a woman?
5 I'm going to have to ask you to answer the
6 question.
7     A.    I'm trying to, yes. I'm trying to
8 think.
9     Q.    Well, you brought this lawsuit.
10 This lawsuit was filed in July, so you've had a
11 lot of time to think about your claims.
12     A.    Yes, okay, but --
13     Q.    So you either know -- you either
14 have a reason to believe that he discriminated
15 against you because you're a woman or you don't
16 and you said you do because of other people on
17 the list.
18     A.    Okay.
19     Q.    And I'm saying besides the other
20 people is there any other reason to believe that
21 it's because you're a woman that Ray Walsh told
22 you you can't work in the pressroom?
23     MS. EISNER: Careful.
24     Do you understand the question?
25     THE WITNESS: Can you -- I was

Page 65

EVA SIU-SAN LEE

1               EVA SIU-SAN LEE
2 going to ask her to --
3     MS. GOLDSMITH: I'm going to ask --
4 I'm sorry. I told her in the beginning of the
5 deposition if she doesn't understand the question
6 she should ask me. I can't have you coaching her
7 to do that.
8
9 BY MS. GOLDSMITH:
10     Q.    Ms. Lee, this is -- we're getting
11 at the crux of your lawsuit. If you can't think
12 of a reason then I'm not really sure why we're
13 here.
14     A.    I'm trying to think.
15     Q.    It's either -- is it more than
16 other people?
17     A.    Is it more than other people?
18 What do you mean by that?
19     Q.    Is there a reason besides the
20 fact -- I asked you why did Ray Walsh tell you
21 you can't work in the pressroom? You said it's
22 because you can't work in two departments and you
23 have a union card with the mailers. Then I said
24 is there any reason to believe that it's because
25 you're a woman? And you said yes, because of the

17 (Pages 62 to 65)

Eva Siu-San Lee                                          11/13/2007

Page 66

EVA SIU-SAN LEE
1
2  way other -- because there are men that are
3  allowed to work in two departments.
4      A.   Uh-huh.
5      Q.   Is there any other reason that you
6  believe that it's because you're a woman, that
7  supports your claim that it's because you're a
8  woman?
9      A.   Besides --
10     Q.   Besides the other people and I'm
11 going to ask you questions about it so you have
12 to be honest.
13     A.   Yes, I will be honest.
14     Q.   Do you have any other reasons?
15     A.   I don't think so.
16     Q.   Yes or no?
17     A.   I think that's a no.
18     Q.   Okay.
19          Let's talk about these other
20 people.
21          Oh, before I go there did Ray --
22     A.   Wait. Wait. Wait. Can you slow
23 down a little bit?
24     Q.   Yes.
25     A.   You're talking too fast.

Page 67

EVA SIU-SAN LEE
1
2      Q.   Yes, that's a New Yorker thing.
3          Did Ray ever tell you that you
4  can't work in the pressroom because you're a
5  woman?
6      A.   No.
7      Q.   Did anyone ever tell you that?
8      A.   No.
9      Q.   Do you have any documents that say
10 that you can't work in the pressroom because
11 you're a woman?
12     A.   I don't have any document.
13     Q.   So it's just your subjective
14 belief and these other people that work in the
15 mailroom and the pressroom?
16     A.   Yes.
17     Q.   Okay.
18          Who are these other people?
19     A.   Other people as to?
20     Q.   You said there are other people,
21 there are other people that get to work in the
22 mailroom and the pressroom.
23     A.   In two department.
24     Q.   When you say two departments those
25 aren't the two departments you're talking about?

Page 68

EVA SIU-SAN LEE
1
2      A.   There's different departments.
3      Q.   Okay.
4          You said -- what are the two
5  departments that you're talking about?
6      A.   Paper handler and the pressroom.
7      Q.   So, okay, you want to work in the
8  pressroom and the mailroom, is that correct?
9      A.   I want to work in -- can you
10 please say that again?
11     Q.   We've been talking about that you
12 weren't allowed to work in the pressroom. You
13 were told by Ray Walsh you weren't allowed to
14 work in the pressroom?
15     A.   Yes.
16     Q.   And it's because -- you said it's
17 because you have -- you work in the mailroom and
18 you have a union card with the mailroom?
19     A.   Yes.
20     Q.   Right?
21     A.   (Indicating.)
22     Q.   And then you said there are other
23 people that get to work in two departments?
24     A.   Yes.
25     Q.   Are there other people that work

Page 69

EVA SIU-SAN LEE
1
2  in the mailroom and the pressroom?
3      A.   To what I know of back in 2004 I
4  don't think I know of any, but 2005 I know Todd
5  Carroll.
6      Q.   Anyone besides Todd Carroll?
7      A.   I'm not sure if Chris Sullivan,
8  I'm not sure of Chris Sullivan. I'm not sure.
9      Q.   Todd Carroll and Chris Sullivan?
10     A.   Yes.
11     Q.   Okay.
12          Todd Carroll, what two -- he works
13 in the mailroom and the pressroom?
14     A.   Yes.
15     Q.   And does he have -- is he a member
16 of a union?
17     A.   Yes.
18     Q.   What union is he a member of?
19     A.   Mailer Union Number 6.
20     Q.   And how do you know that?
21     A.   He works with me at The Times.
22 He's a -- he's a sub at The Times.
23     Q.   And he works in the mailroom at
24 The Post?
25     A.   Yes.

One Penn Plaza, NYC                Toby Feldman, Inc.                tel (212) 244.3990
email@tobyfeldman.com    NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS    tel (800) 246.4950

Eva Siu-San Lee                                                11/13/2007

Page 74

EVA SIU-SAN LEE
1
2    Q.    And you have -- we established
3    right at the beginning of the deposition that you
4    have since 2004, you've worked in both
5    departments?
6    A.    Yes.
7    Q.    So if you -- if you were told that
8    you can't work in two departments, but you
9    currently do work in two departments --
10   A.    Uh-huh.
11   Q.    -- then how did you -- and you've
12   been a woman that whole time, correct?
13   A.    Uh-huh.
14   Q.    So how did you --
15   A.    Joe Vincent.
16   Q.    Joe Vincent.  Joe Vincent allowed
17   you to --
18        MS. EISNER:  I'm sorry, let her
19   finish her questions.
20   Q.    Let me finish my questions.
21        MS. EISNER:  And I'm just going to
22   ask that you let her finish her answers.
23        MS. GOLDSMITH:  Okay.
24        THE WITNESS:  Okay.
25   A.    Finish your question first.

Page 75

EVA SIU-SAN LEE
1
2
3    BY MS. GOLDSMITH:
4    Q.    I'm curious because you're
5    claiming that you were discriminated against by
6    not being able to work in two departments because
7    you're a woman, but yet you do work now, you're
8    admitting that you do work in two departments,
9    right?
10   A.    Yes.
11   Q.    And you're a woman?
12   A.    (Indicating.)
13   Q.    So I want to know how is that that
14   you're able to work in two departments?
15   A.    After that time where I wasn't
16   hired --
17   Q.    What time is that?
18   A.    October 6th.  Sorry, 2004.
19   Q.    Okay.
20   A.    I believe.  Let's see.  I
21   believe -- I forgot who Joe Vincent say this to,
22   was it me or was it to someone else, but he said
23   that there is a policy for no working in two
24   department and I told him that, I believe, let's
25   see, I'm trying to recall that right now, okay.

Page 76

EVA SIU-SAN LEE
1
2    He said that there is a policy for not working in
3    two department and he is not going to enforce it
4    at that time because I believe, I'm not sure was
5    it me that told him that there is other people
6    that who works in two department or I'm not sure
7    was it me that who said it right now.  I'm trying
8    to think.  I'm trying to recall that right now.
9    Q.    Okay.
10        So Joe Vincent told you that there
11   was this rule you can't work in two departments?
12   A.    It wasn't -- I believe I asked him
13   and it wasn't in writing.  That's what they told
14   me and he told me that, I believe that he said
15   that he wasn't going to enforce it.
16   Q.    So he said it was a rule, but he
17   wasn't going to enforce it against you?
18   A.    Not only to me, to everybody.
19   Q.    And when did he say that to you?
20   A.    Somewhere in 2004.
21   Q.    And was anyone else there for that
22   conversation?
23   A.    I don't recall was it me having
24   that conversation with him.  I never met Joe
25   Vincent even though it would happen on the form I

Page 77

EVA SIU-SAN LEE
1
2    don't recall --
3    Q.    So you don't -- so this whole
4    conversation that you just relayed to me, you
5    don't remember if you even had it?
6    A.    I remember.  Exactly who told me,
7    I'm not sure was it Wayne Mitchell.
8    Q.    Wayne Mitchell told you what?
9    A.    That -- I believe, okay?  I'm not
10   too sure on that.  I believe I called up Wayne
11   Mitchell and Wayne Mitchell was supposed to
12   clarify things for me because I was not hired in
13   October 6th of 2004 and he contacted Joe Vincent
14   and he told Joe Vincent -- Joe Vincent told Wayne
15   Mitchell that there is a rule that you cannot
16   work in two department and, but he is not going
17   to enforce it at the time.
18   Q.    Okay.
19        So Joe Vincent told Wayne Mitchell
20   who told you --
21   A.    Yes.
22   Q.    -- that there is a rule?
23   A.    (Indicating.)
24   Q.    Did you have any reason to believe
25   there wasn't a rule?

