# EXHIBIT 1
# PART 2

Eva Siu-San Lee                                                    11/13/2007

Page 174

EVA SIU-SAN LEE
2  Q.   Just your belief?
3  A.   Yes.
4  Q.   Okay.
5       Did any of the union, the men that
6  were throwing these plates tell you they were
7  doing it because you're a woman?
8  A.   No.
9  Q.   Any other instances that you
10 believe that you were discriminated against in
11 assigning work?
12 A.   I'm trying, I'm trying to think,
13 yeah. I'm trying to think. I don't remember
14 right now, but it is in my notes. I don't
15 remember right now. I can't remember right now.
16 I'm thinking.
17 Q.   Okay.
18      Looking at your complaint Exhibit
19 4, sorry, I apologize.
20 A.   Exhibit 4.
21      MR. FRANK: Here, let me take that
22 aside.
23      THE WITNESS: Okay.
24
25 BY MS. GOLDSMITH:

Page 175

EVA SIU-SAN LEE
2  Q.   You allege on Paragraph 40 --
3       MR. FRANK: 40?
4       MS. GOLDSMITH: 40.
5
6  BY MS. GOLDSMITH:
7  Q.   -- that mail workers were placed
8  ahead of you on the casual list?
9  A.   Yes.
10 Q.   And do you believe that to be a
11 basis of your discrimination claim?
12 A.   No, that is because the casual
13 list came up way before the discrimination case.
14 Q.   Okay. I'm not sure what you mean
15 by that.
16 A.   The casual list came up January of
17 2005. My claim wasn't until 2006.
18 Q.   So you're not claiming that
19 there's discrimination against you on the basis
20 of your being a woman in the casual list?
21 A.   I'm claiming, yes, there is.
22 Q.   How?
23 A.   I am the only female on the casual
24 list and I am the last one on that casual list.
25 Q.   Any other reason?

Page 176

EVA SIU-SAN LEE
2  A.   That's not enough?
3  Q.   Well, it's your lawsuit.
4  A.   Okay.
5  Q.   I just want to know what your
6  reasons are. Is that -- it's because you're the
7  only woman and you're last on the list?
8  A.   Yes.
9  Q.   Okay.
10      Do you know how the list is
11 arrived at?
12 A.   I believe I saw in The Post
13 rebuttal it goes by how often you shape, how well
14 you perform and how good your attitude, and your
15 attitude.
16 Q.   So -- okay.
17      And do you have any basis to
18 believe that that's not the way that you get on
19 the casual list?
20 A.   Yes.
21 Q.   And what's that?
22 A.   I got on it, on that casual list,
23 is because Joe Vincent, I would say because of
24 Joe Vincent saying that he'll put me on the
25 casual list. If not I wouldn't have been on that

Page 177

EVA SIU-SAN LEE
2  casual list.
3  Q.   Why not?
4  A.   Why not?
5  Q.   (Indicating.)
6  A.   They -- they weren't even willing
7  to hire me. Do you think that they would put me
8  on that casual list?
9  Q.   I'm sorry, what -- how -- why do
10 you -- that's really not an answer to my
11 question.
12      Why do you believe that they
13 wouldn't -- that you wouldn't have gotten on the
14 casual list otherwise?
15 A.   I was not even given a chance to
16 work day side as a provisional. I was never
17 called in.
18 Q.   How does a provisional get on the
19 casual list?
20 A.   Like I said earlier, that's what
21 The Post rebuttal says, it's how well you
22 perform, your attendance and your attitude.
23 Q.   Do you have any knowledge of how
24 you get onto the casual list besides The Post
25 rebuttal?

45 (Pages 174 to 177)

One Penn Plaza, NYC
email@tobyfeldman.com

Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS

tel (212) 244.3990
tel (800) 246.4950

Page 178

EVA SIU-SAN LEE

1
2    A.    No, they can pretty much pick
3 anyone they want.
4    Q.    What basis do you claim that --
5 how do you believe that?  You just told me the
6 way that you thought you get on.
7    A.    The way I thought I get on?
8    Q.    You just told me --
9    A.    That was from The Post rebuttal.
10 I told you that that was from The Post --
11    Q.    Okay.
12        So you're saying you don't believe
13 that that's the way you get on?
14    A.    I don't believe that.
15    Q.    And what basis do you have not to
16 believe that?
17    A.    What basis?
18    Q.    Uh-huh.
19    A.    By me.  My basis is that I didn't
20 get on that casual list because of any of that
21 reason.
22    Q.    So you --
23    A.    I got on that casual list because
24 of Joe Vincent guarantying me that because I went
25 to him and I told him what was going on.  I'm not

Page 179

EVA SIU-SAN LEE

1
2 being hired.  He told me that there is nothing at
3 that point that he could do for me, but can
4 guaranty me that I will be on the next casual
5 list.
6    Q.    So you got on the casual list
7 by --
8    A.    Not by --
9    Q.    -- by Joe Vincent --
10    A.    Yes.
11    Q.    -- allowing you to be on it?
12    A.    Yes.
13    Q.    And why do you think that you
14 should have been on it anyway?
15    A.    Why?  I show up and I show good
16 attitude and I do my work all the time.
17    Q.    Okay.
18        So you're on the casual list,
19 right?
20    A.    Now, yes.
21    Q.    And you believe that these men
22 should not be ahead of you on the casual list?
23    A.    Certain -- ones that came after me
24 I would say they should be placed after me.
25    Q.    And when you say came after you,

Page 180

EVA SIU-SAN LEE

1
2 what do you mean?
3    A.    They started shaping after me.
4    Q.    How do you know that?
5    A.    I was there.
6    Q.    Who are you talking about?
7    A.    Tommy Lew, Phil Anzalone, Bill
8 Trank.
9    Q.    Anyone else?
10    A.    The ones that I'm not too sure of
11 I don't want to mention right now.
12    Q.    And you're claiming they should
13 not be above you on the list?
14    A.    Yes.
15    Q.    And what do you base that on?
16    A.    Attendance -- my start time that I
17 started shaping.
18        What I'm trying to say is that
19 they never gave me a chance to show what I can
20 perform, what I can do in the pressroom.  Instead
21 they never called me in for day side as a
22 provisional.  Even I shape.  They call everybody
23 else.  There's night incidents where people work
24 six in there and there was pretty much no one
25 down there and a foreman would come down and ask

Page 181

EVA SIU-SAN LEE

1
2 who has worked here before.  And I would stand in
3 the cold and not being hired.  How would you
4 think I don't see that?
5    Q.    Okay.
6        We'll talk about that, but can we
7 just get back to Tommy Lew, Phil Anzalone and
8 Bill Trank?
9    A.    Yes.
10    Q.    They're above you on the casual
11 list you're saying?
12    A.    Yes.
13    Q.    And you don't believe they should
14 be above you?
15    A.    Yes.
16    Q.    Because you work hard and you show
17 up?
18    A.    I show up.
19    Q.    Is there anyone else?
20        MR. FRANK:  She didn't finish her
21 answer.
22    Q.    Does everybody else show up?
23        MR. FRANK:  I want you to finish
24 your answer.
25        Keep on laughing.  How moronic is

One Penn Plaza, NYC
email@tobyfeldman.com

Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS

tel (212) 244.3990
tel (800) 246.4950

Eva Siu-San Lee

11/13/2007

Page 190

EVA SIU-SAN LEE
1
2 the casual list are called before you?
3      A.    Called before me?  I don't
4 understand that question.  Can you please
5 rephrase that?
6      Q.    Absolutely.
7           If -- do you -- as part of your
8 claim that men, excuse me, that are above you on
9 the casual list, the fact that they're called to
10 work before you, that's gender discrimination, is
11 that what you're claiming?
12      A.    No, the placement on the casual
13 list.
14      Q.    So it's the placement?
15      A.    Yes.
16      Q.    Any other ways that you feel that
17 you've been discriminated against in the
18 pressroom?
19      A.    I'm trying to think.  I'm trying
20 to think.  I don't think so right now.
21      Q.    Okay.
22      A.    I don't think I recall any right
23 now.  I don't think, I don't think so right now.
24      Q.    Okay.
25           Can we look at your complaint

Page 191

EVA SIU-SAN LEE
1
2 again?  It's Exhibit 4.  I wrote it down this
3 time.
4      A.    (Reviews.)
5      Q.    Paragraph 20.
6           MR. FRANK:  20.
7           MS. GOLDSMITH:  20.
8      A.    Yes.
9
10 BY MS. GOLDSMITH:
11      Q.    Are you claiming that it's gender
12 discrimination that you are not allowed to have
13 your union card transferred?
14      A.    I will say so.
15      Q.    And when you say transferred, you
16 mean transferred from the mailers to the
17 pressmen?
18      A.    No.
19      Q.    Transferred from where?
20      A.    I wanted to transfer my union card
21 from the New York Times mailers to the New York
22 Post mailers.
23      Q.    And who is responsible for that
24 transfer, for allowing that transfer?
25      A.    I'm not sure if it's the union or

Page 192

EVA SIU-SAN LEE
1
2 The Post.
3      Q.    So you don't know whether it's the
4 union or The Post?
5      A.    I'm not sure.
6      Q.    Has anyone ever told you that it's
7 The Post?
8      A.    Nicky Vazzano, Sr., he is a
9 chairman at The Post.  He once said to me that he
10 did not want any transfer from The Times over.
11 He wanted their own guys in there and, but to my
12 knowledge there was two transferees from the New
13 York Times mailroom to the New York Post
14 mailroom.  It was Mike Falco and Eddie Lenahan.
15      Q.    Nicky Vazzano, who is he?
16      A.    He is a chairman in the mailroom.
17      Q.    Is he management, Post management?
18      A.    No.  His -- no.
19      Q.    He's a union representative?
20      A.    Yes.
21      Q.    Did you ever complain to the union
22 that you couldn't transfer your card to the
23 Times?
24      A.    No.
25      Q.    From The Times, excuse me.

