**EXHIBIT 2**

```
UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK
------------------------------X
EVA LEE,

            Plaintiff,

      vs.

NYP HOLDING INC and RAYMOND
WALSH, JR., an individual,

            Defendants.
------------------------------X
```

December 20, 2007

10:14 a.m.

Deposition of RAYMOND E. WALSH, held at the offices of Jones Day, 221 East 41st Street, New York, New York, pursuant to Notice, before Theresa Tramondo, a Notary Public of the State of New York.



**David Feldman**
Worldwide

**Page 30**

Walsh
1
2  A. November of 1997.
3  Q. Who gave you that promotion?
4  A. John Amann.
5  Q. What is John Amann's position at
6  the Post?
7  A. He no longer works there.
8  Q. At that time what was his position?
9  A. He was the -- I can't remember.
10  Q. Was he part of HR?
11  A. No.
12  Q. Was he the head of the facility at
13  that time?
14  A. I don't know.
15  Q. You don't know. Where is the
16  facility located that you work as a press
17  room superintendent?
18  A. 900 East 132nd Street.
19  Q. Where is that?
20  A. Bronx.
21  Q. How long has the facility been
22  there?
23  A. February of 2001.
24  Q. And previously where was the
25  facility located?

**Page 31**

Walsh
1
2  A. South Street in Manhattan, lower
3  Manhattan.
4  Q. What was the reason for the move?
5     MS. GOLDSMITH: Objection.
6  A. We moved the facility because it
7  was an antiquated building and we needed to
8  upgrade equipment.
9  Q. And did you upgrade your equipment
10  when you went to the Bronx facility?
11  A. Yes.
12  Q. How big is the Bronx facility?
13  A. Big.
14  Q. How big?
15  A. I don't know the square footage.
16  Q. How many floors?
17  A. Three.
18  Q. So it's smaller than this building?
19     MS. GOLDSMITH: Objection.
20  A. It's an industrial complex.
21  Q. Besides what you testified earlier,
22  are there any other duties and
23  responsibilities being the superintendent of
24  the press room?
25  A. Just to supervise and make sure my

**Page 32**

Walsh
1
2  department runs as smooth as possible.
3  Q. Who do you supervise?
4  A. Roughly 115 people.
5  Q. What type of positions do these 115
6  people have?
7  A. They range from foreman to
8  journeyman to flyboys to casuals.
9  Q. How many individuals work in the
10  press room?
11  A. On a day?
12  Q. On a day.
13  A. That depends.
14  Q. What does it depend on?
15  A. Depends on the page size and what
16  our need figure is as per the collective
17  bargaining agreement and the required number
18  of people that we would request to work on a
19  nightly basis.
20  Q. What about on an average day?
21  A. Roughly 40 people.
22  Q. How do you supervise the employees
23  in the press room?
24  A. I delegate it to my foremen.
25  Q. How many foremen do you have right

**Page 33**

Walsh
1
2  now?
3  A. Twelve.
4  Q. What are the names of your foremen?
5  A. Do you want all of them now?
6  Q. Yes.
7  A. I should have brought a priority
8  list with me.
9     Brian Walsh, Bill Bogan, Tom Carew,
10  Tom Scherrer.
11  Q. Could you spell that last name,
12  please?
13  A. S-C-H-E-R-R-E-R.
14     Donald Boyle, John Peers, Jack
15  Himpler, Jim Wilkinson, Gary Sanderson,
16  Constantine Frangoulis, Richard Waldron,
17  Steven McNelis, Bill Schmidt.
18  Q. Is that it?
19  A. (Nodding.)
20  Q. What does a foreman do for you?
21  A. Foreman is responsible for making
22  sure the presses are manned by the collective
23  bargaining agreement. They're also
24  responsible for supervising their individual
25  press that they are assigned to. They're

Page 34

```
                    Walsh
 1
 2   also responsible for the accurate press
 3   reporting and communicating with the
 4   supportive departments throughout the night's
 5   production.
 6      Q.   How does one become a foreman?
 7      A.   They become chosen.
 8      Q.   What is the criteria to choose a
 9   foreman?
10      A.   Work ethic.
11      Q.   Work ethic?
12      A.   (Nodding.) Loyalty.
13      Q.   Loyalty.
14           Does one have to work at the Post
15   before obtaining the position of foreman?
16      A.   Not necessarily.
17      Q.   So you can hire people from the
18   outside the Post, who work outside the Post?
19      A.   As long as it's with the guidelines
20   as of the collective bargaining agreement
21   with the pressmen's union.
22      Q.   You have the power to influence
23   hiring decisions?
24           MS. GOLDSMITH:  Objection.
25      Q.   As part of your responsibilities
```