20 (Pages 74 to 77)

Eva Siu-San Lee                                                                11/13/2007

Page 78

1                EVA SIU-SAN LEE
2       A.      No.
3       Q.      So you believe Joe Vincent there
4   was a rule, but he wasn't going to enforce it?
5       A.      Can you please rephrase that?
6       Q.      You said Joe Vincent said, and
7   you've said this several times, that there was a
8   rule that you can't work in two departments?
9       A.      (Indicating.)
10      Q.      And did you have any reason not to
11  believe Joe, that that was -- that there was that
12  rule?
13      A.      Any reason?  They didn't specify
14  which two department.  You have other employees
15  working in two department.
16      Q.      Right.  We just talked about the
17  other employees working in two departments, but
18  I'm asking you if you didn't -- why you didn't
19  believe Joe Vincent, that that was a rule?
20      A.      If that was a rule why would other
21  people be doing it, right?
22      Q.      Okay.
23              So it's besides the way that other
24  people were treated.
25              Any other reason not to believe

Page 79

1                EVA SIU-SAN LEE
2   him?
3       A.      No.
4       Q.      Do you have any reason to believe
5   that Joe Vincent would not want you to work in
6   two departments because you're a woman?
7       A.      I don't think so.
8       Q.      Again, yes or no?
9       A.      No.
10      Q.      Did you believe Wayne Mitchell
11  when he told you that there was a rule against
12  working in two departments, but that it wasn't
13  going to be enforced?
14      A.      Can you please say that again
15  because --
16      Q.      You said that Wayne Mitchell told
17  you there is a rule that you can't work in two
18  departments?
19      A.      Uh-huh.
20      Q.      But it's not going to be enforced?
21      A.      Yes.
22      Q.      Wayne Mitchell said this to you.
23              Did you believe him?
24      A.      Yes.
25      Q.      So you believed that the rule was

Page 80

1   that there was two -- you believed that the
2   reason you weren't being allowed to work in two
3   departments is because there is a rule?
4           MS. EISNER:  Objection.
5       A.      But --
6           MS. EISNER:  Answer if you can.
7       A.      If there is a rule how come others
8   are doing it and nothing is said?
9       Q.      How do you know nothing is said?
10      A.      They were still working and I
11  wasn't.
12      Q.      Okay.
13              So -- but besides the other people
14  is there any other reason to think that there
15  wasn't a rule?
16      A.      No.
17      Q.      Okay.
18              Let's get back to -- you mentioned
19  Todd Carroll?
20      A.      Yes.
21      Q.      Do you -- are you friends with
22  Todd Carroll?
23      A.      What is the definition of friend?
24      Q.      All right.  Never mind.

Page 81

1                EVA SIU-SAN LEE
2               Do you -- did you ever talk to him
3   about his working in both, in the mailers and the
4   pressroom, the mailroom and the pressroom at The
5   Post?
6       A.      Talking?
7       Q.      Did you ever talk to him about how
8   he works at the mailroom and at the pressroom?
9       A.      How?  What do you mean by how
10  first?  Like --
11      Q.      Well, you said there was a rule.
12  Did you ever talk to him about how he's allowed
13  to work in two departments?
14      A.      No, don't think so.
15      Q.      You never talked to him?
16      A.      No.
17      Q.      So you don't know if he's gotten
18  permission to work in two departments?
19      A.      I don't know.
20      Q.      Do you know anything about the
21  details of how he's able to work in two
22  departments?
23      A.      What kind of details?  Shaping.
24  He shapes for both department, the department, do
25      Q.      And what about Chris Sullivan, do

21 (Pages 78 to 81)

Eva Siu-San Lee                                      11/13/2007

Page 82

                EVA SIU-SAN LEE
1
2    you know -- you said you're not really sure if he
3    works in two departments?
4        A.    I'm not really sure that he work
5    the press, but -- but he mentioned it.
6        Q.    And when did he mention it?
7        A.    That was before I started shaping
8    in the press, before I started shaping the press.
9        Q.    And when did -- I'm sorry.
10            And what did he say?
11        A.    I think one day we were at The
12    Times parking lot.  He said that he worked at The
13    Post pressroom.  He mentioned it.
14        Q.    Just you and him were in the
15    parking lot?
16        A.    I don't recall who else was there.
17        Q.    Were there other people there?
18        A.    I don't know.
19        Q.    He said he worked at The Post, at
20    The Post pressroom?
21        A.    Yes.
22        Q.    Did he say how he was able to work
23    at The Post pressroom?
24        A.    I didn't ask because it didn't pay
25    my mind that day.  I didn't pay attention to it

Page 83

                EVA SIU-SAN LEE
1
2    because I know nothing of The Post Pressroom.  I
3    just didn't pay attention.
4        Q.    So you didn't know how he was able
5    to work in both?
6        A.    No.
7        Q.    Okay.
8            Did you -- when you were told that
9    you weren't allowed to work in the pressroom by
10    Ray Walsh --
11        A.    Uh-huh.
12        Q.    -- did you tell him that other
13    people worked there?
14        A.    Work in --
15        Q.    Other people work in two
16    departments, did you tell him that?
17        A.    That, when I was told by Ray that,
18    no.  That -- I don't think so.
19        Q.    You didn't tell him.
20        MS. GOLDSMITH:  Okay.
21            At this time I'd like to introduce
22    Lee Exhibit 1.
23            (Whereupon, one-page document on
24    New York Post letterhead from Joseph B. Vincent
25    to Ms. Eva Lee, bearing Bates stamp NYP 00085, is

Page 84

                EVA SIU-SAN LEE
1
2    received and marked as Lee Exhibit 1 for
3    Identification.)
4        COURT REPORTER:  Number 1.
5        MS. EISNER:  Just so you know
6    Mr. Frank is on his way.  I don't know if you want
7    to leave his name downstairs or he can just check
8    in and he'll call you.
9        MS. GOLDSMITH:  Let's go off the
10    record.
11            (Whereupon, a discussion is held
12    off the record.)
13        MS. GOLDSMITH:  Let's go back on
14    the record.
15        A.    (Reviews.)
16
17    BY MS. GOLDSMITH:
18        Q.    Have you seen this document
19    before?
20        A.    Yes.
21        Q.    And when did you see it?
22        A.    I got it in the mail.
23        Q.    And is this, what you're looking
24    at, is this an accurate copy of the document that
25    you received in the mail?

Page 85

                EVA SIU-SAN LEE
1
2        A.    Yes.
3        Q.    And do you know why you got this
4    letter from Joe Vincent?
5        A.    No, no.
6        Q.    No, you don't know.
7            Well, let's look at this letter.
8            According to this letter if you
9    look at the last paragraph it says you have a
10    unique opportunity to work in two operational
11    departments?
12        A.    (Reviews.)
13        Q.    Do you know what he means by that?
14        A.    I am not an exception.
15        Q.    An exception?
16        A.    To work in two department.
17        Q.    Okay.
18            Do you have any reason to believe
19    that that's not true?
20        A.    I am not -- yes.
21        Q.    And --
22        A.    I would say yes.
23        Q.    You are an exception?
24        A.    I am not an exception.
25        Q.    And why -- so why do you think

22 (Pages 82 to 85)

Page 86

EVA SIU-SAN LEE

1
2  that Joe Vincent is not being honest in this
3  letter?
4       A.   How am I an exception if others
5  are working in two department?
6       Q.   So because there's these two
7  others you don't feel that you're --
8       A.   No.  About Steve Ruiz.
9       Q.   Steve Ruiz?  He also works in two
10 departments?
11      A.   Yes.
12      Q.   Okay.
13           Is there anyone else?
14      A.   I just -- I just remembered that,
15 Steve Ruiz, R-u-i-z.
16      Q.   Okay.
17           And is Steve -- what position is
18 Steve Ruiz?
19      A.   He is a shaper in the pressroom
20 and a shaper at the mailroom.
21      Q.   And how do you know?
22      A.   I work in the mailroom.  I see him
23 working in the mailroom.  When I work in the
24 pressroom I seen him working in the pressroom.
25      Q.   Since when?

Page 87

EVA SIU-SAN LEE

1
2       A.   I think he started -- I'm not
3  sure.  I think he started shaping some time of
4  2006.
5       Q.   Shaping where?
6       A.   I think he started shaping press
7  and mailroom, press and mailroom.
8       Q.   He started shaping in both the
9  press and the mailroom in 2006?
10      A.   Yes.
11      Q.   Steve Ruiz is a member of the
12 union?
13      A.   No.
14      Q.   He's not a union member?
15      A.   No.
16      Q.   Okay.  Okay.
17           Besides Steve Ruiz, Todd Carroll,
18 Chris Sullivan, the fact that you believed that
19 they're allowed to work in two departments, do
20 you have any other reason to believe that Joe
21 Vincent is not being honest when he says that
22 you're being extended a unique opportunity to
23 work in two departments?
24      A.   Can you slow down and say that
25 again?  Slow down a bit.  You're talking a little

Page 88

EVA SIU-SAN LEE

1
2  too fast.
3       Q.   Okay.
4           You mentioned Todd Carroll.
5       A.   Uh-huh.
6       Q.   Chris Sullivan, Steve Ruiz, these
7  are the people that you believe are working in
8  two departments?
9       A.   Two department between mailroom
10 and --
11      Q.   And mailroom and pressroom?
12      A.   There's also other employees that
13 work in paper handler and pressroom also.
14      Q.   Paper handler and pressroom?
15      A.   Yes.
16      Q.   And who are those employees?
17      A.   Phil Anzalone.  When we started
18 shaping he worked the pressroom, I believe he
19 worked in the pressroom first and he also worked
20 in the paper handler at certain times.
21      Q.   Anyone else?
22      A.   Apolinar Figueroa.  I think that's
23 how he pronounce his last name.
24      Q.   Okay.
25      A.   Also in paper handler and

Page 89

EVA SIU-SAN LEE

1
2  pressroom.  Who else now?  And I want to add
3  mailroom and pressroom.  Jeff Pochter worked in
4  the mailroom and pressroom also and Dwayne Rivera
5  has worked in mailroom, pressroom and paper
6  handler.
7       Q.   Okay.
8           So Phil Anzalone, you said he
9  works in the pressroom and the paper handlers?
10      A.   Yes.
11      Q.   And since -- and when did he begin
12 working in both?
13      A.   2004.
14      Q.   2004 in the -- sorry, Post
15 pressroom and The Post paper handlers?
16      A.   Yes.  I would say so, yes.
17      Q.   Do you know, does Phil Anzalone
18 have a union card?
19      A.   Right now he has a union card with
20 the pressroom.
21      Q.   And do you know when he got that
22 union card?
23      A.   June of '05, the cycle ending from
24 January '05 to June of '05.  I believe that's
25 when he got his union card.