Page 193

EVA SIU-SAN LEE
1
2           Why not?
3      A.    Why not?  Because if they transfer
4 me after the list comes out, if they transfer me
5 and put me where -- because a lot of the new
6 hires they hired when new and they never worked
7 there, if I were to transfer my card there,
8 usually based on how many shifts you worked and
9 then I would go ahead of everybody, I would be
10 making enemies that way.
11      Q.    So you don't really want to have
12 your card transferred?
13      A.    I want to, I put in and I had a
14 physical taken and -- but they didn't give it to
15 me.
16      Q.    Who is they?
17      A.    Either The Post or the union.
18      Q.    You don't know whether it's The
19 Post or the union?
20      A.    I'm not sure.
21      Q.    These two guys, Mike Falco and
22 Eddie Lenahan?
23      A.    Yes.
24      Q.    Who are they?
25      A.    They used to be subs in The Times

49 (Pages 190 to 193)

One Penn Plaza, NYC
email@tobyfeldman.com

Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS

tel (212) 244.3990
tel (800) 246.4950

Page 194

EVA SIU-SAN LEE

1
2  that transferred over to The Post.
3      Q.    And how do you know that?
4      A.    How do I know that?  I forgot how
5  I know that, but I forgot how I know that.
6      Q.    Just your subjective belief?
7      A.    If you want I can get a copy -- I
8  can try getting a copy at The Times and ask them
9  do they have a record of it.
10     Q.    Okay.
11           Looking again at Exhibit 4 --
12     MR. FRANK:  That's the, yes,
13  complaint.
14     Q.    -- Paragraph, let's find out, 47,
15  please.
16     A.    (Reviews.)
17           Wait a minute.  Can I get some
18  water?
19     Q.    Okay, I'm sorry, did I say the
20  paragraph number?
21     MR. FRANK:  47 you stated.
22     MS. GOLDSMITH:  Thank you.
23
24  BY MS. GOLDSMITH:
25     Q.    47.  It says you were continually

Page 195

EVA SIU-SAN LEE

1
2  harassed by an employee in the mailroom, is that
3  correct?
4      A.    Yes.
5      Q.    Do you know if The Post forbids
6  harassment in the mailroom?
7      A.    Can you rephrase that?
8      Q.    Yes.
9           Are you aware of a policy against
10  harassment in the mailroom?
11     A.    I think so.
12     Q.    And are you aware that The Post
13  asks its employees to complain of harassment if
14  they suffer harassment in the mailroom?
15     A.    Yes.
16     Q.    You claim that you were
17  continually harassed by an employee.
18           Who do you claim continually
19  harassed you?
20     A.    John Hom.
21     Q.    And who is John Hom?
22     MR. FRANK:  Hom?
23     THE WITNESS:  Yeah, H-o-m, Hom.
24     A.    He is a sub in the mailroom.
25

Page 196

EVA SIU-SAN LEE

1
2  BY MS. GOLDSMITH:
3      Q.    Does he have a union card?
4      A.    Yes.
5      Q.    With the mailers?
6      A.    Yes.
7      Q.    Does he work at another newspaper?
8      A.    He works at The Times.  He shapes
9  at The Times over there.
10     Q.    So is he in the same position as
11  you are?
12     A.    He's different because he's a sub
13  at The Post and I am a sub at The Times.  If he
14  goes to the Times he's the outside card man at
15  The Times and I am the outside card man at The
16  Post.  It's different -- same situation, but
17  opposite also.
18     Q.    He's not an outside cardholder at
19  The Post?
20     A.    He is not an outside cardholder at
21  The Post.  He is a sub at The Post.
22     MS. GOLDSMITH:  At this time I'd
23  like to mark as Exhibit --
24     MR. LIPPNER:  6.
25     MS. GOLDSMITH:  No, we're past 6.

Page 197

EVA SIU-SAN LEE

1
2  MR. FRANK:  9.
3      COURT REPORTER:  9.
4      (Whereupon, multi page document
5  from Lloyd Vasquez, director of security, New
6  York Post, to Kris Socia, director of production,
7  New York Post, subject, complaint of harassment
8  as reported by mailer slash shaper Eva Lee, dated
9  December 31st, 2006, bearing Bates stamps NYP
10  00061 through NYP 00064, is received and marked
11  as Lee Exhibit 9 for Identification.)
12     COURT REPORTER:  Number 9.
13     MS. EISNER:  I guess I have Exhibit
14  8 in front of me.
15     MR. FRANK:  What are we looking at?
16     MS. EISNER:  That right there.
17     MR. FRANK:  Do you have a copy?
18     MS. GOLDSMITH:  I'm sorry, I didn't
19  realize there would be so many people here.
20     MR. FRANK:  No, that's quite all
21  right.  Not a problem.
22           Uh-huh.
23     MS. GOLDSMITH:  I'm sorry, are
24  we --
25     A.    (Reviews.)

One Penn Plaza, NYC                    Toby Feldman, Inc.                    tel (212) 244.3990
email@tobyfeldman.com        NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS        tel (800) 246.4950

Page 198

EVA SIU-SAN LEE

1
2
3    BY MS. GOLDSMITH:
4        Q.    Have you seen this document
5    before?
6        A.    I have seen it.
7        Q.    When did you see it?
8        A.    At my lawyer's office.
9        Q.    And did your lawyer tell you that
10   it's something that The Post produced to you as
11   part of this lawsuit?
12       A.    Yes.
13       Q.    Have you read it?
14       A.    I skimmed through it, yes.  I
15   would say yes.
16       Q.    Do you believe it to be an
17   accurate and true description of what you
18   reported to Mr. Vasquez?
19       A.    For me on my behalf I would say
20   yes.
21       Q.    Do you think anything was left
22   out?
23       A.    I don't remember.
24       Q.    Well, take a look at it and let me
25   know if you think anything was left out.

Page 199

EVA SIU-SAN LEE

1
2        A.    I don't think so on my behalf.
3        Q.    Okay.
4              So you claim that you told to
5    Lloyd Vasquez that you were harassed by John Hom?
6        A.    Yes.
7        Q.    And looking at this report and
8    your knowledge of the harassment what happened
9    and when did it start?
10       A.    He said it started, I guess it
11   started at The Post Christmas party.
12       Q.    And what happened there?
13       A.    I don't know what happened there.
14       Q.    Okay.
15             Well, let's look at Paragraph 2 of
16   this document.
17             It says that you advised that John
18   Hom was upset at you because of the way that you
19   greeted his wife at the party.
20       A.    Yes.
21       Q.    Is that true?
22       A.    I don't know how I greeted his
23   wife.
24       Q.    But is that why he was mad at you?
25       A.    That's why he said he was mad at

Page 200

EVA SIU-SAN LEE

1
2    me.
3        Q.    And apparently another employee
4    told you that's why he was mad at you?
5        A.    Yes, Iris.
6        Q.    And did you have any reason not to
7    believe that that's why he was mad at you?
8        A.    I don't have any reason.  I don't
9    think there is any reason not to believe.
10       Q.    Okay.
11             And how did you greet his wife?
12       A.    Hi.  I believe, I don't recall it,
13   but that night there were so many people there.
14   I know I said hi to her.  I don't know -- I don't
15   recall it.  He's the one who came up and said
16   that the way how I greeted his wife.  If I knew
17   how I greeted his wife was wrong I would have
18   been the one -- I would -- I don't know what to
19   say.
20       Q.    Okay.  So he said that he was
21   mad --
22       A.    Yes.
23       Q.    -- because you greeted his wife
24   not the way that he would want you to?
25       A.    Yes.

Page 201

EVA SIU-SAN LEE

1
2        Q.    Okay.
3              You say at the end of Paragraph 2
4    you told Lloyd Vasquez that there were two prior
5    occasions --
6        A.    Yes.
7        Q.    -- that he harassed you and those
8    occasions stem from this unhappiness with the way
9    that you treated him --
10       A.    Yes.
11       Q.    -- his wife at the party?
12       A.    Yes.
13       Q.    Okay.  Going to Paragraph 3.
14       A.    Okay.
15       Q.    I guess this was the first of the
16   next incidences on December 16th.
17       A.    December 16th.  No, this is not --
18   this is not an incident.  This is just I told him
19   I -- at that time I didn't know that why was he
20   mad.  I went to him and I brought him, like I say
21   I brought him a candy or lollipop and asked him
22   what was wrong?  He didn't look happy that day.
23   I didn't know at that time, but later on Iris
24   told me that he was mad at me.
25       Q.    Okay.

51 (Pages 198 to 201)

Eva Siu-San Lee                                            11/13/2007

Page 202

EVA SIU-SAN LEE
1
2           And so you went to find him to
3   talk about why he was mad at you, is that what
4   you're saying?
5       A.   Yes, yes.
6       Q.   Okay. So you --
7           THE WITNESS: Sorry. Sorry.
8   Sorry.
9       Q.   Okay.
10          So you approached John Hom and you
11  brought him a lollipop and he asked you to leave
12  him alone?
13      A.   Yes.
14      Q.   So is everything we've just
15  discussed in these first three paragraphs, is it
16  all accurate and true?
17      A.   I would say so.
18      Q.   Okay.
19          Now, Paragraph 4 so -- sorry.
20  Okay.
21          Then Paragraph 5, were you still
22  trying to talk to him to find out why he was mad?
23      A.   We were up to 4 first.
24      Q.   Oh, sorry. That was Iris
25  Rodriguez who told you that?

Page 203

EVA SIU-SAN LEE
1
2       A.   Yes.
3       Q.   Okay.
4           Is everything in Paragraph 4
5   accurate?
6       A.   Yes, I would say so.
7       Q.   Okay.
8           Paragraph 5, that you wanted to
9   speak to him, you pulled him off the machine.
10  You had this conversation with him?
11      A.   Yes.
12      Q.   That's correct?
13      A.   Yes.
14      Q.   Okay.
15          Then the next incident happened on
16  December 20th, I'm sorry, in Paragraph 7, is that
17  correct?
18      A.   Okay. Number 6 is -- okay.
19  Number 7. Yes, that's December 20th.
20      Q.   And what happened then?
21      A.   I believe is that this happened
22  right by the female's ladies room. We passed
23  each other by the staircase over there and he
24  asked me did I have anything to say and I said
25  there was nothing to talk about.

Page 204

EVA SIU-SAN LEE
1
2       Q.   Okay.
3           And then in Paragraph 8 Mr. Hom
4   approached you and you had a conversation with
5   him?
6       A.   Yes, yes.
7       Q.   And is everything in Paragraph 8
8   accurate? There is nothing left out there?
9       A.   I would say so.
10      Q.   Okay.
11          Moving on, Paragraph 10.
12      A.   We're going to skip 9?
13      Q.   Okay, 9. This is that you told --
14      A.   Yeah, okay.
15      Q.   Is that correct, everything
16  correct in there?
17      A.   I would say so, yes.
18      Q.   Nothing left out?
19      A.   I don't think so.
20      Q.   Okay.
21          Paragraph 10, is that correct?
22      A.   Yes.
23      Q.   It's accurate and complete?
24      A.   I believe so.
25      Q.   Paragraph 10?