Page 35

```
                    Walsh
 1
 2   and duties as a press room superintendent, do
 3   you have any influence in hiring individuals
 4   to work in the press room?
 5      A.   What kind of individuals?
 6      Q.   Casuals.
 7      A.   Yes.
 8      Q.   Shapers?
 9      A.   Yes.
10      Q.   Do you have the power to discipline
11   these individuals?
12      A.   Yes.
13      Q.   What type of discipline?
14      A.   Depends on the infraction.
15      Q.   Besides the 12 foremen that you
16   previously testified, can you explain the
17   chain of the command in the press room
18   starting with the top to the bottom of the
19   positions?
20      A.   Each individual foreman is
21   responsible for their press reporting,
22   communicating with other departments, making
23   sure the flow of production is as smooth as
24   possible, so they get out the door as fast as
25   possible, so the paper gets out on a timely
```

Page 36

```
                    Walsh
 1
 2   manner.  They're responsible for press
 3   reporting, equipment fault reporting and any
 4   disciplinary reporting.
 5      Q.   Who is an under a foreman?
 6      A.   Excuse me?
 7      Q.   What position is under the foreman?
 8   Who does the foreman supervise?
 9      A.   From the PIC's down.
10      Q.   What is after the PIC?
11      A.   A journeyman.
12      Q.   What is a "PIC" again?
13      A.   Pressman in charge.
14      Q.   You said a journeyman.  What is
15   after a journeyman?
16      A.   A flyboy, junior.
17      Q.   Then what is before a flyboy?
18      A.   What's after a flyboy; is that your
19   question?
20      Q.   (Nodding.)
21      A.   Casual.
22      Q.   Anything before a casual?
23      A.   Yes.
24      Q.   That's the lowest person?
25      A.   No.
```

Page 37

```
                    Walsh
 1
 2      Q.   Who is the lowest person?
 3      A.   A provisional.
 4      Q.   What is a "provisional shaper"?
 5      A.   A "provisional shaper" is someone
 6   who comes in off the street and is looking
 7   for a day's pay.
 8      Q.   How does one become a provisional
 9   shaper?
10      A.   They walk in the door.
11      Q.   Who do they speak to when they walk
12   in the door?
13      A.   They sign a provisional sign-in
14   sheet.
15      Q.   Who is in charge of the sign-in
16   sheet?
17      A.   The foreman.
18      Q.   The foreman at that given time?
19      A.   Yes.
20      Q.   What does a provisional shaper do?
21      A.   Shapes.
22      Q.   What type of responsibilities or
23   duties would they do when they shape?
24      A.   They just sign their name.
25      Q.   And they just hang out?
```

Page 38

```
                      Walsh
 1
 2      A.   Yes.
 3      Q.   What do they exactly do to assist
 4   in the press room?
 5      A.   If there is a need for a
 6   provisional, if we get that short-staffed, we
 7   have a whole series of procedures that we do
 8   prior to getting to a provisional.
 9      Q.   Have you ever been involved in
10   hiring a provisional shaper?
11      A.   Yes.
12      Q.   How?
13      A.   I don't understand the question.
14      Q.   Do you have influence in hiring the
15   provisional shaper, you said?
16      A.   Yes.
17      Q.   What type of influence do you have?
18      A.   All of my foremen and myself
19   discuss the hiring of outside provisionals
20   and casuals.
21      Q.   What do you talk about?
22      A.   Their work ethic.
23      Q.   Is there anything else?
24      A.   (Nodding.) No.
25      Q.   Just their work ethic?
```

Page 39

```
                      Walsh
 1
 2           MS. GOLDSMITH:  Objection.
 3           You can answer it if you can.
 4           THE WITNESS:  What's the question?
 5           (Record read.)
 6      A.   Yes.
 7      Q.   Do you know if Miss Lee was ever a
 8   provisional shaper?
 9      A.   Yes.
10      Q.   Do you know the time period?
11      A.   Not the specific time period.
12      Q.   Do you know around when?
13      A.   2004.
14      Q.   And how much does an individual who
15   is a provisional shaper make on a given
16   shift?
17      A.   Repeat the question.
18      Q.   How much money does the provisional
19   shaper receive on a given shift?
20      A.   Then or now?
21      Q.   Then.
22      A.   One hundred fifty.
23      Q.   What about now?
24      A.   I don't know what the -- I don't
25   know what the inflation rate was -- is.
```