23 (Pages 86 to 89)

Eva Siu-San Lee                                    11/13/2007

Page 90

EVA SIU-SAN LEE
1
2      Q.     Okay.
3             So somewhere between January and
4  June?
5      A.     You have to make a hundred and ten
6  shift for the union at that time for the union
7  card.  He made it between January '05 to June of
8  '05 and I believe he was sworn in somewhere
9  there.  I don't know.
10     Q.     Okay.
11            After he made it in June '05
12 around then he worked, he still worked in the
13 paper handlers?
14     A.     I don't think so because --
15     Q.     So after he worked in the union
16 card he didn't work in the paper handlers?
17     A.     I don't think so.
18     Q.     Okay.
19            What about Apolinar --
20     A.     Apolinar.
21     Q.     Is that the guy they called
22 Junior?
23     A.     Yes.
24     Q.     Okay.
25            So we'll call him Junior since we

Page 91

EVA SIU-SAN LEE
1
2  all know who that is.
3            MS. EISNER:  That's easier to
4  pronounce.
5            MS. GOLDSMITH:  Yeah.
6
7  BY MS. GOLDSMITH:
8      Q.     You're saying that he worked in
9  the pressroom and in the paper handlers?
10     A.     Yes.
11     Q.     And when did he start working in
12 both?
13     A.     I'm not sure because he, he was
14 there before me.
15     Q.     He was there before you.
16            So you don't know when he started
17 working?
18     A.     I don't know when he started.  I'm
19 not too sure, but --
20     Q.     And do you know when he -- is he a
21 member of a union?
22     A.     Right now, yes, he belongs to the
23 pressroom.
24     Q.     And when did he get the Pressmens
25 Union card?

Page 92

EVA SIU-SAN LEE
1
2      A.     I believe it is the cycle of June
3  to December of '05 I believe.
4      Q.     Okay.
5             And after December '05 do you know
6  if he worked in the paper handlers?
7      A.     I don't know.
8      Q.     You don't know?
9      A.     I don't know.
10     Q.     Do you have any basis to believe
11 he did?
12     A.     I don't think so.
13     Q.     Okay.
14            Jeff Pochter was the other person
15 you mentioned, right?
16     A.     Yes.
17     Q.     And he worked in the mailroom and
18 the pressroom?
19     A.     Yes.
20     Q.     And when did he start working in
21 both?
22     A.     I think he started out in the
23 pressroom, but I don't know when because he came
24 before me exactly.
25     Q.     He is another one who came before

Page 93

EVA SIU-SAN LEE
1
2  you?
3      A.     Yes.
4      Q.     And when did he start working in
5  the mailroom?
6      A.     I believe '05.  I believe it's
7  '05.  I believe the last couple of months of '05.
8      Q.     And is he a member of a union?
9      A.     Right now, yes.  He is a union of
10 the pressmen.
11     Q.     And when did he become a member of
12 the Pressmens Union?
13     A.     The cycle of June to December of
14 '05 I believe.
15     Q.     Okay.
16            And after December 2005 do you
17 have any knowledge of him working in the
18 mailroom?
19     A.     I don't have any knowledge.
20     Q.     Do you believe that he does work
21 in the mailroom after 2005?
22     A.     I don't think so.
23     Q.     Okay.
24            Dwayne Rivera, that was the other
25 person, the last person that you mentioned?

24 (Pages 90 to 93)

Eva Siu-San Lee
11/13/2007

Page 94

1              EVA SIU-SAN LEE
2        A.    Yes.
3        Q.    He works in both the mailroom and
4  the pressroom?
5        A.    And he worked in the paper
6  handler.
7        Q.    And the paper handlers?
8        A.    Yes.
9        Q.    Okay.
10             So when did he start working in
11  the mailroom?
12       A.    I think '06.
13       Q.    And what about the pressroom?
14       A.    I think '03. I'm not too sure.
15  He came before me. I think '03.
16       Q.    And what about the paper handlers?
17       A.    I think he started '06 too. '06
18  somewhere.
19       Q.    And is he a member of a union?
20       A.    No.
21       Q.    Okay.
22             So now have you told me now all of
23  the people that you believe that are working in
24  two departments?
25       A.    What was the question?

Page 95

1              EVA SIU-SAN LEE
2        Q.    Okay.
3        MR. LIPPNER: Could you read it
4  back?
5             (Whereupon, the requested portion
6  is read back by the reporter as follows:
7             "QUESTION: Okay.
8             "So now have you told me now all
9  of the people that you believe that are working
10  in two departments?")
11       A.    I'm still trying to think to see
12  if --
13
14  BY MS. GOLDSMITH:
15       Q.    All right.
16             Well, you've had, you know, you
17  filed an EEOC charge in 2006. So you've had
18  some, a lot of time to think about this.
19       A.    Yes.
20       Q.    So again this is your day to get
21  it out.
22       A.    All right. All right. All right.
23  There's another person who works between the
24  mailroom --
25       Q.    And I'm not saying you need to

Page 96

1              EVA SIU-SAN LEE
2  name every --
3        A.    No. I know.
4        MS. EISNER: I think that's what
5  she thinks.
6        MS. GOLDSMITH: Well, she has to
7  name everyone who she believes is in support of
8  her lawsuit.
9
10  BY MS. GOLDSMITH:
11       Q.    But, you know --
12       A.    Okay.
13       Q.    And your lawsuit is that you're
14  discriminated against because you're a woman.
15       A.    Yes.
16       Q.    So anything that supports that
17  claim.
18       A.    Okay.
19             Also there's this person named, I
20  believe his name is Anthony, I'm not sure. He
21  works in engineer and he is also a sub -- I think
22  he holds, I think he holds a union card -- in the
23  engineer department. I'm not -- he works in one
24  of them, but I'm not sure which one and he is a
25  sub. He was in the Mailers Union.

Page 97

1              EVA SIU-SAN LEE
2        MS. GOLDSMITH: Okay.
3        Q.    Anyone else?
4        A.    I don't think so right now.
5        Q.    Are you claiming that anyone at
6  The Post has made -- in the management at The
7  Post has said --
8        A.    Wait. Wait. Wait. Wait. I just
9  thought of another one. John Smith.
10       Q.    John Smith?
11       A.    Yes. He worked in drivers and
12  pressroom.
13       Q.    When?
14       A.    I would say '04. I would say '04.
15       Q.    And does he have a union card?
16       A.    I don't think so. I don't think
17  so.
18       Q.    Okay.
19             Anyone else?
20       A.    Not right now.
21       Q.    Okay.
22             What I was saying before was have
23  you ever heard of anyone in Post management say
24  anything derogatory towards you?
25       A.    What does that word mean? Can --

25 (Pages 94 to 97)

One Penn Plaza, NYC
email@tobyfeldman.com
Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS
tel (212) 244.3990
tel (800) 246.4950

Eva Siu-San Lee                                                         11/13/2007

Page 98

EVA SIU-SAN LEE

1    EVA SIU-SAN LEE
2    Q.    Have you ever had anyone in The
3    Post who is in management at Post, at The Post
4    say anything mean to you based on your being a
5    woman or make fun of you because you're a woman,
6    make a derogatory remark against you because
7    you're a woman?
8        A.    In management?
9    Q.    Yes.
10       A.    I don't think so.  I don't
11   remember.
12   Q.    So no, you haven't, you don't have
13   any recollection --
14       A.    I don't remember right now.
15   Q.    And you're not -- you know, I've
16   reviewed your lawsuit and your EEOC documents.
17   You didn't mention it there.  In any of those
18   documents you didn't mention anyone saying
19   anything derogatory to you, is that correct?
20       A.    I think so.  I think that's
21   correct.
22   Q.    I'm sorry.  You didn't -- you
23   didn't say in any of these documents that anyone
24   was making fun of you because you're a woman?
25       A.    (Indicating.)