Page 205

EVA SIU-SAN LEE
1
2       A.   To my memory, yes.
3       Q.   Okay.
4           I'm sorry, going back to Paragraph
5   9, it says that Mr. Vasquez asked you to explain
6   a connection between this incident with Mr. Hom
7   and your complaint with the pressmen?
8       A.   Okay.
9       Q.   Well, I'm reading from the --
10      A.   Okay. Oh, you want me to explain?
11      Q.   Well, it says that you told them
12  there are things that you couldn't divulge at
13  that time?
14      A.   Yes.
15      Q.   What are those things?
16      A.   My -- I was -- my EEOC complaint.
17      Q.   But you told them that you had an
18  EEOC complaint?
19      A.   Yes, but the details of it.
20      Q.   So what you couldn't tell them was
21  the details --
22      A.   Yes.
23      Q.   -- of your complaint?
24      A.   Yes.
25      Q.   Okay. Paragraph 10, okay, we

52 (Pages 202 to 205)

Eva Siu-San Lee                                                                          11/13/2007

Page 206

EVA SIU-SAN LEE
1
2  covered 10.
3        Paragraph 11 --
4        A.    I want to make a little thing.  I
5  see that this is in the second folder Number 10.
6  Let me see.  Let me try to recall that one.
7        Q.    Are you looking at Paragraph 10?
8        A.    Yes.  I want to make something --
9  I might have said something that I see.  Hold on.
10  What was that earlier -- okay, I believe it was
11  Number 5 I said it was by the hallway.  It's not.
12  That was by one SLS right here.  Those are the
13  names of the machine.  I see -- no, Number 7, let
14  me see.
15        Q.    Okay.
16        A.    Let me quote Number 7, let me
17  quote Number 7.  I forgot where it happened.  I
18  don't think it happened outside the hallway at
19  the ladies room, but I don't recall where it
20  happened.
21        Q.    Okay.
22        A.    Okay?
23        Q.    Paragraph 10.
24        A.    Okay.
25        Q.    Okay.

Page 207

EVA SIU-SAN LEE
1
2        It says that you, you stated that
3  co-workers had told you that John Hom has had
4  disputes with others at the plant?
5        A.    Yes.
6        Q.    Is that correct?
7        A.    Yes, and I also witnessed one time
8  too.
9        Q.    And who were -- what did you
10  witness?  Who are these others at the plant?
11        A.    I witnessed him fighting with
12  Kevin Dowd on December 2005, 2006 or -- 2005.  I
13  forgot.  At December 2006, 2006 December I would
14  say.  Him and Kevin Dowd fought and I'm not the
15  only one who witnessed it.  Everybody that worked
16  that night in the inserting room saw it.
17        Q.    And is there other -- and you say
18  co-workers advised you that he had disputes with
19  others.
20        Who else?
21        A.    I forgot who.  I forgot who.  I
22  don't recall it because they just told me and I
23  didn't really wrote anything down or said.  I
24  forgot who.  I know it was in regards that he was
25  working on 1M and someone threw some water at him

Page 208

EVA SIU-SAN LEE
1
2  and he got -- it was regarding that night.  That
3  is all what I know right now, to my memory right
4  now.
5        Q.    Someone threw water at him?
6        A.    Yes.
7        Q.    Do you know if -- I'm sorry.
8        A.    I don't know who did it because I
9  wasn't paying attention and I wasn't watching.
10        Q.    Do you know if it was a man or a
11  woman?
12        A.    I don't know.
13        Q.    Is Kevin a man or a woman?
14        A.    Kevin is a man.
15        Q.    Is that the person who he had the
16  razor --
17        A.    Uh-huh.
18        Q.    And that's another person?
19        A.    That's another person.
20        Q.    And do you know who that is?
21        A.    I don't know.
22        Q.    And do you know if that's a woman
23  or a man?
24        A.    I would say that was a man, but
25  not too sure.  I would say that that was a man.

Page 209

EVA SIU-SAN LEE
1
2        Q.    And has John Hom ever physically
3  assaulted you?
4        A.    No, I don't think so.
5        Q.    Okay.
6        Number 11.
7        You read that Paragraph 11?
8        A.    Yes.
9        Q.    And is that true and accurate?
10        A.    Yes.
11        Q.    Anything left out?
12        A.    I don't think so.
13        Q.    And you said that Hom called you a
14  sharpshooter?
15        A.    Yes.
16        Anything left out?  Let's see.
17        Yes, something was.  I believe I
18  remember.  He was telling Dwayne Rivera -- John
19  Hom was telling Dwayne Rivera that I was tape
20  recording everyone and --
21        Q.    I'm sorry, John Hom --
22        A.    Was telling Dwayne Rivera and
23  other shapers at the shape that night.  He was
24  telling that I was tape recording people.
25        Q.    Okay.

53 (Pages 206 to 209)

Eva Siu-San Lee                                           11/13/2007

Page 210

EVA SIU-SAN LEE
1
2        And were you?  And you're under
3  oath.
4      A.    I know.
5        MR. FRANK:  She knows.
6      A.    I know.  I am taping pretty much
7  not everybody.  The foremens or chairmans.
8        MR. FRANK:  You can wait if they're
9  talking amongst each other.
10        THE WITNESS:  Okay.
11        MS. GOLDSMITH:  I'm sorry.
12
13  BY MS. GOLDSMITH:
14      Q.    Go ahead.
15      A.    I was taping the foremens how they
16  work, the chairmens, but not everybody.  I was
17  taping certain people that do things differently
18  or what is not right in there.  I was taping not
19  everybody in random.
20      Q.    People you believed didn't act
21  right?
22      A.    I was actually -- no.  I was
23  taping not didn't act right.  Like I was trying
24  to get -- in the mailroom contract it says that
25  you have to be union member to be a foreman.  I

Page 211

EVA SIU-SAN LEE
1
2  was trying to get the tape on something in record
3  that Whit, Sutherland and Mike Guzzi is not in
4  the union and also how the stack down works, how
5  shrink wrap goes and certain people like if I
6  taped Mike Granito for my wages that I did not
7  receive to have you guys know that I -- he was
8  aware of it.
9      Q.    All these tapes, did you give them
10  to your attorney?
11      A.    Yes.
12      Q.    And have they been produced to --
13      A.    I believe so.
14      Q.    -- Defendant?
15        MR. FRANK:  Have they?
16      Q.    Every single tape that you've
17  made?
18        MR. FRANK:  She wouldn't know.  Oh,
19  sorry.  You're asking whether she produced every
20  single tape?
21        MS. GOLDSMITH:  Yes.
22        MR. FRANK:  Okay.
23      A.    Some of them that didn't catch on
24  and some of them that didn't go through that I
25  thought it was useless I deleted them.

Page 212

EVA SIU-SAN LEE
1
2
3  BY MS. GOLDSMITH:
4      Q.    And camera, pictures that you've
5  taken on your camera?
6      A.    Camera pictures?  I don't know was
7  there any pictures, I don't know.  I'm not sure
8  was there any pictures.
9        MS. GOLDSMITH:  And you produced
10  every tape that you were given?
11        MR. FRANK:  She doesn't know.  I
12  don't know.  We will check that and we will
13  confirm that fact with you.
14        MR. LIPPNER:  We would also ask
15  that you instruct your client to stop destroying
16  evidence.  She just testified that she destroyed
17  evidence.
18        THE WITNESS:  I didn't know that at
19  that --
20        MR. FRANK:  Well, you might think
21  it's evidence.  She said that she didn't think it
22  was relevant so she did it.  So I don't have to
23  instruct her.  I mean --
24        MR. LIPPNER:  We will take it up
25  with the Court.  Just putting you on notice.

Page 213

EVA SIU-SAN LEE
1
2        MR. FRANK:  Please take it up with
3  the Court.
4        MS. GOLDSMITH:  Okay.
5
6  BY MS. GOLDSMITH:
7      Q.    Paragraph -- so is there anything
8  else that's left out of this, this memo?
9      A.    I don't think so.
10      Q.    So this memo has everything that
11  you told Lloyd Vasquez about your incidents with
12  John Hom?
13      A.    I think so.
14      Q.    Did you have any other incidents
15  with John Hom that are not represented in this
16  memo?
17      A.    I don't think so.
18      Q.    Do you know what happened after --
19      A.    Yes, yes, yes.  There was a time
20  that I was outside shaping and I don't know is
21  that considered incident.  He saw my car parked
22  right outside shaping.  He went around twice
23  before he pulled into the gates, that was another
24  incident, but I was in my car, but I saw him
25  going around twice before he headed in.

One Penn Plaza, NYC                    Toby Feldman, Inc.                    tel (212) 244.3990
email@tobyfeldman.com          NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS          tel (800) 246.4950

Eva Siu-San Lee                                                           11/13/2007

Page 214

```
1              EVA SIU-SAN LEE
2        Q.    John Hom?
3        A.    Yes.
4        Q.    And did you complain to anyone of
5   that?
6        A.    No, because there is nothing that
7   happened, but I was at the shape and he just went
8   around before he headed in.  I believe it was
9   twice.  He just circled around before he headed
10  into The Post.
11       Q.    Do you have knowledge of what
12  happened after you reported this --
13       A.    No.
14       Q.    -- complaint to Lloyd Vasquez?
15       A.    The next day after the complaint I
16  was working in the pressroom.  Lloyd pulled me,
17  called me into Ray's office and he advised me to
18  stay away from John Hom and he also told me that
19  John Hom has been advised to stay away from me
20  also.  That's --
21       Q.    Do you have any reason to believe
22  that this dispute that you had, this, everything
23  that's described in this memo was sexual
24  harassment?
25       A.    I don't think it was sexual, no.
```

Page 215

```
1              EVA SIU-SAN LEE
2        Q.    Do you believe it was because
3   you're a woman?
4        A.    I don't know.
5        Q.    Well, why do you think it
6   happened?
7        A.    You mean these harassments?  I
8   don't know why did it happen.
9        Q.    These incidents with John Hom that
10  are described in this memo --
11       A.    Okay, yes.
12       Q.    -- why do you think they happened?
13       A.    Because I'm a woman.  If he said
14  that I rolled my eyes to his wife it must have
15  been I am a woman or I am a female.
16       Q.    Did anyone ever tell you it's
17  because you're a female?
18       A.    No.
19       Q.    So it's just your belief that
20  because you rolled your eyes --
21       A.    That's --
22       Q.    -- you're a female, it was because
23  you're a woman?
24       A.    Yes.
25       Q.    Anything else?
```

Page 216

```
1              EVA SIU-SAN LEE
2        A.    No.
3        Q.    And after this incident and you
4   just described the John Hom driving around you,
5   anything else?
6        MR. FRANK:  I don't think that's --
7   she -- was it driving or walking around?
8        THE WITNESS:  Driving.
9        MR. FRANK:  Oh, I'm sorry.  My
10  mistake.  I didn't hear the driving part.
11       A.    I don't think so.
12
13  BY MS. GOLDSMITH:
14       Q.    No further incidents with John
15  Hom?
16       A.    No.  I don't think so.
17       Q.    Oh, yes.  When did that incident
18  in the parking lot where he drove around you
19  twice, when did that happen?
20       A.    I'm not sure, but it's in here
21  somewhere.
22       Q.    Before this incident or after this
23  incident?
24       A.    After.
25       Q.    After?
```