Page 40

```
                      Walsh
 1
 2      Q.   Who pays these individuals?
 3      A.   The New York Post.
 4      Q.   Are you the person in charge of
 5   these provisional shapers, the head person?
 6           MS. GOLDSMITH:  Objection.
 7      A.   No.
 8      Q.   Who is?
 9      A.   The company.
10      Q.   Who in the company?
11      A.   Repeat the question.
12      Q.   Who in the company is?
13      A.   There are a few individuals.
14      Q.   What individuals?
15      A.   Legal counsel.
16      Q.   Anyone else?
17      A.   And my boss.
18      Q.   Previously you testified that right
19   now there are 12 foremen in the press room.
20   Are they all men?
21      A.   Yes.
22      Q.   To the best of your knowledge how
23   many shapers are there at a given time in the
24   press room --
25           MS. GOLDSMITH:  Objection.
```

Page 41

```
                      Walsh
 1
 2      Q.   -- when needed?
 3      A.   Depends.  Depends on the day.
 4      Q.   Why would that be?
 5      A.   Well, it was July 4th weekend, I
 6   don't think you're going to get many people.
 7   If it's Super Bowl Sunday and it's snowing
 8   out, you'll probably get some more.
 9      Q.   To the best of your knowledge, who
10   gave Miss Lee the job of shaping?
11           MS. GOLDSMITH:  Objection.
12      A.   Miss Lee was a provisional.
13      Q.   Correct.
14           When she came in to sign in as a
15   provisional, when she signed her name, do you
16   know who she spoke with?
17           MS. GOLDSMITH:  Objection.
18      A.   I do not.
19      Q.   What is a "casual"?
20      A.   "Casual" is a substitute individual
21   who -- if needed would be called to work.
22      Q.   What type of duties does a casual
23   in the press room perform if they're needed?
24      A.   They would conduct the same duties
25   as a flyboy out on the press.
```

### Page 42

Walsh

1  Q. What type of duties is that?
2  A. **You want me to repeat all those duties I said before?**
3  Q. No. You don't have to.
4  A. **Thank you.**
5  Q. Is a casual -- have a higher position than a provisional?
6  MS. GOLDSMITH: Objection.
7  A. **Yes, yes.**
8  Q. Can you explain?
9  A. **Casual is on a casual sheet.**
10 Q. What is a "casual sheet"?
11 A. **Casual sheet is a sheet that has people's names on it, and when the office and the union expire their need of workers, we revert to the casual list.**
12 Q. So how does one shed their status as provisional shaper and become a casual?
13 A. **Can you repeat the question?**
14 Q. How does one shed their status as a provisional shaper and become placed on the press room's casual list?
15 A. **How do they shed their status?**
16 Q. Yes.

### Page 43

Walsh

A. **What does that mean?**
Q. How does one leave the position as a provisional shaper and then become on the press room casual list?
A. **Depending on if we need casuals, we would add them to a casual sheet, elevate them to casual status.**
Q. And what criteria do you use that you would elevate these provisional shapers onto the casual list sheet?
A. **Depends if we need to elevate provisionals to casuals.**
Q. The time when you do need to, what would it be?
A. **Can you repeat that?**
Q. The times that you would need these individuals on the casual -- I am sorry.
MS. SKIR: Could you read that back, please.
(Record read.)
A. **We elevate our provisionals to casual status. We have a criteria we use. It's attitude and aptitude criteria.**
Q. Anything else besides attitude and

### Page 44

Walsh

aptitude criteria?
A. **Willingness to learn, follow directions, orders, like that.**
Q. Who evaluates these things, these criteria?
MS. GOLDSMITH: Objection.
Answer it if you understand it.
A. **I don't understand it.**
Q. Who has a say in this criteria in order to put these individuals on the press room casual list?
A. **I do.**
Q. Anyone else besides you?
A. **Yes.**
Q. Who is that?
A. **A couple other foremen.**
Q. Which foremen?
A. **My assistant foremen.**
Q. Who is your assistant foremen?
A. **You have a whole list in front of you.**
Q. Of these 12 individuals, who is your assistant foremen?
A. **Bill Bogan and Brian Walsh.**

### Page 45

Walsh

Q. Why are they your assistants and not the other ten?
A. **Because those two work closely with me and they helped me with a lot of issue at the New York Post.**
Q. What type of issues?
A. **Numerous issues.**
Q. What type of numerous issues?
A. **I can't even go back and tell you. We'd be here for 12 days.**
Q. Do they have more experience than the other ten individuals on the list that you gave me?
A. **Yes.**
Q. Have they been there longer?
A. **Yes.**
Q. Is Miss Lee on the press room casual list?
A. **Yes.**
Q. How did she become a casual in the press room?
A. **We graded her and she became a casual.**
Q. How did you grade her?