Page 99

1    EVA SIU-SAN LEE
2    Q.    Said mean things to you because
3    you're a woman?
4        A.    I don't think anybody has said
5    anything to me like that.
6    Q.    Okay.
7        So you're not -- you're not
8    claiming in this lawsuit that anyone said
9    anything to you mean --
10       A.    Yes.
11   Q.    -- because you're a woman?
12       A.    Yes.
13   Q.    Yes, you're not?
14       A.    Yes, I'm not.
15   Q.    Okay.  Okay.
16       Back to this Joe Vincent letter,
17   besides these other people that you believe are
18   doing it, is there any other reason to believe
19   that Joe would be lying when he said you were
20   having a unique experience, unique opportunity?
21       A.    I don't think so.
22   Q.    Okay.
23       This letter says that you -- that
24   the purpose of the casual list in the pressroom
25   is to create a system for people to get into the

Page 100

1    EVA SIU-SAN LEE
2    pressmen union.
3        Is that your understanding?
4        A.    Yes.  I think so yes.
5    Q.    Getting back to Ray Walsh, besides
6    his not allowing you to work in the mailroom, in
7    the pressroom, I'm sorry, in 2004 --
8        A.    Uh-huh.
9    Q.    -- any other basis to believe that
10   he discriminated against you because you're a
11   woman?
12       A.    Yes.
13   Q.    And what is that?
14       A.    I requested for time off and he
15   said that I was refusing work.
16   Q.    And when did that happen?
17       A.    2005.  I believe it's -- I went to
18   him March of 2005 and I told him I needed a week
19   off in April.  I did not have anyone to watch my
20   daughter and my son.
21   Q.    And he --
22       A.    He approved it at that time.
23   Q.    Okay.
24       A.    I told him I can come in and sign
25   the sheet, but I can't work and he said okay.

Page 101

1    EVA SIU-SAN LEE
2        A week before that I was supposed
3    to come in and sign only, I reminded him and he
4    told me that that is refusing work.
5    Q.    And so when he told you that was
6    refusing work, that was in 2005?
7        A.    Yes.
8    Q.    And so did you not take vacation?
9        A.    I came -- I did not -- I came in
10   to sign at that time, I did come in to sign and,
11   but at that time when I came in to sign I made
12   sure that there was no work before asking him to
13   sign.
14   Q.    Okay.
15       So you still did what you were
16   planning to do?
17       A.    No, I signed.  No, I did --
18   Q.    Oh, you were planning not to sign?
19       A.    I was planning to sign and not
20   work, but I was planning to sign and not work,
21   but if there is work I didn't come those days.
22   If I knew that there was work I wouldn't come in
23   that week.
24   Q.    Okay.
25       Do you have any -- and what makes

One Penn Plaza, NYC                          Toby Feldman, Inc.                    tel (212) 244.3990
email@tobyfeldman.com        NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS        tel (800) 246.4950

Eva Siu-San Lee                                                11/13/2007

Page 102

EVA SIU-SAN LEE
1
2  you believe that Ray told you you could take it
3  and then said you couldn't do it, you would be
4  marked as refusing work, what makes you believe
5  that he did that because you're a woman?
6        A.    I don't know.
7        Q.    So it's just your subjective
8  belief?
9        A.    Yes.
10       Q.    No facts?
11       A.    No fact. I don't think so.
12       Q.    Okay.
13              Are there any other things that
14  you believe Ray Walsh did against you because
15  you're a woman? Any other ways he discriminated
16  against you because you're a woman?
17       A.    I will say yes.
18       Q.    And what are they?
19       A.    I work in the mailroom and
20  sometimes the night before I come in and shape
21  for the pressroom and we check off for days and
22  sometimes if I'm working in the mailroom I cannot
23  answer the call. I felt bad. I went to Ray one
24  day. I believe it was -- I'm not sure was it '05
25  or '06. I really can't remember, okay? I went

Page 103

EVA SIU-SAN LEE
1
2  to him and I asked him if I don't answer would I
3  be penalized? He said that that was refusing
4  work also.
5        Q.    So you work in the mailroom and
6  you're getting -- you would get a call to work in
7  the pressroom?
8        A.    If I don't answer.
9        Q.    And you don't answer?
10       A.    Yes.
11       Q.    And Ray told you that would be
12  refusing to work?
13       A.    Yes.
14       Q.    And why do you believe that's --
15       A.    He said you checked off the night
16  before.
17       Q.    And why do you believe that's
18  discrimination because you're a woman?
19       A.    Don't we have a choice if we don't
20  answer that why would it be considered refusing
21  work to begin with?
22       Q.    Well, you know that there are
23  rules that govern the shaping procedure, right?
24       A.    Yes.
25       Q.    So if Ray is telling you that this

Page 104

EVA SIU-SAN LEE
1
2  is one of the rules that you have to answer the
3  phone to be available for work, why would you
4  believe that's on the basis of your gender?
5        A.    That same day I went to Brian
6  Walsh with the same question. His answer to me
7  was, okay, that is not considered refusing work.
8  I asked him, but there is only certain amount of
9  times that you can do it or else you will be
10  bumped at the back of the list. That's what he
11  told me.
12       Q.    And who is in charge of the
13  pressroom?
14       A.    Ray Walsh.
15       Q.    So Ray Walsh is ahead of Brian, is
16  that who you said you just asked?
17       A.    Yes.
18       Q.    Okay.
19              Is there any reason to believe
20  that Ray was making you be absent because, was
21  saying to you if you don't answer the phone
22  you're going to be absent, is that -- why do you
23  believe that's because you're a woman?
24              That's what I'm trying to
25  understand.

Page 105

EVA SIU-SAN LEE
1
2        A.    I'm not sure.
3        Q.    So it's just your subjective
4  belief?
5        A.    I will say so.
6        Q.    Okay.
7              Looking back at this Exhibit 1,
8  Mr. Vincent's letter, it says a problem -- in the
9  third paragraph it says you are booking jobs in
10  The Post mailroom and then scratching at the last
11  moment to work in the pressroom, right? That's
12  what it says?
13       A.    Yes.
14       Q.    So would that be an example of you
15  being in the mailroom and getting a call to work
16  in the pressroom and answering the call and then
17  going to work in the pressroom? Is that what he
18  means?
19       A.    Not the call. I would say, I will
20  say as a physical shape at night, but I don't --
21  I don't remember. Do you have the date on that?
22  I don't remember this.
23       Q.    You don't remember what?
24       A.    This says scratching in the
25  mailroom, do you have the date on that date that

27 (Pages 102 to 105)

One Penn Plaza, NYC
email@tobyfeldman.com

Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS

tel (212) 244.3990
tel (800) 246.4950

Eva Siu-San Lee                                                    11/13/2007

Page 106

EVA SIU-SAN LEE
1
2  I scratched in the mailroom?
3      Q.    No, I don't have any dates.  I'm
4  just -- I'm just asking this is what the letter
5  says.
6      A.    Okay.
7      Q.    Do you have a reason to believe
8  that you weren't doing this?
9      A.    I don't recall it.
10     Q.    Were you ever disciplined for
11 doing this?
12     A.    I don't -- I don't remember did I
13 do it.  I was not disciplined for it.
14     Q.    Okay.
15           This is what they call I guess
16 sharpshooting.  He calls this sharpshooting.
17           Have you ever heard that phrase
18 before?
19     A.    Yes.
20     Q.    And what does that phrase mean?
21     A.    Working in two department.
22     Q.    So you are -- you are doing it?
23 You work in two departments, right?
24     A.    Yes, I work in two department.
25     Q.    So you are sharpshooting.

Page 107

EVA SIU-SAN LEE
1
2           Have you ever been disciplined for
3  sharpshooting?
4      A.    No.
5      Q.    Okay.
6      A.    Disciplining means is what Ray
7  Walsh turned me away from October 6th, when he
8  turned me away not hiring, does that consider
9  disciplining me?
10     Q.    2004 you mean?
11     A.    2004, yeah.  Sorry.
12     Q.    Discipline means some kind of
13 punishment for breaking a rule.
14     A.    I did not get to work.  That's
15 considered a punishment, right?  So that would be
16 yes I would say, right?
17     Q.    No, it's the suspension of pay.
18 It's a disciplinary -- it's something that an
19 employer does when the rules are not being
20 followed.  If you're not working there then you
21 can't -- you can't be disciplined because you're
22 not -- you can't not follow the rules.  But we're
23 talking about you not getting work.  That --
24     A.    That is not not getting work.
25 That is being rejected I would say.

Page 108

EVA SIU-SAN LEE
1
2      Q.    Rejected for work?
3      A.    For 2006, that is rejecting me as
4  not getting work.  That is being more of a
5  rejection.
6      Q.    Okay.
7           And this -- wait.  I'm sorry.
8  What are you saying about 2006?
9      A.    No, 2004.  2004.  October 6th.
10     Q.    October 6th, 2004.
11           Any other time that Ray turned you
12 away for work?
13     A.    No.
14     Q.    Okay.
15           MS. GOLDSMITH:  All right.
16           I'd like to introduce Exhibit 2,
17 what I'll have marked as Exhibit 2.
18           (Whereupon, multi page document
19 entitled Agreement By and Between NYP Holdings,
20 Inc. and New York Mailers Union Number 6, bearing
21 Bates stamps 167 through 191, is received and
22 marked as Lee Exhibit 2 for Identification.)
23           COURT REPORTER:  Number 2.
24           THE WITNESS:  Okay.
25     A.    (Reviews.)