Page 217

```
1              EVA SIU-SAN LEE
2        A.    Yes.
3        Q.    Before or after Lloyd Vasquez told
4   you to stay away from John Hom?
5        A.    After I would say.
6        Q.    But you never complained of it?
7        A.    No, I thought nothing of it, but I
8   just saw him.  I just brought it up because I was
9   aware of it.
10       MS. GOLDSMITH:  Do you know what,
11  I'm sorry, my bladder, I have to use the restroom.
12  Would that be all right?
13       THE WITNESS:  Yes.
14       (Whereupon, a short recess is
15  taken.)
16       MS. GOLDSMITH:  Let's go back on
17  the record.
18
19  BY MS. GOLDSMITH:
20       Q.    I'm going to ask you again to look
21  at Exhibit 4 which is your complaint in this
22  lawsuit.
23       A.    (Reviews.)
24       Q.    Okay.
25             Paragraph 49, 49, you claim on
```

55 (Pages 214 to 217)

Eva Siu-San Lee                                    11/13/2007

Page 218

EVA SIU-SAN LEE
1
2   January 5th, 2007 one of the provisional shapers
3   John Magalia threatened Plaintiff on the street
4   at the location of Broadway and East Third
5   Street, is that correct?
6       A.   Yes.
7       Q.   What position is John Magalia?
8       A.   He is a shaper in the pressroom.
9       Q.   He is a member of the union?
10      A.   No.
11      Q.   He's not a union member.
12           Is he a member of management?
13      A.   No.
14      Q.   And this -- he threatened you not
15  at The Post facility?
16      A.   Not at The Post facility.
17      Q.   And what did he say?
18      A.   He said that if you hurt me I will
19  hurt you. He told me that not to mention any
20  names in regards to the claims and I told him if
21  everybody was my friend and everybody says come
22  to me and ask me not to mention their name, I
23  wouldn't have a claim.
24      Q.   And how long has Mr. Magalia been
25  a provisional?

Page 219

1            EVA SIU-SAN LEE
2       A.   I'm not that sure.
3       Q.   Did you know what he meant by hurt
4   him at work?
5       A.   Yes, I would say yes.
6       Q.   And what was he talking about?
7       A.   Because he came after a lot of
8   people that started shaping before him and he
9   will work more often than a lot of people who
10  started shaping before him and he knows -- he
11  says that if I give his name he thinks that they
12  will stop hiring him.
13      Q.   Give his name for what?
14      A.   In this complaint.
15      Q.   In this lawsuit?
16      A.   In this complaint.
17      Q.   Was anyone else present for this
18  conversation?
19      A.   No.
20      Q.   Did he tell you that he didn't
21  want you to name him in this lawsuit or is that
22  just what you think he meant?
23      A.   He mentioned not to mention name.
24      Q.   Names where?
25      A.   He didn't specifically say his

Page 220

1            EVA SIU-SAN LEE
2   name, but he says that I am looking to seek -- I
3   am looking -- I am trying to get a job in there
4   and I'm not looking to step on anybody's toes so
5   don't step on mine.
6       Q.   Who did he not want you to name
7   names to?
8       A.   I would say if I -- at that time
9   the EEOC complaint, if I were to call into the
10  EEOC I don't think he wanted me to bring up his
11  name totally.
12      Q.   But did he tell you that?
13      A.   Directly?
14      Q.   Yes.
15      A.   He didn't say in that phrase like
16  the way how I told you he said it.
17      Q.   Did he specifically say to you not
18  to mention his name in this lawsuit or to the
19  EEOC?
20      A.   I don't think so.
21      Q.   I'm going to --
22           MS. GOLDSMITH:  Mark for
23  introduction 10, Exhibit 10.
24           (Whereupon, two-page document
25  dated January 8th, 2007, bearing Bates stamps NYP

Page 221

1            EVA SIU-SAN LEE
2   00053 and NYP 00054, is received and marked as
3   Lee Exhibit 10 for Identification.)
4            COURT REPORTER:  Number 10.
5            THE WITNESS:  Thank you.
6       A.   (Reviews.)
7
8   BY MS. GOLDSMITH:
9       Q.   Do you know what this is?
10      A.   Yes.
11      Q.   What is it?
12      A.   It's the complaint with John
13  Magalia.
14      Q.   So is this -- is this a -- kind of
15  a transcript of your conversation with Penny
16  Morgan about your complaint?
17      A.   I would say so.
18      Q.   Is it a true and accurate
19  statement of everything that you told Penny
20  Morgan?
21      A.   To my belief it is. To my memory
22  I would say so.
23      Q.   Is anything left out from this?
24      A.   I don't think so. I don't
25  remember.

56 (Pages 218 to 221)

Eva Siu-San Lee

11/13/2007

Page 222

1             EVA SIU-SAN LEE
2        Q.    What -- are you claiming in this
3   lawsuit that John Magalia's threat against you
4   was sexual harassment?
5        A.    I don't think so.
6        Q.    Are you claiming that he
7   threatened you because you're a woman?
8        A.    I don't know.
9        Q.    Do you believe that he threatened
10  you because you're a woman?
11       A.    I don't know.
12       Q.    Well, what would make you
13  believe -- sorry.  Scratch that.
14             Withdraw that.
15             MS. EISNER:  Strike.
16             MS. GOLDSMITH:  I can never think
17  of that word.
18
19  BY MS. GOLDSMITH:
20       Q.    Well, let's just say looking at --
21  I read this memo that you just said was accurate
22  and that didn't have anything left out and it
23  doesn't mention that you think you're being --
24  this was because you're a woman.
25             So did you not believe it then?

Page 223

1             EVA SIU-SAN LEE
2        A.    It didn't come to my mind.
3        Q.    So you didn't think it was because
4   you're a woman then?
5        A.    I don't think so.
6        Q.    But you do believe it now?
7        A.    I don't think so.
8        Q.    Did anyone tell you that Jon
9   Magalia was threatening you because you're a
10  woman?
11       A.    No.
12       Q.    Are you romantically involved with
13  Mr. Magalia?
14       A.    No.
15       Q.    Are you friends with him?
16       A.    Not now.
17       Q.    Has anything happened since this
18  incident --
19       A.    No.
20       Q.    -- between you and Jon Magalia?
21       A.    No.
22       Q.    So you complained about this to
23  Penny Morgan?
24       A.    Yes.
25       Q.    And she's in The Post HR?

Page 224

1             EVA SIU-SAN LEE
2        A.    I believe so, yes.
3        Q.    And do you know what happened
4   after you complained?
5        A.    I don't know what happened, but I
6   called her up and requested, I wanted a copy and
7   she said that I wasn't entitled to a copy of it.
8   If I wanted a copy I would have to have my
9   lawyers put it in writing.  I believe that was --
10       Q.    And when was that?
11       A.    Somewhere in January of '06.
12             MR. FRANK:  Do we know what a copy
13  is?  A copy of what?
14       A.    '07 I would say.
15             THE WITNESS:  A copy of the
16  complaint, the harassment complaint.  I wanted to
17  see a copy of the complaint.
18       A.    Can I say something?
19
20  BY MS. GOLDSMITH:
21       Q.    Sure.
22       A.    I left something out with The
23  Post, about the pressroom being discrimination.
24  Yes, because I've seen Junior coming into the
25  shape sheet -- sign in shape late and I have seen

Page 225

1             EVA SIU-SAN LEE
2   Steve Mcillinis sign the shape sheet for him.  It
3   was Junior and I believe it was Jeff.  I wasn't
4   sure was it Jeff, but it is in my notes.  It is
5   Junior and Jeff I believe.  Steve Mcillinis
6   signed the shape sheet for both of them so they
7   can work that night.
8        Q.    When was that?
9        A.    I would say 2005.
10       Q.    When in 2005?
11       A.    Somewhere in November, December,
12  I'm not too sure.  I'm not too sure.
13       Q.    And was anyone else there when
14  Steve Mcillinis signed the chart, the shape
15  sheet?  I'm sorry.
16       A.    The guard, the guard that who --
17  the guard that who calls -- the shape guard.  He
18  was in there with him.  I don't know the guard's
19  name.
20       Q.    Anyone else?
21       A.    I don't know if the other shapers
22  see it, but there was other shapers there.  I
23  don't know that they see it.
24       Q.    Did you ever talk to Steve about
25  it?

57 (Pages 222 to 225)

Eva Siu-San Lee                                                  11/13/2007

Page 226

          EVA SIU-SAN LEE
1
2      A.    No.
3      Q.    Or ask him why he did it?
4      A.    No.
5      Q.    Did you ever complain to anyone?
6      A.    No.
7      Q.    Did you ever talk to Junior --
8      A.    No.
9      Q.    -- or Jeff and find out?
10     A.    No.
11     Q.    I'm sorry, you have to let me
12  finish.
13     A.    No. Okay. I'm sorry. I'm sorry.
14     Q.    Did you ever talk to Junior or
15  Jeff about Steve signing the shape sheet for
16  them?
17     A.    I don't think so.
18     Q.    So have we now talked about -- do
19  you feel that anyone else harassed you at The
20  Post?
21     A.    I don't think so. I don't think
22  so. Oh, Lloyd Vasquez, Lloyd Vasquez.
23     Q.    Lloyd Vasquez harassed you?
24     A.    He -- I was -- yes.
25     Q.    And how did Lloyd Vasquez harass

Page 227

          EVA SIU-SAN LEE
1
2  you?
3      A.    He -- he -- he told me to leave
4  the premises.
5      Q.    And why, why did he tell you to
6  leave the premises?
7      A.    He said that shapers, if I'm
8  shaping I cannot be on the premises.
9         MR. FRANK: Don't answer when
10  they're talking.
11         THE WITNESS: Okay.
12
13  BY MS. GOLDSMITH:
14     Q.    Sorry, go ahead.
15     A.    He said that if I'm shaping I am
16  not allowed on the premise.
17     Q.    And he asked you to leave the
18  premises?
19     A.    Yes.
20     Q.    And why do you think that -- do
21  you know of a rule that you're not allowed to be
22  on the premises while you're waiting to shape?
23     A.    I didn't know of one at that time.
24     Q.    Do you think that there is not a
25  rule?

Page 228

          EVA SIU-SAN LEE
1
2      A.    I don't think so because at times
3  where I shape, Lloyd has seen me shaping and
4  nothing was said.
5      Q.    So Lloyd has seen you do it other
6  times and not said anything?
7      A.    Yes.
8      Q.    So what makes you believe that
9  he's discriminating against you because you're a
10  woman?
11     A.    Because there is a driver in the
12  delivery department, he shapes on his nights off
13  and he parks in the premises also. He is shaping
14  on his nights off and he was not asked to leave.
15     Q.    And when were you asked to leave?
16  What was the date on that?
17     A.    Somewhere in August or -- August I
18  will say this year. I'm not sure.
19     Q.    August 2007?
20     A.    I would say some time in August,
21  August or September.
22     Q.    Okay.
23         So you said -- do you know whether
24  this other person -- who was this other person,
25  this driver, delivery driver?