Page 46

Walsh

A. Through the aptitude and attitude process.
Q. Is there a manual that explains the procedures and rules of casuals?
A. I don't follow.
Q. Is there a book that tells about the rules and procedures of staying on the press room casual list and what a casual must do?
A. Yes.
Q. And where is that posted?
A. It's a letter.
Q. It's just a letter?
A. Uh-hmm, yes.
Q. Nothing else?
A. That's it.
Q. That's it. Do casuals receive it?
A. Yes.
Q. How do they receive it?
A. Either by mail or hand delivered.
Q. Are you aware if the plaintiff Miss Lee received it?
A. Yes.
Q. Do you know around what time she

Page 47

Walsh

received it?
A. I believe it was in the early January of '05.
Q. Who sends the rules and procedures to the casuals?
A. I do.
Q. What are the procedures and rules?
A. I don't know them off the top of my head right now.
Q. Can you explain the placement of the rules?
    MS. GOLDSMITH: Objection.
Q. I am going to show you what has been Bates stamped NYP 0048 -- I am sorry. I withdraw the last question.
    MS. SKIR: Please mark this as Plaintiff's Exhibit 1.
    (Plaintiff's Exhibit 1, letter dated January 25, 2005, marked for identification, as of this date.)
Q. The reporter has just handed you what has been marked as Exhibit 1 for identification purposes. Please review the document, Mr. Walsh.

Page 48

Walsh

A. I see it.
Q. Do you recognize this document?
A. Yes.
Q. Are you familiar with it?
A. Yes.
Q. When is it dated?
A. It's dated January 25, 2005.
Q. Who wrote the letter?
A. The person who signed it is Raymond Walsh, Jr.
Q. What is the letter?
A. This is a letter notifying an individual that they had been placed on the casual hiring list with the shape procedures numbered below.
Q. Who is it addressed to?
A. Miss Eva Lee.
Q. Are you aware what the mode of delivery was?
A. The "mode of delivery," meaning how it was delivered?
Q. Yes.
A. I don't know if it was delivered by mail or hand delivered. Don't know.

Page 49

Walsh

Q. Are you aware if she received it?
A. Yes.
Q. How do you know?
A. Because she's on the list.
Q. Now, after reviewing this document, do you know what the shape procedures are?
A. Yes.
Q. Can you explain them to me?
A. One through eight?
Q. Sure.
A. Would you like me to read them.
Q. No. Just could you summarize them for me?
A. It states what some of the procedures are. You know, you have to shape five nights a week, Saturdays and Sundays are required, all other nights are optional. And then it talks about there will be no shape -- day-side shape, and it's specifies how a person gets called for work in the order -- you know, the one through five, and blah, blah, blah, all that stuff. And then it talks about how the provisional shapers would be hired after the casuals. It talks about

50

Walsh

1 any excused absences from the foremen's
2 approval, the company periodically evaluates
3 the performance of casuals, failing to meet
4 the shape requirements result in being
5 removed from the list. It tells them that
6 they're on a probationary period, you know,
7 whatever, probationary employees. And it
8 also says the company reserves right to add,
9 change or delete any of the procedures,
10 requirements or rules set forth. And then it
11 just says you're shaping record will be
12 revised periodically. And then it says "Ray
13 Walsh, Jr." on it.
14   Q.  Besides this document are there any
15 other documents that explain shape
16 procedures?
17   A.  No.
18   Q.  How do you have a --
19     Is there a formal review of these
20 casuals?
21     MS. GOLDSMITH: Objection.
22   Q.  Do you formally review casuals on a
23 daily basis?
24   A.  No.

51

Walsh

1   Q.  You don't.
2     Who reviews their competence, their
3 competence?
4   A.  Foremen.
5   Q.  The foremen?
6   A.  Yes.
7   Q.  Do you have any input on that?
8   A.  Yes.
9   Q.  What type of input?
10   A.  Feedback.
11   Q.  What type of feedback?
12   A.  From my foremen.
13   Q.  Is this documented?
14   A.  No.
15   Q.  So it's just you talk about it
16 orally and there is no written communication
17 about the evaluations of their competence?
18     MS. GOLDSMITH: Objection.
19   A.  Unless there is an infraction
20 report.
21   Q.  Besides the foremen and yourself,
22 is there anyone else who evaluates the
23 casuals?
24   A.  No.

52

Walsh

1   Q.  Are you aware -- how long has
2 Miss Lee been on the casual list?
3   A.  I don't know the specific time
4 period.
5   Q.  Is it safe to say, that this letter
6 was written on January 25, 2005, that she has
7 been on the casual list for a little less
8 than three years?
9   A.  That's fair.
10   Q.  Are there any females besides
11 Miss Lee on the casual list?
12   A.  No, I don't think so.
13   Q.  Are you aware of what her number is
14 on the casual list?
15   A.  Yes.
16   Q.  What is that?
17   A.  Number 11.
18   Q.  Number 11.
19     How many casuals are there right
20 now on the list?
21   A.  Eleven.
22   Q.  There are 11?
23   A.  Yes.
24     MS. GOLDSMITH: Could we gp off