Page 109

EVA SIU-SAN LEE
1
2
3  BY MS. GOLDSMITH:
4      Q.    Do you recognize this document?
5      A.    Yes.
6      Q.    And can you identify it?
7      A.    This is the contract between the
8  Mailers Union and The Post.
9      Q.    And you produced this document to
10 The Post as part of this litigation, is that
11 correct?
12     A.    Yes.
13           MS. GOLDSMITH:  I'd like to
14 introduce Lee Exhibit 3 and have that marked.
15           (Whereupon, multi page document,
16 by-laws, bearing Bates stamps 291 through 313, is
17 received and marked as Lee Exhibit 3 for
18 Identification.)
19           COURT REPORTER:  Number 3.
20           THE WITNESS:  Thank you.
21     A.    (Reviews.)
22
23 BY MS. GOLDSMITH:
24     Q.    Do you recognize this document?
25     A.    This is one of the by-laws.  I'm

One Penn Plaza, NYC                          Toby Feldman, Inc.                       tel (212) 244.3990
email@tobyfeldman.com           NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS        tel (800) 246.4950

Eva Siu-San Lee

11/13/2007

Page 118

1                EVA SIU-SAN LEE
2              (Whereupon, multi page document
3    entitled EEOC Affidavit in Rebuttal, bearing
4    Bates stamps 135 through 144, is received and
5    marked as Lee Exhibit 7 for Identification.)
6            COURT REPORTER:  Number 7.
7        A.    (Reviews.)
8
9    BY MS. GOLDSMITH:
10       Q.    Is this the affidavit that you
11   submitted to the EEOC in response to The Post's
12   statement to the EEOC?
13       A.    Yes.
14       Q.    And did anyone assist you in
15   preparing this?
16       A.    Yes.
17       Q.    And who is that?
18       A.    Frank & Associates.
19       Q.    And looking at the last page you
20   swore to this on February 2nd, 2007, is that
21   correct?
22       A.    Yes.
23       Q.    And that's your signature?
24       A.    Yes.
25       Q.    And when you signed it you

Page 119

1                EVA SIU-SAN LEE
2    believed everything in this affidavit to be true?
3        A.    Yes.
4        Q.    And do you still believe it to be
5    true today?
6        A.    I have to make one -- let's see.
7    I saw something.  Yes, I think so.
8        Q.    Did you -- in Exhibit 7 and
9    Exhibit 6, these affidavits, did you review these
10   facts with your attorneys in drafting the
11   affidavits?
12       A.    Yes.
13       Q.    And what did you base -- how did
14   you derive the facts that are put in your
15   affidavits?
16       A.    Can you rephrase that?
17       Q.    The affidavits go back to, and
18   describe incidents in 2004.
19            How did you know -- and they're
20   signed in 2007 or 2006.  So how did you know
21   those incidents?
22       A.    A lot of them I would say from the
23   diary.
24       Q.    From the diary.
25            MS. GOLDSMITH:  Okay.

Page 120

1                EVA SIU-SAN LEE
2              Mark and introduce as Exhibit 8.
3              (Whereupon, multi page document
4    bearing Bates stamps 405 through 559, is received
5    and marked as Lee Exhibit 8 for Identification.)
6            COURT REPORTER:  Number 8.
7        A.    (Reviews.)
8
9    BY MS. GOLDSMITH:
10       Q.    Ms. Lee, is this the -- do you
11   recognize this?
12       A.    Yes.
13       Q.    Can you identify it?
14       A.    This is my diary.
15       Q.    So this is your diary?
16       A.    Yes.
17       Q.    So when you refer today to your
18   diary and earlier you said something about your
19   diary, this is your diary?
20       A.    Yes.
21       Q.    Okay.
22            How did you make this diary?
23       A.    Writing it.
24       Q.    You wrote it on -- you had pads or
25   something?

Page 121

1                EVA SIU-SAN LEE
2        A.    Yes.
3        Q.    And did you write on it every day?
4        A.    Just about almost every day.
5        Q.    And where do you keep it?
6        A.    In my car, at home.
7        Q.    You carry it with you?
8        A.    (Indicating.)
9        Q.    And so every day you would be
10   writing in this?
11       A.    A lot of times, yes.
12       Q.    And how did you get -- what did
13   you base the things that you wrote in here on?
14       A.    Things that happened in The Post.
15   I based everything that happened in The Post.
16       Q.    Things you observed?
17       A.    Yes.
18       Q.    Did anyone help you make this
19   diary?
20       A.    No.
21       Q.    So it's based on your observations
22   and beliefs?
23       A.    Yes.
24       Q.    And is everything in this true and
25   accurate --

31 (Pages 118 to 121)

Eva Siu-San Lee                                                                    11/13/2007

Page 126

EVA SIU-SAN LEE
1
2  in the pressroom?
3       A.    Assignment of work, not that much
4  in the pressroom.
5       Q.    Not that much in the pressroom?
6       A.    Not really, not really in the
7  pressroom assignment of work.
8       Q.    So you were not discriminated
9  against --
10      A.    Because there is no other jobs
11 besides at nighttime being a fly boy.  I would
12 say yes, okay, yes.
13      Q.    Yes, okay what?
14      A.    Yes, in the pressroom and in the
15 mailroom.
16      Q.    And work is assigned by the same
17 person in the pressroom and the mailroom?
18      A.    In the mailroom the mailroom
19 foremens assign and the pressroom the pressroom
20 foremens assign the work.
21      Q.    And you believe that you were
22 discriminated in assignment of work by all of
23 these people?
24      A.    Yes.
25      Q.    Who assigns work in the mailroom?

Page 127

EVA SIU-SAN LEE
1
2       A.    The foremen.
3       Q.    Who?
4       A.    At nighttime mostly is Mike
5  Granito.
6       Q.    Mike Granito.
7            Who else?
8       A.    Who else?
9       Q.    Uh-huh.
10      A.    All foremens gets to assign work
11 to people.
12      Q.    Okay.
13            So let's start this way:  Who do
14 you believe in the mailroom was a foreman who
15 discriminated against you in assignment of work
16 because you're a woman?
17      A.    Mike Granito.
18      Q.    You earlier said that he didn't
19 discriminate against you because you're a woman?
20      A.    Mike Granito I said, yes.
21      Q.    And on what basis do you believe
22 that he denied you work because you're a woman?
23      A.    You mean assignment of work,
24 right?
25      Q.    Yes.

Page 128

EVA SIU-SAN LEE
1
2       A.    He always placed us -- he placed
3  us on the stack downs, my sisters and I.
4       Q.    He always placed you on the stack
5  down?
6       A.    Often, yes.
7       Q.    Often on the stack down?
8       A.    Yeah.
9       Q.    And do you have a reason to
10 believe that you shouldn't be put on the stack
11 down?
12      A.    No.
13      Q.    Any other way that you believe
14 that he discriminated against you?
15      A.    Yes.  Now, that -- after I filed
16 this complaint when he hires, when he calls the
17 shape on certain nights and when he calls the
18 shape he would hire a lot of people behind me
19 before he hires me.
20      Q.    What do you mean behind you?
21      A.    That came after me in the mailroom
22 as an outside card man.
23      Q.    What came after you?  What do you
24 mean?
25      A.    For instance, Richie Frisco, he

Page 129

EVA SIU-SAN LEE
1
2  came last year and shaped and there are a lot of
3  times that he work and I don't work and he only
4  puts in on the weekends.
5       Q.    So you're talking about that he
6  came to work at The Post after you?
7       A.    Yes.
8       Q.    Do you know what position Richie
9  is?
10      A.    Richie?  He is a shaper at The
11 Post.
12      Q.    In the mailroom?
13      A.    Yes.
14      Q.    So you had said that you're an
15 outside cardholder at the mailroom?
16      A.    Yes.
17      Q.    Is there -- do you know how work
18 is assigned among outside cardholders at the
19 mailroom?
20      A.    They say it's how often you shape
21 and they also say --
22      Q.    For the mailroom?
23      A.    Yes, and how long you've been
24 there.
25      Q.    Who is they?

33 (Pages 126 to 129)

One Penn Plaza, NYC
email@tobyfeldman.com
Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS
tel (212) 244.3990
tel (800) 246.4950

Eva Siu-San Lee                                              11/13/2007

---

Page 138

1              EVA SIU-SAN LEE
2    right now.
3         Q.    Well, you know, this is the basis
4    of your lawsuit.
5         A.    I know, but I'm kind of nervous.
6    You have to understand that.
7         Q.    That's fine --
8              MR. FRANK:  Object to -- object to
9    arguing with my client.
10             MS. GOLDSMITH:  I'm not -- I'm not
11   arguing.
12             MR. FRANK:  You're arguing with my
13   client.
14             MS. GOLDSMITH:  Sir, I'm not
15   arguing.  We've been here all morning and you
16   haven't and this has been a repeat --
17             MR. FRANK:  That is really a tough
18   one, I understand that, but you're arguing with my
19   client.  You're trying to convince her that she's
20   doing something wrong because she said she doesn't
21   remember.
22             MS. GOLDSMITH:  No.  I'm trying to
23   show her that this is her day to tell her
24   testimony.
25             MR. FRANK:  She absolutely knows

Page 139

1              EVA SIU-SAN LEE
2    that.  She's not a moron.
3              MS. GOLDSMITH:  Well, I didn't say
4    she was a moron.
5              MR. FRANK:  Well, look, she's not a
6    moron.  She knows what she's here for.  You want
7    to read back the last --
8              MS. GOLDSMITH:  Unbelievable.
9              MR. FRANK:  The last -- yes, I
10   know.  It's the real world.
11             You want to read back, please, the
12   last question that, the last actual question that
13   she asked before she started giving advice?
14             (Whereupon, the requested portion
15   is read back by the reporter as follows:
16             "QUESTION:  Okay.
17             "Besides this that you just
18   described, any other reason to believe that you
19   were discriminated in assigning work in the
20   mailroom because you're a woman?")
21             MR. FRANK:  And was there an answer
22   to that question?
23             THE WITNESS:  I'm trying to think.
24             MR. FRANK:  No.
25             THE WITNESS:  Okay.