Page 229

          EVA SIU-SAN LEE
1
2      A.    Yes.
3      Q.    Who is that?
4      A.    I just know his first name. His
5  first name is Joe.
6      Q.    Do you know whether Joe was asked
7  to leave the premises?
8      A.    I don't think so.
9      Q.    Did you ever complain that --
10     A.    When --
11     Q.    -- somebody else was parked there?
12     A.    Yes. When -- when Lloyd Vasquez
13  told me to leave that night I told him that I am
14  not the only one who is in here shaping who is
15  parked in here and I told him that there was
16  other people doing it and I --
17     Q.    And what did he say?
18     A.    I forgot.
19     Q.    And besides telling him when you
20  were being asked to leave that other people do
21  it, did you ever report other people doing it at
22  any other time?
23     A.    I don't think so. To Penny Morgan
24  with the HR complaint I would say.
25     Q.    How do you know that delivery

One Penn Plaza, NYC                    Toby Feldman, Inc.                    tel (212) 244.3990
email@tobyfeldman.com    NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS    tel (800) 246.4950

Eva Siu-San Lee

11/13/2007

Page 230

EVA SIU-SAN LEE

1    guy's name is Joe?
2    A.    He says hi to me when I shape.
3    Q.    Any other basis?
4    A.    There's one -- there's sometimes
5    when I'm not -- when I shape he would always ask
6    me am I working and I say no and then he says --
7    sometimes he says that, he asked me do I want to
8    hang out, go out for dinner.
9    Q.    And did you go out to dinner with
10   him?
11   A.    Yes.
12   Q.    So was that a romantic --
13   A.    No.
14   Q.    You went out to dinner as friends?
15   A.    Yes.
16   Q.    But you don't know his last name?
17   A.    I don't know his last name.
18        MS. GOLDSMITH:  Can I mark as
19   Exhibit 11.
20        MR. FRANK:  Is there some way for
21   us to go back on this?  Can I look earlier?
22        COURT REPORTER:  Yes.
23        MS. EISNER:  I can show you.  He
24   showed me how to do it.
25

Page 231

EVA SIU-SAN LEE

1        COURT REPORTER:  She knows how to
2    do it.
3        (Whereupon, one-page document
4    entitled Conversations with Eva Lee 11:45 a.m.
5    9/19/07, bearing Bates stamp NYP 00052, is
6    received and marked as Lee Exhibit 11 for
7    Identification.)
8        COURT REPORTER:  Number 11.
9        MR. FRANK:  It says I don't think
10   so.  To Pennsylvania Morgan.  I don't know what
11   that --
12        MS. GOLDSMITH:  That's shorthand
13   for him to be able to type it up.
14        COURT REPORTER:  I have to change
15   things like that later.
16        MR. FRANK:  Oh, you do?
17        COURT REPORTER:  Yes.
18        MR. FRANK:  Oh, okay.
19   A.    (Reviews.)
20
21   BY MS. GOLDSMITH:
22   Q.    Have you seen this before?
23   A.    I think so.
24   Q.    When do you think you saw it?
25

Page 232

EVA SIU-SAN LEE

1    A.    At the -- let's see.  I believe it
2    was at the lawyer's office I will say.
3    Q.    You saw it at the lawyer's office?
4    A.    I believe so.  I'm not sure.
5    Q.    Well, can you read it?
6    A.    I'm going to read it right now.
7    Okay.  Okay.
8    Q.    Is this an accurate report of what
9    you told Ms. Morgan?
10   A.    I would say so, yes.
11        MS. GOLDSMITH:  I'll mark this as
12   Exhibit 12.
13        (Whereupon, one-page document from
14   Eva Lee to Penny Morgan, sent Wednesday,
15   September 19th, 2007 at 12:26 p.m., bearing Bates
16   stamp NYP 00051, is received and marked as Lee
17   Exhibit 12 for Identification.)
18        COURT REPORTER:  Number 12.
19   A.    (Reviews.)
20
21   BY MS. GOLDSMITH:
22   Q.    Have you seen this document
23   before?
24   A.    Yes.
25

Page 233

EVA SIU-SAN LEE

1    Q.    And can you identify it?
2    A.    I E-mailed this to Penny Morgan.
3    Q.    So in Exhibit 10 it says that
4    Penny Morgan asked you to put your complaint in
5    writing.
6        Is this how you put your complaint
7    in writing?
8    A.    She told me to E-mail her, yes.
9    Q.    So this is your complaint about
10   Lloyd Vasquez?
11   A.    Yes, I would say so.
12   Q.    And it's true and accurate?
13   A.    I would say so, yes.
14   Q.    So what basis do you have to
15   believe that Mr. Vasquez asked you to leave the
16   premises because you're a woman?
17   A.    I've seen minorites in the
18   building on the premises.  I have seen Todd
19   Carroll going in the building without an escort
20   because there is one night that I was -- I left
21   my ID and I was shaping.  I left something in my
22   locker room and Lloyd was there.  This was -- he
23   had a female security guard escort me up to my
24   locker.
25

59 (Pages 230 to 233)

One Penn Plaza, NYC
email@tobyfeldman.com

Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS

tel (212) 244.3990
tel (800) 246.4950

Page 234

EVA SIU-SAN LEE

1
2     Q.    When was that?
3     A.    I'm trying to recall it right now,
4  but it is in here somewhere.  I would say it is
5  '06 in, I'm not sure of the date, I will say
6  about -- about --
7     Q.    And why do you --
8     A.    -- June.  I would say about June.
9  I'm not too sure.  June.
10    Q.    June '06?
11    A.    I would say.  I'm not sure.
12    Q.    And why do you believe that that
13 was dis -- because you were a woman?
14    A.    I have not seen anyone else being
15 escorted into the building beside me.
16    Q.    Did anyone tell you that it was
17 discrimination because you're a woman?
18    A.    No.
19    Q.    Do you have any documents that say
20 that Lloyd Vasquez discriminated against you
21 because you're a woman?
22    A.    No.
23    Q.    So it's just your subjective
24 belief that it's because you're a woman?
25    A.    I would say so.

Page 235

EVA SIU-SAN LEE

1
2     Q.    And how do you know these other,
3  these other individuals that you mentioned, Todd
4  Carroll I think was one, how do you know that
5  they were in the building without their ID?
6     A.    No, they don't have an ID, not
7  without an ID.  Todd Carroll does not have an ID
8  at that time.
9     Q.    How do you know?
10    A.    I was right behind him.  I was
11 going into the building.  I was right behind him
12 and I watched him.
13    Q.    You watched him what?
14    A.    Because I was shaping.  He came in
15 and I saw him pull in and I saw him walk right
16 in.  I watched him going in without an escort.
17    Q.    Was there a security guard there?
18    A.    In the main lobby?  Yes, I would
19 say so.
20    Q.    And did you complain to anyone
21 about Todd Carroll being there without an ID?
22    A.    No.
23    Q.    And how did he get in the building
24 if he didn't have an ID?
25    A.    They can buzz you in I would say.

Page 236

EVA SIU-SAN LEE

1
2     Q.    So you're guessing that he got
3  buzzed in?
4     A.    (Indicating.)
5     Q.    But you don't know?
6     A.    I'm not sure.
7     Q.    Have you now told -- do you know
8  who let him in?
9     A.    No.
10    Q.    Have you now told me every way
11 that you feel that Lloyd discriminated against
12 you because you're a woman?
13    A.    I'm trying to think here.  I think
14 that's it.  I don't remember, but I don't
15 remember at this time right now.
16    Q.    So you think right now that we
17 have discussed everything that you think Lloyd
18 Vasquez has done against you because you're a
19 woman?
20    A.    Yes, right now, yes.
21    Q.    And you -- when you complained
22 about John Hom you complained to Lloyd Vasquez,
23 right?
24    A.    Yes.
25    Q.    And you were a woman then?

Page 237

EVA SIU-SAN LEE

1
2     A.    Yes.
3     Q.    And do you feel that he didn't
4  treat your complaint properly because you're a
5  woman?
6     A.    I don't know how a complaint is
7  supposed to be treated.
8     Q.    Was he cooperative with you?
9     A.    He took down the notes.
10    Q.    Did he follow up with you?
11    A.    He came to me and to advise me
12 not -- to stay away from John Hom.
13    Q.    Did he tell you to call him if
14 anything happened?
15    A.    I think he did.  I think he did.
16    Q.    Okay.
17          Looking at Exhibit 4, your
18 complaint, Paragraph 50.
19          MR. FRANK:  50.
20          MS. GOLDSMITH:  50.
21          (Whereupon, one-page document
22 bearing Bates stamp 283, is received and marked
23 as Lee Exhibit 13 for Identification.)
24          COURT REPORTER:  Number 13.
25    A.    (Reviews.)

Eva Siu-San Lee                                    11/13/2007

Page 238

EVA SIU-SAN LEE

BY MS. GOLDSMITH:

3   BY MS. GOLDSMITH:
4       Q.    Do you recognize this document,
5   Ms. Lee?
6       A.    Yes.
7       Q.    And what is it?
8       A.    This is the police report.
9       Q.    The police report?
10      A.    Of the -- the police report that I
11  filed for East Third Street and Broadway.
12      Q.    Oh.
13      A.    On John Magalia.
14      Q.    The incident that we've already
15  discussed with John Magalia?
16      A.    Yes.
17      Q.    Is this an accurate and true copy
18  of the police report?
19      A.    Yes.
20      Q.    Is anything left out?
21      A.    I don't think so.
22      Q.    Have we now discussed all the
23  incidents of harassment that you bring, that
24  you're bringing in this lawsuit?
25      A.    Not yet.

Page 239

EVA SIU-SAN LEE

1            EVA SIU-SAN LEE
2       Q.    What haven't we discussed?
3       A.    Mailroom.
4       Q.    What in the mailroom?
5       A.    2004 one night I got hurt, I got
6   hurt and Charlie Cuchiara came to me and said
7   that if I go home that night I will not get paid.
8   They will call someone in to replace me.
9       Q.    Who is Charlie?
10      A.    He is a foreman in the mailroom.
11      Q.    And is that -- did you complain
12  about this incident?
13      A.    I spoke with my union president
14  afterwards. I asked him -- I told him what was
15  said to me that night.
16      Q.    And do you think -- you think that
17  you should not be able to be paid -- you should
18  be paid if you go home?
19      A.    I got hurt at work. I was
20  stacking down and I got hurt on the job.
21      Q.    Did you tell anyone at The Post?
22      A.    About what?
23      Q.    About this incident? You said you
24  reported it to your union.
25      A.    The complaint or what Charlie

Page 240

EVA SIU-SAN LEE

1            EVA SIU-SAN LEE
2   Cuchiara said to me? Can you be more specific on
3   that?
4       Q.    I thought the complaint is what
5   Charlie said to you?
6       A.    What Charlie said to me that night
7   was if you go home you will not get paid. We
8   will call someone in to replace you. And five
9   minutes later he came back and he said if you go
10  to the hospital you will get paid, but with all
11  this time that you'll be waiting in the hospital,
12  we'll be done. Why don't you continue working?
13      Q.    So you decided to stay and work?
14      A.    No, I chose to go to the hospital.
15      Q.    You went to the hospital?
16      A.    They asked me did I need an
17  ambulance. I told them that no, I hurt my right
18  hand at that time.
19      Q.    And did you get paid for that
20  night?
21      A.    Yes.
22      Q.    Who asked you if you wanted an
23  ambulance?
24      A.    Right now I forgot who.
25      Q.    Someone at The Post?