53

Walsh

1 the record.
2     (Discussion off the record.)
3   Q.  Were there the 11 casuals at the
4 time of 2005, or are there 11 casuals at this
5 time in 2007?
6   A.  2005.
7   Q.  How many casuals are on the list
8 presently?
9   A.  Four.
10   Q.  Previously you testified at some
11 point Miss Lee was graded, she was graded?
12     MS. GOLDSMITH: Objection.
13   Q.  Reviewed?
14   A.  Yes.
15   Q.  Do you recall when she was
16 reviewed?
17   A.  December of '04.
18   Q.  So that was before she received
19 Plaintiff's Exhibit 1?
20   A.  Yes.
21   Q.  And who was involved in that
22 review?
23   A.  Myself.
24   Q.  Anyone else?

Page 78

Walsh

MR. SACK: Thank you.
Q. Mr. Walsh, as you sit here today, do you know when Phil Anzalone became an employee of the Post?
A. Not off, no.
Q. Do you happen to have any recollection or recall of whether or not Mr. Anzalone began to shape before or after Miss Lee?
A. He shaped before Miss Lee.
Q. How do you know that?
A. Phil Anzalone is a steady situation employee at New York Post.
Q. Currently, correct?
A. Yes.
Q. Isn't it a fact that Miss Lee and Mr. Anzalone shaped at the same time?
A. I don't know.
Q. Is it possible that Miss Lee actually began to shape before Mr. Anzalone?
A. I don't know.
Q. Do you know Bill Trank?
A. Yes.
Q. Who is he?

Page 79

Walsh

A. He's a junior.
Q. The same as Mr. Anzalone?
A. Correct.
Q. Do you recall when he began to shape as a provisional?
A. I don't know the specific date.
Q. Are there any documents maintained by the Post that would bear this information?
A. Yes.
Q. What documents are those?
A. Shape records.
Q. When you say "shape records," what exactly are you referring to?
A. These documents here and the other documents when you sign in.
Q. So Plaintiff's 2 and the handwritten notes that are taken by foremen at the shape?
A. It's the casual sign-in sheet.
Q. Those documents would show when, in fact, someone would come and appear at the shape?
A. Yes.
Q. Is it your testimony that foremen

Page 80

Walsh

log all this information?
A. Yes.
Q. So the actual shaper him or herself doesn't actually sign the sheet?
A. Yes, they have to sign the sheet.
Q. What information is asked for on the sign-in sheet besides the signature of the shaper?
A. Well, you have the casual sheet, the shape sheet, and then you have your name on it, print, you know -- and then you have a sign and then signature, and you know, your phone number, things like that.
Q. Is there a time-in, time-out box or slot?
A. No, there is no time-in.
Q. Now, who decides which provisional receives an opportunity to work?
A. It's random.
Q. What do you mean by that?
A. We pick and choose.
MS. GOLDSMITH: Who decides?
I am sorry.
THE WITNESS: The foremen.

Page 81

Walsh

MS. GOLDSMITH: Who decides?
THE WITNESS: The foremen.
Q. All the foremen that you previously testified to, they're all white males; is that correct?
A. Yes.
Q. Brian Walsh, is he related to you?
A. Yes.
Q. How is he related to you?
A. He's my brother.
Q. Older or younger?
A. Younger. Yes, younger.
Q. Now, you said that random foremen pick which provisionals work on any given shift; is that your testimony?
A. Yes.
Q. Have you ever had to make a hiring decision in your capacity as superintendent in hiring provisionals?
A. I'm sure at one time I had to.
Q. Were you ever in charge of making a decision as to whether Miss Lee would work as a provisional?
A. I don't recall.

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

21 (Pages 78 to 81)

Page 82

Walsh

Q. You don't recall whether or not you specifically either affirmatively or negatively denied her the opportunity to work as a provisional?
A. Can you repeat the question?
MR. SACK: Please read it back.
(Record read.)
A. I have affirmatively let her work as a provisional in the press room.
Q. Approximately how many times?
A. I wouldn't know.
Q. When was this, if you can recall?
A. I don't know offhand, you know.
Q. What motivated your decision to hire Miss Lee as a provisional?
A. We give people chances to prove themselves in the press room.
Q. And that's why you gave her a chance to work?
A. Yes.
Q. And as a result of you providing Miss Lee the opportunity to work, what was your analysis of her job performance as a provisional?