Page 140

1              EVA SIU-SAN LEE
2              MR. FRANK:  Was there an answer,
3    please?
4              (Whereupon, the requested portion
5    is read back by the reporter as follows:
6              "ANSWER:  I'm trying to think of
7    that right now.  I don't remember right now.
8    Can't remember right now.")
9              MR. FRANK:  Okay.  There it is.
10             MS. GOLDSMITH:  Okay.
11
12   BY MS. GOLDSMITH:
13        Q.    So let's talk about the pressroom.
14   And if you remember then we'll come back to it.
15        A.    I remember something.  The
16   assignment of work, I want to know, I would say I
17   don't know who is in charge of the hiring.  You
18   have male employees who are outside card men who
19   has been suspended at The Post who still goes to
20   work in front of me and which I have never been
21   suspended at The Post.
22        Q.    Goes to work in front of you
23   where?
24        A.    In the mailroom.
25        Q.    And who is this?

Page 141

1              EVA SIU-SAN LEE
2        A.    I believe Andre Smith has been
3    suspended for one day before.  John Stallworth
4    has been suspended for six weeks, I believe six
5    weeks.  Let's see who else has been suspended.
6    Chris Sullivan, he was suspended before.  I'm
7    going to continue thinking.  It's going to come
8    to me slowly, but I have -- I'm kind of nervous
9    so you have to --
10        Q.    Anyone else?
11        A.    Not right now.
12        Q.    Andre Smith you said?
13        A.    Yes.
14        Q.    How do you know that he was
15   suspended?
16        A.    Because one night everybody
17   worked.  I called him up.  I asked him why wasn't
18   he at work.  He told me Nicky Vazzano said that
19   he was suspended for no call no show for that
20   day, for the previous day that there was a no
21   call no show that he did not -- he called the
22   wrong number -- he was suspended for no call no
23   show for that shift.  That's why they didn't put
24   him to work.  That's what he told me.
25        Q.    That's what he told you?

36 (Pages 138 to 141)

Eva Siu-San Lee                                    11/13/2007

Page 142

                    EVA SIU-SAN LEE
1
2      A.    Yes.
3      Q.    When did he tell you?  Never mind.
4            And do you have any knowledge of a
5  rule, of a rule that if you're suspended you
6  can't be called back to, can't be called to work?
7      A.    You could -- if The Post is saying
8  that they hire by how they perform, how often
9  they show up and how good is your attitude, if I
10 have never been suspended and I perform my work
11 in a satisfactory manner, I would say why would
12 they go ahead of me?
13           MS. GOLDSMITH:  Yeah, I know.
14     Q.    Did anyone at The Post tell you
15 that if you're suspended you can't be called back
16 to work or that it would affect the order in
17 which you're called to work?
18     A.    No.
19     Q.    John Stallworth, how do you know
20 he was suspended?
21     A.    He was suspended for six weeks I
22 believe.  I forgot for what reason.  It was in
23 the office -- it was -- I forgot why was he -- I
24 don't know.  I don't know, but I know he was
25 suspended for six weeks.

Page 143

                    EVA SIU-SAN LEE
1
2      Q.    How do you know?
3      A.    He wasn't able to work for that
4  six weeks.  Actually I think he was suspended
5  for, I'm not sure, making a sexual comment to
6  Danielle, Danielle.
7      Q.    That's what you believe?
8      A.    I believe so.
9      Q.    Do you have any facts to support
10 that he was suspended for that reason?
11     A.    Andre once told me that, Andre
12 Smith once told me that Mike Guzzi said to him
13 that John Stallworth is lucky to even be working
14 here.
15     Q.    Okay.
16           Any firsthand knowledge that he
17 was suspended?
18     A.    That -- no, not --
19     Q.    Just your belief?
20     A.    Yes, that's my knowledge.
21     Q.    And Chris Sullivan?
22     A.    Yes.
23     Q.    How do you know Chris Sullivan was
24 suspended?
25

Page 144

                    EVA SIU-SAN LEE
1
2      A.    He was, he was a no call no show.
3      Q.    I'm sorry?
4      A.    He was suspended because it was --
5  last week or two weeks, it was recently within
6  the past month, okay?  He was booked to work at 9
7  o'clock.  He never showed up and never called in
8  and he was suspended for the next day for one
9  day.
10     Q.    And how do you know that?
11     A.    People talk.
12     Q.    So it's just what you heard?
13     A.    Yes.
14     Q.    Anyone in Post management tell you
15 that?
16     A.    No.
17     Q.    Andre Smith, John Stallworth and
18 Chris Sullivan, those are the three guys we just
19 talked about?
20     A.    Uh-huh.
21     Q.    Do you know what positions they
22 are?
23     A.    Shapers.
24     Q.    Shapers, that's their position?
25     A.    They shape.

Page 145

                    EVA SIU-SAN LEE
1
2      Q.    They shape where?
3      A.    In the mailroom.
4      Q.    And do they have union cards?
5      A.    Yes.
6      Q.    With the mailers?
7      A.    Yes.
8      Q.    And do they work at The Times?
9      A.    Andre and John Stallworth, yes.
10 Chris Sullivan, no.  Used to.  Not anymore.
11     Q.    And is he a member of the union?
12     A.    Yes.
13     Q.    So are they outside cardholders?
14     A.    Yes.
15     Q.    Okay.
16           Any other reason --
17     A.    I'm trying to think.
18     Q.    That's okay.
19           Any other basis for --
20     A.    Not right now.  Not right now.
21     Q.    Okay.  Okay.
22           So now that we've talked about the
23 mailroom, let's move to the pressroom.
24           You claim that you were being
25 discriminated against in assigning work because

                                    37 (Pages 142 to 145)

Eva Siu-San Lee                                        11/13/2007

Page 146

1           EVA SIU-SAN LEE
2   of your gender in the pressroom, is that correct?
3       A.   Yes.
4       Q.   On what basis do you believe that
5   to be the truth?
6       A.   Assignment of work, yes, because
7   if 1, 2 and 3 on the casual list worked the night
8   just, for instance, like say 1, 2 and 3 worked
9   tonight and tomorrow I would be the first one up,
10  all right?  If I am called in first if there are
11  journeymen slots available, if I am called in
12  first why don't I fill in the journeymen slots?
13  It had happened to me that 1, 2 and 3, actually
14  numbers ahead of me work nights and on daytime
15  when I am called in if there is journeymen slots
16  in which there is a different pay scale on that,
17  they would go, Number 1 would be the journeyman
18  and I would stay as a boy.
19      Q.   So you're saying that you should
20  get work ahead of Number 1 and 2?
21      A.   No.  What their shaping procedure
22  is if 1, 2 and 3 worked tonight, the next one to
23  be work in the morning is Number 4.  And if
24  Number 4 is the first one to be called in, I
25  would say, right, why isn't that person the one

Page 147

1           EVA SIU-SAN LEE
2   to go up as a journeyman first?
3       Q.   When do you claim that this
4   happened?
5       A.   It happened in 2005.
6       Q.   When in 2005?
7       A.   I believe, I don't recall
8   much -- no, not -- I don't think -- I don't
9   remember.  I don't remember.  I don't remember.
10      Q.   And any other times that this has
11  happened?
12      A.   That has not -- that has been once
13  or twice -- once I believe and there is times
14  that if 1, 2 and 3 worked that night they would
15  start back at Number 1 and pass by.  And there is
16  another incident that I looked through last night
17  and I saw on my notes, I believe it was -- I'm
18  not sure of the date, I can't remember, March 9th
19  of '05 that 1, 2 and 3 worked days and then 4, 5,
20  6, 7, 8, 9, 10 worked nights.  And then the next
21  day it were assumed to be 1, 2, 3 and then me,
22  Number 11 work on day side.  But no, it was 1, 2
23  and 3 and Number 5 and Number 6, Number 5 and
24  Number 6 worked days instead of me.
25      Q.   And how do you know that?

Page 148

1           EVA SIU-SAN LEE
2       A.   I have it written in my document,
3   my journal in here.
4       Q.   In your diary?
5       A.   Yes.
6       Q.   Can you refer to the page?
7           MR. FRANK:  It's going extremely
8   well.
9           MS. GOLDSMITH:  Yes, I agree.
10
11  BY MS. GOLDSMITH:
12      Q.   March 9th, 2005.
13      A.   Yes.  Oh, right here.
14          MS. EISNER:  The number on the
15  bottom.
16      A.   This right here.
17          MR. FRANK:  What's the number on
18  the bottom?
19      A.   512.
20      Q.   And what does it say on Page 502?
21          MR. FRANK:  512.
22      Q.   512?
23          MS. GOLDSMITH:  Pardon me.
24      A.   1, 2, 3 work days, day.  4, 5, 7,
25  9, 10 work night.  So the next day I should be

Page 149

1           EVA SIU-SAN LEE
2   after 1, 2, 3, but 5, 6 was called in instead.
3       Q.   So on May 9th you should have been
4   called to work, is that what you're saying?  Or
5   May 10th?
6       A.   That is March.
7       Q.   Oh, we're talking about March?
8           And who do you believe should have
9   called you and didn't?
10      A.   Brian Walsh.
11      Q.   And what basis do you have to
12  believe that Brian Walsh didn't call you because
13  you're a woman?
14      A.   Isn't that part of the shaping
15  procedure?
16      Q.   I'm sorry, I'm not sure how that
17  answers my question.
18      A.   I didn't really know how to answer
19  that question.
20      Q.   Well, what number were you on the
21  shape list at that time?
22      A.   Number 11.
23      Q.   Is there anyone below you on the
24  shape list at that time?
25      A.   No.