Page 241

EVA SIU-SAN LEE

1            EVA SIU-SAN LEE
2       A.    Yes.
3       Q.    Management at The Post?
4       A.    I believe it was security, the one
5   who took in the report, the incident report.
6       Q.    Lloyd Vasquez?
7       A.    No, it was -- I think his name was
8   Rivera. I'm not sure of the first name. I
9   think. I'm not sure.
10      Q.    When did that happen?
11      A.    2004.
12      Q.    And when in 2004?
13      A.    I guess it was July. I would say
14  July.
15      Q.    Anything else?
16      A.    Not right now.
17      Q.    So at this point we have discussed
18  all your complaints of being discriminated
19  against because you're a woman in the mailroom
20  and in the pressroom at The Post?
21      A.    To my memory at this point I would
22  say so, but there is always things that I don't
23  remember right now.
24      Q.    And this police report that you
25  filed, have you done anything to follow up with

61 (Pages 238 to 241)

One Penn Plaza, NYC
email@tobyfeldman.com

Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS

tel (212) 244.3990
tel (800) 246.4950

Eva Siu-San Lee                                                          11/13/2007

Page 246

1           EVA SIU-SAN LEE
2   Mike Granito?
3       A.   Yes.
4       Q.   And told him you have a lawsuit?
5       A.   They were going to ask him some
6   questions on it.
7       Q.   Do you know if they called him?
8       A.   I'm not sure.
9       Q.   So do you know if Mike Granito
10  knows about your lawsuit?
11      A.   I would say he knows.  Not only
12  these two newspaper, also the Amsterdam News.  I
13  called up a reporter there.
14      Q.   Did you take notes when you called
15  up the reporter?
16      A.   I don't remember.  I got their
17  business card.  I don't think I did.
18      Q.   Did you provide any documents to
19  reporters?
20      A.   I provided the complaint for them
21  to review.
22      Q.   So your belief is that Mike
23  Granito knew about your lawsuit and your
24  complaint with the EEOC because of reporters?
25      A.   Yes.  And also at that time I was

Page 247

1           EVA SIU-SAN LEE
2   still friends with John Hom.  He came to me and
3   said Nicky Vazzano pulled him into his office and
4   asked him what was going on.
5       Q.   And what does that have to do with
6   your lawsuit?
7       A.   He was asking questions.
8       Q.   John Hom told you this?
9       A.   Yes.
10      Q.   Were you there for that
11  conversation?
12      A.   No.
13      Q.   So it's just based on John Hom
14  telling you?
15      A.   Yes.
16      Q.   And has Mike Granito ever said to
17  you that he knew about your lawsuit?
18      A.   No.
19      Q.   Have you ever spoken to Mike
20  Granito about your lawsuit?
21      A.   No.
22      Q.   Have you ever spoken to Mike
23  Granito about your EEOC charge?
24      A.   I don't think so.
25      Q.   Have you ever spoken to any

Page 248

1           EVA SIU-SAN LEE
2   foreman at The Post about your EEOC charge?
3       A.   I don't think so.
4       Q.   Have you ever spoken to any
5   foreman at the --
6       A.   Wait.  The foreman.  Let's see.  I
7   don't think so.
8       Q.   Have you spoken to any foreman at
9   The Post about your lawsuit?
10      A.   I don't think so.
11      Q.   So what do you claim -- so Mike
12  Granito, you're claiming Mike Granito retaliated
13  against you?
14      A.   Yes.
15      Q.   Anyone else?
16      A.   Nicky Vazzano, Sr.
17      Q.   And Nicky Vazzano.
18           What did Mike Granito do to
19  retaliate against you?
20      A.   My order of hiring, before the
21  complaint was filed my order of hiring --
22           MR. FRANK:  Don't talk, not when
23  they're talking.
24           Go ahead.
25      A.   The order --

Page 249

1           EVA SIU-SAN LEE
2       Q.   The order of your hire?
3       A.   Yes.
4       Q.   That's how you believe he
5   retaliated against you?
6       A.   Yes.
7       Q.   Anything else?
8       A.   I don't think so.
9       Q.   Did anyone tell you that Mike
10  Granito was retaliating against you because of
11  your lawsuit?
12      A.   I don't think so.
13      Q.   Did you complain to anyone that
14  Mike Granito was retaliating against you because
15  of your lawsuit?
16      A.   I don't think so.
17      Q.   Did anyone tell you that Mike
18  Granito is retaliating against you because of
19  your EEOC charge?
20      A.   I don't think so, no.
21      Q.   And did anyone -- did you complain
22  to anyone that Mike Granito was retaliating
23  against you because of your EEOC charge?
24      A.   I don't think so.
25      Q.   And how did Nicky Vazzano

Eva Siu-San Lee                                                    11/13/2007

Page 250

EVA SIU-SAN LEE

1
2    retaliate against you?
3        A.    The same way the hires.
4        Q.    Does he hire?
5        A.    He calls the shape.
6        Q.    He calls the shape in the
7    mailroom?
8        A.    I would say so.  Mailroom is a
9    call in shape.  You call in at a certain time and
10   you call back and it's part of Nicky's job to put
11   people on when -- to place who goes to work.
12       Q.    And you believe that he was not
13   calling you because you filed a charge and a
14   lawsuit?
15       A.    Yes, I would say so.
16       Q.    Did anyone tell you that?
17       A.    No.
18       Q.    Did he ever tell you that?
19       A.    No.
20       Q.    Did you ever complain to anyone
21   that Nicky Vazzano was retaliating against you?
22       A.    I don't think so.
23       Q.    Did you ever complain to the union
24   that you were being retaliated against because of
25   your charge?

Page 251

EVA SIU-SAN LEE

1
2        A.    I don't remember.
3        Q.    Did you ever --
4        A.    I may have asked Wayne Mitchell
5    what, what is -- how do they hire at The Post.
6        Q.    Have you ever sued, have you sued
7    the union because of --
8        A.    I don't think so.
9        Q.    And what basis do you have to
10   believe that Mike Granito is not giving you work
11   because of your lawsuit or your charge with the
12   EEOC?
13       A.    Can you repeat that?
14       Q.    What -- so --
15           MS. GOLDSMITH:  Right.  Okay.
16       Q.    In your lawsuit on Paragraph 57
17   you said that you're one of the first to hire and
18   now that you have your complaint you're one of
19   the last.
20           Is that the way you feel that
21   you've been retaliated against?
22       A.    I would say so.
23       Q.    Any other ways?
24       A.    I don't think so.
25       Q.    Okay.

Page 252

EVA SIU-SAN LEE

1
2           MS. GOLDSMITH:  I'd like to mark
3    for Exhibit 13.
4           COURT REPORTER:  14.
5           MS. GOLDSMITH:  14?  Can't get it
6    right.
7        A.    And I want to make sure I say
8    something.  This morning you asked --
9
10   BY MS. GOLDSMITH:
11       Q.    Wait until -- let's just get this
12   marked.
13       A.    Okay.
14       Q.    And then I would like you to tell
15   me.
16           MR. FRANK:  Hold that thought.
17           THE WITNESS:  Okay.
18           (Whereupon, multi page document
19   entitled Plaintiff's Initial Disclosures Pursuant
20   to Rule 26(a), not bearing Bates stamps, is
21   received and marked as Lee Exhibit 14 for
22   Identification.)
23           COURT REPORTER:  Number 14.
24           MR. FRANK:  This is disclosures.
25           MS. GOLDSMITH:  Okay.

Page 253

EVA SIU-SAN LEE

1
2        A.    (Reviews.)
3
4    BY MS. GOLDSMITH:
5        Q.    Before we talk about Exhibit 14 I
6    think Ms. Lee would like to tell me something
7    that she --
8        A.    Yes.  It just came to my mind that
9    this morning you asked me have I sued anyone,
10   right?  I told you I went to civil court, small
11   claims court and I believe civil court and I
12   don't know, I am divorced.  I don't know is that
13   considered, I'm not sure.  I just want to put
14   that in there.
15       Q.    Thank you.  You're right.  You're
16   right.  Good catch.  Okay.
17           Looking at Exhibit 14.
18           MS. GOLDSMITH:  Right?
19           COURT REPORTER:  (Indicating.)
20           MS. GOLDSMITH:  Okay.
21
22   BY MS. GOLDSMITH:
23       Q.    Do you recognize this document?
24       A.    Yes.
25       Q.    And what is it?

64 (Pages 250 to 253)

One Penn Plaza, NYC
email@tobyfeldman.com
Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS
tel (212) 244.3990
tel (800) 246.4950

Eva Siu-San Lee

11/13/2007

Page 286

                    EVA SIU-SAN LEE
1
2       A.      Mine.
3       Q.      Yours.
4               And in 2005 were you suffering
5  stress from the divorce?
6       A.      No, I don't think so.
7       Q.      And why did you decide to
8  separate?
9       A.      We weren't getting along.
10      Q.      And did you have -- do you share
11 custody?
12      A.      Yes.
13      Q.      Did you have to go to court over
14 custody?
15      A.      No.
16      Q.      Was your husband abusive?
17      A.      No.
18      Q.      Any other -- you talked about your
19 depression, your embarrassment and humiliation
20 about being rejected for work in October of 2004
21 and of having to have a female security guard and
22 of being in the shape house, when was that, with
23 John Hom?  Oh, when you complained about the John
24 Hom incident?
25      A.      I would say last year 2006.

Page 287

                    EVA SIU-SAN LEE
1
2       Q.      Do you claim that the New York
3  Post or anyone in management at The Post
4  intentionally caused you to have stress, to be
5  emotional distressed?
6       A.      Anyone in management?
7       Q.      Yes.
8       A.      I would say so.
9       Q.      Who?
10      A.      Ray is considered management, Ray
11 Walsh is management.
12      Q.      And you think Ray Walsh
13 intentionally wanted to cause you emotional
14 distress?
15      A.      Yes.
16      Q.      And why do you believe that?
17      A.      He could have turned anyone else
18 away that night that they were hired, that they
19 hired everybody on October 6th, 2004.  He turned
20 me.  I was ready to work.
21              Also --
22      Q.      And --
23      A.      They were still short --
24              MR. FRANK:  It's so funny that I
25 want her to finish her, her testimony.