Page 83

Walsh

A. It was fair.
Q. And what are you basing that upon?
A. My 28-years experience in the industry.
Q. If you had the opportunity to hire Miss Lee and there was an opening or a need for her to work on a press tonight, for example, would you recommend hiring her to one of the foremen?
A. Miss Lee is on the casual list.
Q. What does that mean?
A. She fits the work, she goes to work.
Q. Who dictates the order maintained on the casual list?
A. That order was dictated due to the criteria ratings.
Q. Now, these criteria ratings, are they documented anywhere?
A. I don't know if I have any. They are submitted to our attorney Elliott.
Q. So they are documented?
A. I would assume so.
Q. Have you ever personally filled out

Page 84

Walsh

a grade or evaluation form?
A. Yes.
Q. Have you done so for Miss Lee?
A. Yes.
Q. Approximately how many times?
A. Once.
RQ  MR. SACK: We're going to ask for that document.
MS. GOLDSMITH: We will get you it.
MR. SACK: Thanks.
Q. That was in December '04, approximately?
A. Yes.
Q. That's the only time Miss Lee's work performance at that time as a provisional was evaluated?
MS. GOLDSMITH: Objection. Asked and answered.
A. Yes.
Q. During Miss Lee's appointment to the casual list, has she ever been the subject of an evaluation or rating, if you know?

Page 85

Walsh

A. Just repeat that again, please.
(Record read.)
A. Not to my knowledge.
Q. Are casuals subject to any sort of evaluation when they're on the casual list?
A. Yes.
Q. And what is that criteria?
A. It's in exhibit -- it's this exhibit (indicating).
Q. It's included in Plaintiff's 1?
A. I believe so, yes.
Q. Now, how often are the ratings or evaluations of casuals conducted?
A. It depends.
Q. What does it depend on, sir?
A. It depends on their work performance.
Q. What do you mean by that?
A. If I have a casual that is not performing up to their ability or just falling apart or failing, we need to take a good, hard look at it and see if they're going to cut -- make the cut.
Q. Conversely, if someone is doing

## Page 94

Walsh

reason not contrary to the law."

Q. What is meant by that paragraph?

A. What is meant by it?

Q. Yes.

A. You could probably just take them off the list.

Q. That's what you mean by paragraph 7?

A. They're on probation when they get on the casual list. They're not performing their duties, we have the right to remove them from the list.

Q. Now, if someone is on the casual list, and they can't possibly comply with the shape procedures due to the fact that they're out of the country, for example, what would a foreman or you do in determining whether or not that person would be disciplined?

MS. GOLDSMITH: Objection.

A. I don't know.

Q. What did you do in those three instances that you previously described where you had to delist those individuals?

A. Right.

## Page 95

Walsh

Q. What was the protocol?

A. I just wrote them a letter. I wouldn't let them in the building.

Q. Did you have a meeting with any of the foremen about the issues?

A. No.

Q. You just made a unilateral decision to exclude these three troublemakers?

A. Yes.

Q. Hypothetically, if I'm on the casual list and I work my butt off and I tell you I am going to go out of town for two months, and in fact, I don't come back to work for two and a half months, what, if anything, would you do in that circumstance?

MS. GOLDSMITH: Objection.

A. I would reach out see if I could get in touch with you.

Q. And what if you couldn't?

A. I would see if somebody could get in touch with you.

Q. What if we were unable to discuss the situation?

A. Then I would seek advice from

## Page 96

Walsh

counsel.

Q. Have you had to do that in the past?

A. Yes.

Q. Can you describe those situations?

A. What time period?

Q. Within the last five years.

A. I had an individual who wasn't meeting the shape requirements, and I tried to reach out and get in contact with him, and finally he showed up. I already had a letter written up for his removal from the list, and he came in and told me his hardship. Obviously, the rules stated that he would be delisted, but I had spoken to counsel regarding --

MS. GOLDSMITH: I am going to advise my client not to discuss his discussions with counsel because they're privileged.

A. I had asked counsel --

MS. GOLDSMITH: Be careful.

THE WITNESS: I know.

A. This person had a hardship, and I

## Page 97

Walsh

had felt as though this individual was a good worker, he wasn't a troublemaker, I would appreciate it if we give an opportunity for this person to remain on the list.

Q. What was done, if anything?

A. He remained on the list.

Q. So is it fair to say that there are certain exceptions that are made depending on the presentation or the facts surrounding why that person may not be compliant with the shape requirements?

A. There may be some instances.

Q. Getting back to the casual list and casuals in general, are casuals employees of the Post?

A. When they are hired, they fall underneath the guidelines of the New York Post policies and procedures.

Q. Are they employees?

A. They're substitutes who fill in for the -- they fill the void for the collective bargaining agreement, you know, holes (indicating), that they would fall underneath the jurisdiction of the union's jurisdiction

Page 98

Walsh

and company's guidelines. You know, you're a guest, but you have to follow the rules like everybody else. That goes for both sides.

Q. What do you mean "both sides"?

A. Well, you've got the union and you're going to do what the union's policies and procedures are as far as work, jurisdictions with their job, and also you're hired here tonight as a sub, casual or whatever, and you've got to follow within the office rules, guidelines.