38 (Pages 146 to 149)

Eva Siu-San Lee                                                                11/13/2007

Page 150

EVA SIU-SAN LEE
2  Q.    So what basis do you have to
3  believe that you weren't not called because you
4  were last on the shape list?
5  A.    I'm last on the shape list, but
6  their rule on the casual hiring list says if 1,
7  2, 3 worked the night they don't go first in the
8  morning.  If you have the casual hiring sheet, I
9  don't know if that's in here somewhere.
10  Q.    How do you know that there was
11  work available?
12  A.    I went in and signed that night on
13  March 9th, the night that the 5, 6 worked before
14  me, I went in and signed.  They signed the shape
15  sheet and I did not.
16  Q.    So if you didn't sign the shape
17  sheet then how were you supposed to get the work?
18  A.    Because they worked and they
19  signed.  When you work you don't have to come
20  back in and shape.  When you work you sign the
21  sheet.  You sign --
22  Q.    Are you claiming for the --
23  MR. FRANK:  Wait, wait.  She didn't
24  finish her answer.
25  A.    I'm saying for the day shift.  If

Page 151

EVA SIU-SAN LEE
2  you work you go in, you sign the payroll and you
3  sign the shape sheet.  If you work days you don't
4  have to come back at night and shape again.
5  When I went in that night, the
6  following night I would say right now, the
7  following night when I went in I saw 5, 6 sign
8  the sheet.
9  Q.    What sheet?
10  A.    The shape sheet and it says W on
11  it meaning work days.
12  Q.    They worked when?
13  A.    March 9th.
14  Q.    During the day?
15  A.    Yes.
16  Q.    And you're claiming they shouldn't
17  have been able to work the next day?
18  A.    I should -- I'm claiming that they
19  should be after me on the next day.
20  Q.    And why is that?
21  A.    On the casual letter it says if --
22  Q.    I'm sorry, you can keep talking.
23  A.    If -- casuals that work night,
24  they go behind -- you can read the letter.
25  Q.    Casuals that work night?

Page 152

EVA SIU-SAN LEE
2  A.    They go after -- if 1, 2, 3 work
3  that night, the next morning they start off at 4
4  instead of 1.
5  Q.    But you said they worked during
6  the day?
7  A.    1, 2, 3 worked during the day, but
8  that night -- for instance, today 1, 2, 3 worked
9  and tonight 4, 5, 6 --
10  MS. GOLDSMITH:  Oh, okay.
11  A.    Today, for instance, today if 1,
12  2, 3 worked and tonight 4, 5, 6 worked tonight,
13  tomorrow it would be 1, 2, 3 and then 7 instead
14  of 1, 2, 3, 4.
15  Q.    Okay.
16  A.    Because Number 7 never worked.
17  Q.    So you're claiming that you were
18  skipped?
19  A.    Yes.
20  Q.    And you believe that's because
21  you're a woman?
22  A.    Yes.
23  Q.    And what basis do you have to
24  believe that it's because you're a woman?
25  MR. FRANK:  Objection as to form.

Page 153

EVA SIU-SAN LEE
2  Can't be answered.
3  Q.    Go ahead and answer it.
4  A.    I don't know.
5  Q.    You don't know.
6  Do you know who was on the list,
7  the casual list at this time?
8  A.    At this time?  Yes.  Brian --
9  MR. FRANK:  Are you talking about
10  now or are you talking about then?
11  Q.    I'm talking about the time that
12  you -- you just described, March 8th, '05.
13  MR. FRANK:  Oh, '05.  Okay.
14  A.    Yes.
15  Q.    Who was on the list?
16  A.    Ronnie Jones, Phil Anzalone, Bill
17  Trank, T-r-a-n-k, Junior, Gashi, Kenny Vaughan,
18  Jeff Pochter, Brian Kelly, Tommy Lew, Dwayne
19  Rivera and Eva Lee.
20  Q.    So on that day 4, 5 and 6 worked
21  on the list, is that what you're saying?
22  A.    That day?  1, 2, 3 worked.
23  Q.    You were skipped?
24  A.    Yes.
25  Q.    Was anyone else skipped?

39 (Pages 150 to 153)

Eva Siu-San Lee                                                        11/13/2007

Page 154

EVA SIU-SAN LEE

1
2      A.    No.
3      Q.    So everybody ahead of you on the
4   list worked?
5      A.    That day?
6      Q.    Yes.
7      A.    Which day? March 9th. Not
8   everybody worked, but what I'm trying to say is
9   that if 1, 2, 3 worked today and tonight 4, 5, 6,
10  7, 10 work the night shift.
11     Q.    Okay.
12     A.    And I am Number 11.
13     Q.    What about 8?
14     A.    He didn't show up.
15     Q.    So he didn't work either?
16     A.    He didn't work because he didn't
17  come in.
18     Q.    And how do you know?
19     A.    How did I know? I was there. He
20  didn't shape. If not, his number would have been
21  in my notes.
22     Q.    So because it's not in your notes?
23     A.    He did not show up.
24     Q.    And your basis is because it's not
25  in your notes?

Page 155

EVA SIU-SAN LEE

1
2      A.    Yes.
3      Q.    And when was he absent? I'm
4   sorry.
5      A.    March 8th he did not come in and
6   sign.
7      Q.    Okay.
8            Besides that incident, any other
9   times that you were discriminated against in
10  assignment of work in the pressroom because
11  you're a woman?
12     A.    Yes.
13     Q.    And when was that?
14     A.    I would say last, no, '06 in
15  December.
16     Q.    Okay.
17           How were you discriminated
18  against?
19     A.    Denied work. Denied work.
20     Q.    What day?
21     A.    I don't have the date. Kenny
22  Vaughan worked seven shift I believe. No union
23  member, journeymen or Junior are allowed to work
24  seven shifts and him as a casual worked seven
25  shifts in December of '06.

Page 156

EVA SIU-SAN LEE

1
2      Q.    And that's how you believe you
3   were discriminated against?
4      A.    If you work seven shift, even
5   provisionals should go ahead of you. I didn't
6   work those shifts that he worked, seven shift,
7   the seven shift.
8      Q.    And so who told you that you
9   should go ahead of him?
10     A.    You are not allowed to work seven
11  shift.
12     Q.    Who told you that?
13     A.    I asked Danny Paulino.
14     Q.    Who is Danny Paulino?
15     A.    Someone in -- someone that works
16  in the pressroom in The Post.
17     Q.    Is he management?
18     A.    No.
19     Q.    Anyone at management tell you that
20  this was the rule?
21     A.    No.
22     Q.    Okay.
23           Besides this -- besides Kenny
24  Vaughan being able to work seven shifts, do you
25  feel that you've been discriminated against in

Page 157

EVA SIU-SAN LEE

1
2   assigning work in the pressroom because you're a
3   woman, any other bases for this belief?
4      A.    Yes. One time I had my son and my
5   daughter with me at the shape and I signed the
6   shape sheet and there was work. I cannot work
7   because I have them with me and I believe it was
8   last year in another incident where John Daniello
9   has a Christmas tree stand, John Daniello, he's
10  a -- no, he's not a casual. He's a provisional.
11  He has a tree stand where he sells Christmas
12  trees and after the shape they gave him an hour
13  and a half to go back to the tree stand before
14  coming back into work. That hour and a half I
15  didn't have to turn down work. If they gave me
16  an hour and a half I would have drove my daughter
17  and my son where they safe. I didn't have
18  to turn down the work. Why --
19     Q.    Did you ask --
20           MR. FRANK: She didn't finish her
21  answer.
22           MS. GOLDSMITH: Oh, my God.
23           MR. FRANK: I'm afraid so. She has
24  to be able to finish her answer.
25           MS. GOLDSMITH: Sir, calm down and

40 (Pages 154 to 157)

One Penn Plaza, NYC
email@tobyfeldman.com

Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS

tel (212) 244.3990
tel (800) 246.4950

Eva Siu-San Lee                                                      11/13/2007

Page 158
```
 1              EVA SIU-SAN LEE
 2  stop yelling at me.
 3          MR. FRANK:  Please, please.
 4          MS. GOLDSMITH:  We were doing just
 5  fine.
 6          MR. FRANK:  Be a professional now.
 7          MS. GOLDSMITH:  You as well.
 8          MR. FRANK:  Try it.
 9          MS. GOLDSMITH:  You try it as
10  well --
11          MR. FRANK:  You might like it.
12          MS. GOLDSMITH:  -- sir.
13      A.    If I was given the time I would
14  have went and drove my son and my daughter to a
15  safe place and came back to work within an hour
16  and a half also.
17
18  BY MS. GOLDSMITH:
19      Q.    Did you ask for permission to
20  leave?
21      A.    No.
22      Q.    Do you know how John Daniello was
23  able to leave?
24      A.    I don't know.
25      Q.    Do you have any reason to believe
```