Page 288

                    EVA SIU-SAN LEE
1
2       A.      It doesn't make sense.  I was
3  there and able to work when the shift starts.
4  They had to call someone in for that shift to
5  replace the spot that they did not hire me for.
6       Q.      And why do you think it is that
7  Ray doesn't like you?
8       A.      I don't know.
9       Q.      Anyone else that you think
10 intentionally caused you emotional distress?
11      A.      I'm trying to think right now.
12 Yes.
13      Q.      Who is that?
14      A.      Joe Vincent.
15      Q.      Joe Vincent?
16      A.      Yes.
17      Q.      And how do you believe that Joe
18 Vincent intentionally caused you emotional
19 distress?
20      A.      The letter that he sent to me that
21 was a document, I couldn't figure out when was
22 it.  I don't recall it, the letter that he sent
23 to me I believe.
24              MR. FRANK:  (Indicating.)
25      A.      Yes, this was Number 1.

Page 289

                    EVA SIU-SAN LEE
1
2       Q.      Exhibit 1?
3       A.      Exhibit 1.
4       Q.      What about the letter?
5       A.      He said that I tripped up in the
6  mailroom at the last minute and shaped the
7  pressroom and worked the pressroom.  I don't
8  remember that.  I've been trying to think.  I'm
9  still trying to think of that day and I still
10 don't recall it.
11      Q.      So by -- I'm sorry, are you done?
12      A.      Yes.
13      Q.      So by sending a letter, that's how
14 you believe that Ray, excuse me, Joe Vincent
15 intentionally caused you emotional distress?
16      A.      And by sending this letter he
17 could have at least put in the date.
18      Q.      Okay.  All right.  I'm sorry.
19              Can I bring you back to, I should
20 have written the exhibit number, the initial
21 disclosures?
22              MR. FRANK:  Initial disclosures?
23              MS. EISNER:  It's on your pad.
24              MS. GOLDSMITH:  I'm sorry.
25              MR. FRANK:  You want me to give her

73 (Pages 286 to 289)

One Penn Plaza, NYC
email@tobyfeldman.com
                    Toby Feldman, Inc.
        NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS
                                    tel (212) 244.3990
                                    tel (800) 246.4950

Page 298

EVA SIU-SAN LEE
1
2 union that who has a collective bargaining
3 agreement with The Post, you cannot be a sub.  I
4 believe that is what I saw.
5       Q.    Can't be a sub?
6       A.    Yes, you cannot, yes, I believe
7 that is what it says.
8       Q.    Okay.
9             Were you a sub?
10      A.    No, not at The Post.
11      Q.    Not at The Post.
12            To your recollection have you ever
13 booked jobs in The Post mailroom and then
14 scratched at the last moment to work as a Post
15 casual pressmen?
16      A.    I don't remember.
17      Q.    So to the best of your
18 recollection is that answer yes or no?
19      A.    To my best recollection it's a no.
20      Q.    To your recollection have you ever
21 sharpshot, sharpshooting?
22      A.    My definition of sharpshooting is
23 working two department I would say unless there's
24 another definition.  If it's working in two
25 department that would be yes.

Page 299

EVA SIU-SAN LEE
1
2       Q.    Okay.  You believe you
3 sharpshooted?
4       A.    If --
5             MS. GOLDSMITH:  Asked and answered.
6       Q.    Do you believe you sharpshooted?
7       A.    Yes.
8       Q.    Did you -- did you ever see or
9 know of any rule that said you couldn't
10 sharpshoot?
11      A.    No.
12      Q.    Did you receive a letter from
13 Mr. Vincent dated September 4th, 2007?
14      A.    Yes.
15      Q.    That is exhibit -- is that Exhibit
16 Number 1 --
17      A.    Yes.
18      Q.    -- that I'm showing you?
19      A.    Yes.
20      Q.    Was that letter received after you
21 filed the charge with the EEOC?
22      A.    Yes.
23      Q.    Was that letter received after you
24 filed, you had filed on your behalf the complaint
25 in District Court, U.S. District Court?

Page 300

EVA SIU-SAN LEE
1
2       A.    Yes.
3       Q.    How long had you operated in this
4 system where you worked in the mailroom and the
5 press at The Post?
6       A.    Since May, my first shift I worked
7 in the pressroom was in June.  Since June of
8 2004.
9       Q.    Had you ever received a letter
10 like this from anyone in management from The
11 Post?
12      A.    No.
13      Q.    Do you consider this to be
14 retaliation for filing of your complaints?
15            MS. GOLDSMITH:  Objection.
16      A.    Yes.
17      Q.    Okay.
18            MR. FRANK:  You can object.
19            I don't know why I'm not allowed to
20 ask for your opinion since you've spent the better
21 part of six hours.
22            You can object as to form.  This is
23 not a courtroom.
24      Q.    Let me repeat that.
25            MR. FRANK:  Would you please play

Page 301

EVA SIU-SAN LEE
1
2 back that question?
3            (Whereupon, the requested portion
4 is read back by the reporter as follows:
5            "QUESTION:  Do you consider this
6 to be retaliation for filing of your
7 complaints?")
8
9 BY MR. FRANK:
10      Q.    Your answer?
11      A.    Yes.
12      Q.    Do you consider the fact that you
13 were escorted, told to leave the premise when --
14            MS. GOLDSMITH:  Object.
15            Leading.
16      Q.    -- when as --
17            MR. FRANK:  Leading?  In a
18 deposition?  Are you kidding?  Please.  Don't
19 embarrass yourself.
20      Q.    Do you consider it -- do you
21 consider it to be retaliation, did you consider
22 it and do you consider it to be retaliation when
23 you were told not to be on the premises when
24 other male people were allowed to be on the
25 premises when off shift?

One Penn Plaza, NYC                    Toby Feldman, Inc.                    tel (212) 244.3990
email@tobyfeldman.com        NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS        tel (800) 246.4950

Eva Siu-San Lee

11/13/2007

Page 302

```
1              EVA SIU-SAN LEE
2        MS. GOLDSMITH:  Objection.
3    Q.    Go ahead.  Answer the question.
4    A.    Yes.
5        MR. FRANK:  Objection as to form is
6   the proper way to do it.
7    Q.    Do you consider it retaliation
8   when you were escorted by a female security
9   person, by a female security personnel to
10  different places within The Times location?
11       MS. GOLDSMITH:  Objection.
12   Q.    I mean Post, The Post location?
13   A.    That I cannot consider
14  retaliation.
15   Q.    Why?
16   A.    That is because I believe the time
17  frame it happened, let's see, when did it happen?
18  It happened, but my case was not filed yet.
19   Q.    So it happened prior to the EEOC
20  charge being filed?
21   A.    Yes.
22   Q.    Okay.
23       Do you consider that Mr. -- I
24  forget his name.
25       Withdraw that, please.
```

Page 303

```
1              EVA SIU-SAN LEE
2        MR. FRANK:  No more questions.
3        MS. GOLDSMITH:  Okay.
4        Just a few questions.
5
6   EXAMINATION BY MS. GOLDSMITH:
7    Q.    Are you a union officer?
8    A.    No.
9    Q.    Are you a part of management at
10  The Post?
11   A.    No.
12   Q.    Have you ever seen the New York
13  Post's office rules for the pressroom?
14   A.    I don't recall it.  I don't think
15  so.
16   Q.    Have you ever looked at the
17  bulletin board in the pressroom?
18   A.    For the markups.
19   Q.    So you've seen the bulletin board?
20   A.    I've seen the bulletin board for
21  the markups if there was any job openings.
22   Q.    And have you ever looked at The
23  postings on the bulletin board besides the
24  markups?
25   A.    Not really because I thought they
```

Page 304

```
1              EVA SIU-SAN LEE
2   didn't concern me.
3    Q.    I'm sorry?
4    A.    Not really because I thought they
5   didn't really concern me.
6    Q.    They don't concern you?
7    A.    I don't think I never really
8   looked at it.
9    Q.    So the office rules don't concern
10  you?
11   A.    I don't know does it, but I never
12  really looked at it.  I don't --
13   Q.    Okay.
14       MS. GOLDSMITH:  That's it.
15       MR. FRANK:  That's it?
16       MS. GOLDSMITH:  Yes.
17       MR. FRANK:  Done for the day.
18  Okay.
19       Off the record.
20       (Time noted:  4:59 p.m.)
21                    _Eva Lee_
22                    EVA SIU-SAN LEE
23  Subscribed and sworn to before me
24  this _2nd_ day of _January_ 200_8_
25           _Jennifer J. Mazzo (DeVenuti)_
                    _Notary Public_
```

JENNIFER L. MAZZO (DeVenuti)
Notary Public, State of New York
No. 01MA6135554
Qualified in Nassau County
My Commission Expires October 24, 2009

Page 305

```
1
2   STATE OF _New York_ )      Pg.  of  Pgs.
3                     ) ss.:
4   COUNTY OF _Suffolk_ )
5        I wish to make the following changes, for
6   the following reasons:
7   PAGE LINE
8   _232  14_  CHANGE: _minors_
9          REASON: _not minorities._
10  ____ ____  CHANGE: _____
11         REASON: _____
12  ____ ____  CHANGE: _____
13         REASON: _____
14  ____ ____  CHANGE: _____
15         REASON: _____
16  ____ ____  CHANGE: _____
17         REASON: _____
18  ____ ____  CHANGE: _____
19         REASON: _____
20  ____ ____  CHANGE: _____
21         REASON: _____
22  ____ ____  CHANGE: _____
23         REASON: _____
24  ____ ____  CHANGE: _____
25         REASON: _____
```

JENNIFER L. MAZZO (DeVenuti)
Notary Public, State of New York
No. 01MA6135554
Qualified in Nassau County
My Commission Expires October 24, 2009
_Subscribed and sworn to before me_
_this 2nd day of January 2008_
_Jennifer J. Mazzo (DeVenuti)_
_Notary Public_

_Eva Lee_

77 (Pages 302 to 305)

One Penn Plaza, NYC
email@tobyfeldman.com

Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS

tel (212) 244.3990
tel (800) 246.4950



900 E 132nd Street, Bronx, NY 10454  T 718.742.3180  F 718.292.7721  JVincent@nypost.com

**JOSEPH B. VINCENT**
Senior Vice President Operations

September 04, 2007

Ms. Eva Lee
40-18 247th Street
Little Neck, NY 11363

Dear Ms. Lee,

Records reflect that you are a regular situation holder in the mailroom at the New York Times and a member of the New York Mailers' Union Number Six (Mailers' Union). You work substitute mailer shifts at the New York Post ("Post") as an outsider from the New York Times under the Post-Mailers' Union collective bargaining agreement. Somehow you managed to get on the New York Post Pressroom Priority Casual List. This placement allows you to work in the Post pressroom as a casual on a priority basis over other non-priority casuals. The purpose of the Priority Casual List was to create a system which would maximize the opportunity of casuals to move into the New York Printing Pressmen's Union Number Two (Pressmen's Union) and become a full-time pressman in the bargaining unit. By definition you cannot be a member of both the Mailer's Union at the Times and the Pressmen's Union working at the Post.