Q. How did the various or -- I would probably assume, the pressmen's collective bargaining agreement with the Post, how does that influence a casual's position at all, if any?

MS. GOLDSMITH: Objection.

A. I don't understand.

Q. You said that a casual would fall under the jurisdiction of the Post's policies and procedures, as well as the union CBA. How is that?

A. Journeymen's work is journeymen's work. Boys' work is boys' work. I wouldn't

Page 99

Walsh

ask a journeyman on or a flyboy to fix a lightbulb because that the electrical union, and we would be walking around with candles. I wouldn't ask them to fix a mechanical on a particular piece equipment if it's the machinist's jurisdiction. I also wouldn't ask them to go out to the truck and start loading bundle of papers to the truck because that's within the delivery jurisdiction. When they're within the box of the press room, they'll do what they're required to do within the press room's jurisdiction.

Q. But the casuals aren't a represented party in the collective bargaining agreement between the Post and the union, correct?

A. They're hired in spot and in the same spot as a junior who is not there. So they're filling the void as -- you know, the casual is filling where the junior would not be there.

Q. But a casual is not protected by rights that are contained in the collective bargaining agreement because they're not

Page 100

Walsh

union members, right?

A. Right.

Q. Now, after you sent Miss Lee Plaintiff's number 1, did you have any subsequent conversation with her regarding her attempt to gain the necessary shifts or work the necessary shifts so that she could one day become a member of the pressmen's union?

A. No.

Q. Do you recall ever having a conversation with Miss Lee regarding a vacation request that she made to you?

A. Yes.

Q. Do you recall when that was?

A. No.

Q. Do you recall what the sum and substance of that conversation was?

A. No.

Q. Was it more than one conversation?

A. It was one conversation.

Q. One single conversation?

A. Yes.

Q. And you don't recall what was

Page 101

Walsh

discussed but it had something to do with a vacation?

A. Yes.

Q. Where did that discussion take place?

A. In my office.

Q. And where is that in relation to the press room?

A. I'm right there.

Q. On the first floor?

A. 1-M, yes.

Q. One?

A. Yes, one.

Q. How did it come to be that Miss Lee brought the subject up to you?

A. She asked if she could have some time off.

Q. Did she walk into your office?

A. She was at my door.

Q. She requested time off?

A. Yes.

Q. Did she do it verbally or in writing?

A. Verbally.

```
                                                                   106
 1                 Walsh
 2   to the hiring of what they call offlist --
 3        MS. GOLDSMITH:  Objection.
 4   Q.   -- potential workers?
 5   A.   No.
 6   Q.   Do you know who Eric Abraham is?
 7   A.   No.
 8   Q.   I want to direct your attention
 9   back to the year 2004, before Miss Lee was
10   sent your letter advising her that she was
11   going to be placed on the casual list.  Do
12   you recall having a conversation with her
13   regarding whether or not she could work in
14   two departments at the Post?
15   A.   Yes.
16   Q.   And do you recall the sum and
17   substance of that conversation?
18   A.   I knew she worked in the mailroom.
19   Q.   But do you recall what the
20   conversation was -- what it pertained to?
21   A.   No.
22   Q.   But it regarded the fact that
23   Miss Lee was at that time working as needed
24   in the press room and also in the mailroom,
25   correct?
```

```
                                                                   107
 1                 Walsh
 2   A.   I don't understand the question.
 3   Q.   In 2004 do you know if Miss Lee was
 4   working in the mailroom at the Post?
 5   A.   What part of 2004?
 6   Q.   Any part of 2004?
 7   A.   Yes.
 8   Q.   And at that time was Miss Lee also
 9   shaping in the press room?
10   A.   Yes.
11   Q.   And you testified previously that
12   Miss Lee and yourself had a conversation
13   regarding her situation, right?
14   A.   What situation?
15   Q.   The situation, meaning the fact
16   that she was working in both the mailroom and
17   the press room?
18   A.   Right.
19   Q.   And do you recall the sum and
20   substance of that conversation?
21   A.   I don't know the specifics of it.
22   Q.   Generally what was the conversation
23   about?
24   A.   I don't -- I don't think that I
25   knew Eva Lee worked in the -- I know that Eva
```

```
                                                                   108
 1                 Walsh
 2   Lee worked in the mailers.
 3   Q.   M-A-I-L-E-R-S?
 4   A.   Yes.
 5        And she works -- and she is a union
 6   member in the mailers' union, and I found out
 7   she is a mailer union -- you know, a union --
 8   a member in the mailers' union and she
 9   started shaping in the pressmen's ranks.  I
10   don't believe that she should be shaping in
11   both departments.
12   Q.   Why is it that?
13   A.   Because she has a union card in the
14   mailers union.
15   Q.   Is that the only reason?
16   A.   I don't believe that a person with
17   a union card in this industry should hold two
18   union cards in the same craft in the same
19   industry.
20   Q.   Why is that?
21   A.   Because that's just the way I
22   think.
23   Q.   When you say "in the industry," are
24   you referring to the production of
25   newspapers?
```

```
                                                                   109
 1                 Walsh
 2   A.   The newspaper industry.
 3   Q.   Isn't it a fact that there are
 4   several employees of the Post who are members
 5   of more than one union who apparently work at
 6   the Post?
 7   A.   I don't know that.
 8   Q.   Is there a post policy regarding
 9   whether someone can at the same time maintain
10   membership in two separate unions?
11   A.   I don't know of a policy.
12        MR. SACK:  Let's mark this as
13   Plaintiff's Exhibit 3, please.
14        (Plaintiff's Exhibit 3, one-page
15        document, marked for identification, as
16        of this date.)
17   Q.   Let the record reflect the witness
18   has been handed a copy of what has been
19   marked Plaintiff's 3.
20        Sir, I would ask you to take an
21   opportunity to review what has been marked
22   Plaintiff's 3.  It's a one-page document.
23   A.   Okay.
24   Q.   Have you had an opportunity to
25   review the document?
```