Page 159
```
 1              EVA SIU-SAN LEE
 2  that he was allowed to leave because he's a man?
 3      A.    Yes, because I wouldn't get that
 4  special treatment.
 5      Q.    And what do you base that on?  How
 6  do you know?
 7      A.    If I would have asked numerous
 8  times Ray Walsh says I was refusing work.  I
 9  wouldn't even dare to ask.
10      Q.    So you never asked?
11      A.    No.
12      Q.    So you just are assuming that you
13  would have been told no?
14      A.    I told -- Steve Mcillinis was the
15  foreman that came down and shaped that night.  I
16  told him I had my son and my daughter.  I can't
17  work.  He did not say anything and I just -- I
18  just -- I told him the reason why I can't work.
19  It was because my son and my daughter was in the
20  car.
21      Q.    Okay.
22          MS. GOLDSMITH:  Maybe now is a good
23  time to break for lunch.
24          MR. FRANK:  Okay by us.
25          MR. LIPPNER:  Come back at 2.
```

Page 160
```
 1              EVA SIU-SAN LEE
 2          MR. FRANK:  2 o'clock is fine.
 3          (Whereupon, the witness is
 4  excused.)
 5          (Whereupon, a luncheon recess is
 6  taken at 1:04 p.m.)
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 161
```
 1              EVA SIU-SAN LEE
 2  A F T E R N O O N   S E S S I O N
 3  (2:09 p.m.)
 4          MS. GOLDSMITH:  Let's go back on
 5  the record.
 6
 7  E V A   S I U - S A N   L E E,
 8  residing at 40-18 247th Street, Little Neck, New
 9  York  11363, having been previously duly sworn or
10  affirmed by a Notary Public within and for the
11  States of New York and New Jersey, resumed and
12  continued to testify further as follows:
13  CONTINUED EXAMINATION BY MS. GOLDSMITH:
14      Q.    So, Ms. Lee, before we took a
15  break for lunch you were telling me about an
16  incident that you had your son and daughter at
17  work?
18      A.    Yes.
19      Q.    Okay.
20          And besides that incident, are
21  there any other incidents that we haven't
22  discussed already where you believe that you were
23  being discriminated against in assignment of work
24  in the pressroom?
25      A.    Yes.
```

41 (Pages 158 to 161)

Eva Siu-San Lee                                        11/13/2007

Page 162

1              EVA SIU-SAN LEE
2       Q.    Okay.
3              When was that?
4       A.    November.  I would say I don't
5  know when exactly the time because this is --
6  this actually between November of '05 I would say
7  to January of '06 where Kenny Vaughan --
8       Q.    This was in that time frame, is
9  that what you're saying?  I'm sorry?
10      A.    I would say never of '05 until
11 January of '06.
12      Q.    Yes.
13      A.    Wait.  Let me quote that.  The
14 night that I had my daughter and my son in the
15 car, that night I asked Steve Mcillinis that
16 night, okay, asked him --
17      Q.    You asked Steve Mcillinis what?
18      A.    Was there a 10 o'clock start.
19             Was there a 10 o'clock start.  It
20 was a Saturday night.  I asked him was there
21 available for 10 o'clock start.
22      Q.    Okay.
23      A.    That gives me time to drive my
24 daughter back and he told me no.
25      Q.    And you just remembered right now

Page 163

1              EVA SIU-SAN LEE
2  that you asked?
3       A.    We were actually in the middle of
4  it earlier and then as I was -- that's where we
5  stopped off where it was, when my son and my
6  daughter --
7       Q.    And you asked him if you could
8  leave and come back?
9       A.    No, I did not ask him can I leave
10 and come back.  I asked him because Saturday
11 nights there is a late press that comes in at 10
12 o'clock.  The shift and the shape starts at 6
13 p.m.  I shaped and there was work.  I asked him
14 that night was there a 10 o'clock spot that was
15 open and he said no.
16      Q.    And you think that was a lie?
17      A.    No, that wasn't a lie.  I did
18 mention that I was able to work and I was willing
19 to work and why was -- why wasn't I given the
20 opportunity to drive my daughter in which John
21 Daniello was given the opportunity to go back to
22 the tree stand?
23      Q.    Okay.  Okay.
24             Now, you were -- before you
25 remembered this after the break you were telling

Page 164

1              EVA SIU-SAN LEE
2  me about November '05 to January '06?
3       A.    Yes.  Right now, yes.  Yes.
4       Q.    Okay.
5              And what -- I asked you if there
6  were any other instances of discrimination --
7       A.    Yes.  I'm not --
8       Q.    You have to let me finish.
9       A.    That letter that's dated, the
10 letter, the casual letter states that you need
11 permission to take long period of time off,
12 right?
13      Q.    Okay.
14      A.    Kenny Vaughan, he left in
15 November, middle of November I would say and he
16 came back in January '06, November of '05 and
17 came back in January of '06 to my memory.  He did
18 not shape at that time and when he came back,
19 when the new casual list came back on, when the
20 new casual list came back on he was back as -- he
21 was up as Number 1.
22      Q.    And he was Number 1 before he
23 left?
24      A.    No, he was not Number 1.  He was
25 Number 2.

Page 165

1              EVA SIU-SAN LEE
2       Q.    And what happened to the Number 1?
3       A.    He made his union card.
4       Q.    And you're saying because Kenny
5  Vaughan left in the middle of November and he
6  didn't come back until January that's the basis
7  for your belief that you're discriminated because
8  you're a woman?
9       A.    That is not -- yes, because it
10 is -- that letter states clearly if you take
11 certain amount of period of time off you have to
12 give notice.
13      Q.    Do you have any evidence that
14 Kenny Vaughan didn't give notice or have
15 permission from the foreman?
16      A.    No.
17      Q.    I'm sorry?
18      A.    No.
19      Q.    Okay.
20             Any other basis to believe that
21 you were discriminated against in the assignment
22 of work in the pressroom because you're a woman?
23      A.    Yes.
24      Q.    And what is that?
25      A.    One day I went in to work and the

42 (Pages 162 to 165)

Eva Siu-San Lee                                                11/13/2007

Page 170

EVA SIU-SAN LEE

1          EVA SIU-SAN LEE
2    today, if I can come back I will come back and
3    shape for the night if there is work available,
4    but you can't.
5          Q.    Who said you can't?
6          A.    I don't know, but that is a good
7    question.
8          Q.    Do you know if there is a place at
9    The Post that you can use soap and wash up?
10         A.    Yes.
11         Q.    Yes, there is a place?
12         A.    Yes.
13         Q.    So on the instance when you got
14   ink on the sheet, is there a reason that you
15   hadn't washed your hands before you signed in the
16   sheet?
17         A.    You can wash up, but I had the
18   white overall on in which it was all inky.
19         Q.    Can you take that off to sign in
20   on the sheet?
21         A.    Yes, but a lot of times when you
22   work, when you sweat if I'm wearing a T-shirt
23   underneath it sees through.  I won't take that
24   off unless I'm going into the ladies room to
25   change.

Page 171

EVA SIU-SAN LEE

1          EVA SIU-SAN LEE
2          Q.    Okay.
3                Are there any other ways that
4    you've been discriminated against in the
5    pressroom on --
6          A.    I'm trying to think right now.
7          Q.    Okay.
8                So take a minute and think of --
9    let's try and think of --
10         A.    Yes, yes.
11         Q.    -- any other reasons.
12         A.    Yes, yes.
13         Q.    Okay.
14         A.    Let's see.  This year I don't
15   recall when.  The night I was working, I was
16   working and certain members of the union were
17   throwing paper all over the press floor for me to
18   pick up plates all over the floor and not placing
19   them neatly intentionally just for me to pick up
20   and have me clean it.  And at that night I made a
21   complaint with the foreman of my press that
22   night.  I told him that what happened and what
23   they were doing to me and --
24         Q.    Certain members of the union were
25   throwing plates on the floor intentionally?

Page 172

EVA SIU-SAN LEE

1          EVA SIU-SAN LEE
2          A.    Intentionally.
3          Q.    How do you know they were
4    intentionally doing this?
5          A.    Usually I would say they put it
6    aside.  That night it was all over the floor.
7    They put it aside in a stack on, at least it's
8    together, not scattered all over the floor and
9    the papers -- the bin is right here and the shoot
10   is here, in the middle there is a little area, a
11   space.  Instead of throwing it in the bin where I
12   could clear the bin or in the shoot it goes down
13   to the bin downstairs, they throw it all over the
14   middle of the floor in the quiet room and I made
15   a comment to the foreman that night.
16         Q.    So these were all union members
17   that were doing this?
18         A.    Yes.
19         Q.    No foremen?
20         A.    No, I told the foreman that what
21   was happening.
22         Q.    What foreman did you complain to?
23         A.    I believe it was John Pearce.  I
24   believe it was John Pearce.  I'm not too sure.  I
25   think it was John Pearce, but I think I have it

Page 173

EVA SIU-SAN LEE

1          EVA SIU-SAN LEE
2    on my notes.  I think it was John Pearce.
3          Q.    And do you know if anything
4    happened to these males that you claim are
5    throwing plates all over the floor?
6          A.    I don't know.
7          Q.    Do you know if they were
8    disciplined?
9          A.    I don't know.
10         Q.    Do you know -- when you complained
11   to John Pearce what did he say?
12         A.    He said okay, he'll take care of
13   it.
14         Q.    And do you know whether he took
15   care of it?
16         A.    I don't know.  The next time I
17   worked that didn't happen.  That's all I can say.
18         Q.    Why do you think that that -- that
19   the union members throwing plates on the floor
20   was because you're a woman?
21         A.    They weren't doing it anywhere
22   else to anyone else.
23         Q.    Any other basis?
24         A.    I don't think so.  I don't think
25   so.

One Penn Plaza, NYC                    Toby Feldman, Inc.                    tel (212) 244.3990
email@tobyfeldman.com       NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS       tel (800) 246.4950