The Post decided never to allow your situation to reoccur, but to permit you to make the decision as to which Union and position you will take, when you have worked the necessary shifts in a six month period to obtain your Pressmen's Union card. We are not applying the rule prohibiting working as a casual in two bargaining units to you retroactively.

Another problem has arisen. Apparently, you are booking jobs in the Post's Mailroom and then scratching at the last moment to work as a Post casual pressman if a work opportunity arises in the Post's Pressroom. This sharp shooting is unacceptable and will not be tolerated. If you book a Post Mailroom position, you are hereby instructed not to accept work for that shift in the Post Pressroom. You will not be penalized for refusing the available pressroom shift.

By our decision to grandfather you from the rule against working both in the Post Pressroom and the Post Mailroom, you have been extended the unique opportunity to work on a substitute basis in two operational departments. I expect that you will respect my directive and will cease conduct arising from this anomaly that negatively impacts Post operations. Should you again scratch a scheduled shift in the Post Mailroom and work that shift in the Post Pressroom, you will be disciplined up to and including a permanent bar from working in the Post Mailroom and/or removal from the Post Pressroom Priority List.

Sincerely,

Joseph B Vincent
Senior Vice President of Operations

Cc: Wayne Mitchell, President, New York Mailers' Union Number Six
John M. Hefferman, President, New York Printing Pressmen's Union Number Two

DEPOSITION EXHIBIT
Lee 1
11 '13 '07
Rich Germosen, CSR, CSR-R, RPR, CRR

A NEWS CORPORATION COMPANY

January 8, 2007
Eva Lee called Penny Morgan regarding a complaint and wanted to give a statement.

Call started at 3:03pm
Call terminated at 3:19pm

Eva Lee's statement of conversation between herself and John Magalia is as follows:

Eve states that:

I had gone to the Times to pick up something my sister had left for me in my locker. I saw my boss I was talking to my boss Randy and when John Magali called me on my cell phone. I told him that I was talking to my boss and I would call him later. I didn't call him back but when I pulled up to the Shape house at the New York Post, I saw him in his car. He called me on my cell phone and asked me "Why I didn't him call me back and I said that I was talking to my boss". He asked, "What about after you left the Times", and I said ," I didn't have my blue tooth and I didn't want to be driving and talking at the same time. He then said, If I didn't call him, then he was not going to call me again, and I replied "Okay" and then I became busy.

He asked, "What I meant by okay?" For a moment I kept my mouth shut, he then repeated, "What is okay? Then went on to say that "Everything you did you did to yourself". I said "I didn't want to talk about it". He asked me if my window was closed and I said yes.

Note : I am distancing myself from everybody because everyone is looking at me in a weird way.

I told him I didn't want to talk about it and I hung up on him.

I went into the shape house and then a minute or two later he came in there. He said that I was very bad that I hung up on him and something else but do not remember.

He left the shape at that point and then I got in my car and he called me again, he asked where I was going? I told him I was going to get cream puffs for my daughter and my son, I told him I'd call him right back because I had to take another call.

A few minutes called him back and he said where was I going to get the cream puff, "we have to talk…"

I asked him what is there to talk about. He said there is a lot to talk about he asked was he a nice person and I said yes but I don't know you that well. Then, I think we said bye and that was it.

He told me that he had exited on FDR .When he called I was on 14th street and 1st avenue and he asked how to get to where I was.

DEPOSITION EXHIBIT
Lee 10
11/13/07
Rich Germosen, CSR, CSR-R, RPR, CRR

I was on Broadway and Astor Place, he said he would meet me there. Then he called me back and said he passed the place. He was on East 1st and Broadway. When I reached the cream puff place, it was closed so he said he would drive over as he was on my way down and meet him.

When I met up with him, I pulled up by his car, with my window open, he asked what I was doing for tonight and I told him I was going home. He asked me what was to do at home and asked me to "hang out a little" I told him that there was a lot to do at home and he said not to tell it was laundry again; and I replied that I had already done the laundry.

John said that he considered Dwayne (his friend) and he considered I was his friend, then, he said he likes Dwayne and he likes me to but he also has interest in me.   He then sia that he respected what I was doing but didn't want to be mentioned at all because he had family ties at The Post.  It said to him who doesn't have family ties?  If I have to mention names I will if everybody tells me that they are my friend and not to mention their names when I go up there I will be looking like a fool.  I also mentioned that if I mentioned names if would not hurt you in any way as you are not the one who is doing wrong.  Then he blasted my radio, and said,   "look I am trying to get a job here and I not looking to step on anyone's toes and not looking for anyone to step on mine. "

Then he said, things can get very bad, just remember, if you hurt me I will hurt you.

I didn't say anything, I was trying to close my window and leave. His arm was on my window.  I closed my window and left.

Eva asked for a copy of the notes for her attorney, and I advised her that when her attorney  contact us we will handle requests then.

I asked for her contact numbers and the best time to contact her should I need to gain further information

H :718 593 4090
C: 347 556 6920.

Call terminated at 3:19pm

**Conversation with Eva Lee 11:45am 9/19/07**

I spoke with Eva Lee today 11.45 regarding a complaint she wanted to lodge against the Director of Security Mr Lloyd Vasquez.

She explained that on August 21 she had parked inside the premises on a day off and had gone to the Shape room to shape.

Mr Vasquez had requested that she return her ID badge and advised it was company property and would be returned to her on the days she physically works.

Thus, when she was not working for the New York Post she was not authorized to be on company premises.

I asked Eva to put her complaint in writing which would allow me to fully investigate it.

Eva asked me when she was going to get her ID badge back and I asked what Lloyd had advised when he took it away.

Eva explained that Lloyd has said he would return it to her on her next shift which was Monday.

I then confirmed with her that if Lloyd had agreed to return this to her then he would do so, therefore I was confused as to why she felt she did not know when she would get her ID back.

I again, requested her to put the detail into an e-mail or memo and send it to me.

The conversation was terminated at 11:47am.

DEPOSITION EXHIBIT

Lee 11

11/13/07

Rich Germosen, CSR, CSR-R, RPR, CRR

**Morgan, Penny**

| | |
|---|---|
| **From:** | Eva Lee [evalee10@hotmail.com] |
| **Sent:** | Wednesday, September 19, 2007 12:26 PM |
| **To:** | Morgan, Penny |
| **Subject:** | Security |

Dear Penny Morgan

On 8/21/07 I was in the Post parking lot and saw Lloyd Vasquez. Lloyd told me that I can't in the parking lot, if I am shaping and not working. On 9/14/07 I saw him again, as I was walking to my car and ready to leave. He warned me that he had told me before not to be here while shaping. I said to him that "you are security and it's a safety issue that I am in here."
He said he doesn't care and asked if I had my Id with me and to hand it to him. I went to my car and got my Id and handed it to Lloyd. Then Lloyd asked Gus to come over and to be a witness. He took my Id and said this belongs to the Post and we loan this to you. I am the Director of Security and taking it. Lloyd said he will write an incident report up and you'll
get your Id on Monday. My daughter was in the car at the time. Lloyd was questioning about her as to who she is and her name. I said "she's my daughter."

Eva Lee

Test your celebrity IQ. Play Red Carpet Reveal and earn great prizes!
http://club.live.com/red_carpet_reveal.aspx?icid=redcarpet_hotmailtextlink2

DEPOSITION EXHIBIT
Lee 12
11/13/07
Rich Germosen, CSR, CSR-R, RPR, CRR

1

VERIFICATION OF CRIME /
LOST PROPERTY
PD 542-061 (Rev. 09-08)

## Do Not Detach — Submit In Duplicate

Complainant/Victims will be sent verification free of charge, other applicants must send a non-refundable processing fee of $15.00 (Check or Money Order — NO CASH) payable to the NYC Police Department with each application. All applicants must enclose a stamped self-addressed envelope. Please mail requests to: New York City Police Department, Criminal Records Section (Verification Unit), 1 Police Plaza, Room 300, New York, NY 10038.

* Complaint Number    Precinct of Report

2007 0090203 44th 9

Mail Record To:

40-18 247 ST
(Print or Type)
Little Neck NY 11363
Eva Lee

1. Exact location where crime / loss took place    Precinct of Occurrence

Broadway Broadway and E 3rd ST    9th

2. Date reported to Police    Time (if known)    This report concerns:    ☐ Crime  ☐ Other (describe)    Threat

1/8/07    10:30 pm    ☐ Lost Property

3. Full name and address of complainant/victim as reported to Police Department

Eva Lee 40-18 247 ST Little Neck NY 11363

Date and Time of Crime / Loss of Property (if different than date of report)    DATE 1/5/07    TIME 9:30 pm    Name of officer who received your report, if known.

Any additional information which may aid in searching for your record

* INSTRUCTIONS: In order to find this record you MUST furnish all information requested above, particularly the complaint number and precinct of record (Occurrence). Verification of your request cannot be made without this information. The complaint number may be obtained by calling the precinct or detective squad concerned during the hours of 8 a.m. to 5 p.m. Do Not Detach — Submit In Duplicate.

Applicant's Signature  Eva Lee    Date 1/9/07    Name and address of Insurance company    Date

FOR POLICE DEPARTMENT USE ONLY

FOLLOWING IS A VERIFICATION OF THE ABOVE REQUEST

MOTOR VEHICLES

CURRENCY

NEW YORK CITY POLICE DEPARTMENT
CRIMINAL RECORDS SECTION
P.O. BOX 2528
NEW YORK, NEW YORK 10272-2528

JEWELRY

FURS — CLOTHING

FIREARMS

OFFICE EQUIPMENT

T.V., RADIOS, CAMERAS, ETC.

HOUSEHOLD GOODS

CONSUMABLE GOODS

MISCELLANEOUS

NEW YORK CITY POLICE DEPARTMENT
CRIMINAL RECORDS SECTION
P.O. BOX 2528
NEW YORK, NEW YORK 10272-2528

DEPOSITION EXHIBIT
Lee 13
11/13/07
Rich Germosen, CSR, CSR-R, RPR, CRR

BRIEFLY DESCRIBE MANNER OF CRIME / LOSS OF PROPERTY    Street — Complainant states that harassment perp approached her vehicle and threatened to hurt her if she caused problems at their workplace. Perp's actions caused complainant annoyance and alarm.

NEW YORK CITY POLICE DEPARTMENT
CRIMINAL RECORDS SECTION
P.O. BOX 2528
NEW YORK, NEW YORK 10272-2528

Alarm No.    Report verified by (print title, name/sign)  P. Gray    Date 61/20/07