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

28 (Pages 106 to 109)

142

Walsh

1
2  Q. Can you describe to me what your
3  level of involvement is with the human
4  resources department?
5  A. **Follow-up with workers' comp**
6  **claims, forms, payroll issues, people out**
7  **sick, people want to go out on disability. I**
8  **try to expedite getting forms to the**
9  **employees if they're going out for an**
10 **operation.**
11 Q. Do they ever question you regarding
12 a decision either made by you or by one of
13 your foremen to either hire either a
14 provisional or a casual to fill a shift?
15 A. No.
16 Q. When you sent that 2005, letter
17 Plaintiff's 1, to plaintiff, was she required
18 to fill out any paperwork?
19 A. No.
20 Q. So she was just put on the list and
21 she's on the list and that's it, right?
22 A. Yes.
23 Q. Now, if she was somehow able to
24 meet the shift requirement, whether it was
25 110 shifts, whether it was the new current

143

Walsh

1
2  shift requirement of 124, what type of
3  paperwork would she be required to fill out
4  to become an employee of the Post?
5  MS. GOLDSMITH: Objection.
6  A. **The basic paperwork that she**
7  **already filled out was identification, you're**
8  **a U.S. citizen, you're 18 years of age, your**
9  **driver's license, social security card, tax**
10 **reasons and 401K, you know, application,**
11 **pension, dues checkoff, things like that.**
12 Q. Why would the plaintiff here fill
13 out those documents?
14 A. **We have an automatic dues deduction**
15 **from our paychecks through the union and the**
16 **finance department with the New York Post.**
17 **As opposed to me mailing a check every week**
18 **or every month, we have it automatically**
19 **deducted from our paycheck.**
20 Q. Are you referring to the pressmen's
21 union?
22 A. **Union dues, yes.**
23 Q. But Miss Lee isn't a member of that
24 union; is that correct, is not?
25 A. **Right.**

144

Walsh

1
2  MR. LIPPNER: I don't think he
3  understood the question.
4  MR. SACK: Let's take a two-minute
5  recess.
6  (Recess taken.)
7  MR. SACK: I have just a few
8  questions, and then I don't know, if you
9  have any questions planned, but you will
10 have your chance to question.
11 MS. GOLDSMITH: Go ahead.
12 MR. SACK: Thanks.
13 BY MR. SACK:
14 Q. Mr. Walsh, I know you said you
15 didn't read the complaint, but there is an
16 allegation that you denied plaintiff the
17 opportunity to work in October of 2004 when
18 she was a provisional?
19 A. Yes.
20 Q. Do you recall that specific
21 incident?
22 A. Yes.
23 Q. What do you recall about that
24 incident?
25 A. **I didn't want her working in the**

145

Walsh

1
2  **press room.**
3  Q. I am sorry?
4  A. **I don't want her working in the**
5  **press room.**
6  Q. That's what you said to the
7  plaintiff?
8  A. **I don't believe that she should be**
9  **working in two departments because she holds**
10 **a union membership in the mailroom.**
11 Q. Is this what you told the
12 plaintiff?
13 A. **I believe so.**
14 Q. What did she say to you in
15 response?
16 A. **I can't remember.**
17 Q. And your decision was based solely
18 on your personal belief which you've
19 expressed a couple of times today?
20 A. Yes.
21 Q. And it has nothing to do with the
22 fact that the plaintiff is a woman?
23 A. **Not at all.**
24 Q. And it has nothing to do with the
25 fact that she is Chinese or of Chinese