# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EVA LEE,

                      Plaintiff,

      -against-                           07 CIV 6475 (JSR)

NYP HOLDING INC. and
RAYMOND WALSH JR.,

                      Defendants.

## AFFIDAVIT OF RAYMOND WALSH, JR.

Raymond Walsh, Jr. being duly sworn, deposes and says as follows:

1.     I am of legal age and am competent to make this Affidavit. I have personal knowledge of the facts set forth in this Affidavit.

2.     Until I recently resigned, effective December 21, 2007, I was employed by NYP Holdings, Inc. (the "Post" or "Company") in the position of Post Pressroom Superintendent, for approximately 12 years. As Post Pressroom Superintendent, I was the foreman in charge of the Post Pressroom and supervised the entire Pressroom staff of approximately 115 individuals, including foremen, Pressmen and non-union employees. Prior to becoming the Post Pressroom Superintendent, I held the position of foreman in the Post Pressroom. Before working for the Post, I was employed by the New York Daily News (the "Daily News") for approximately 16 years. I am currently employed, effective January 1, 2008, by the New York Times (the "Times") as General Foreman.

3.     I have been a member of the New York Newspaper Printing Pressmen's Union Number 2 (the "Pressmen's Union") since 1980. I obtained membership in the Pressmen's

Union by shaping, and worked my way up the ranks from the lowest priority job, Junior Pressman (also called a Flyboy), to the highest position of Journeyman, which I hold today.

### Ms. Eva Lee's Lawsuit Against The Post

4.  I understand that Ms. Lee has filed a lawsuit against the Post claiming she was discriminated, harassed and retaliated against on the basis of her gender. Ms. Lee never served me with a copy of her Complaint.

### Employees and Priority of Work Assignments in the Post Pressroom

5.  There are several categories of employees who work in the Post Pressroom: (1) members of the Pressmen's Union ("Pressmen"), either Journeymen or Juniors, whose regular employment is with the Post, (2) outside Pressmen (Journeymen or Juniors) whose regular employment is with either the Times or the Daily News, or (3) non-union individuals (Casuals or Provisionals). The main difference between Journeymen and Juniors is that Journeymen have been in the Pressmen's Union longer; under the Post's collective bargaining agreement ("CBA") with the Pressmen's Union, a certain number of Journeymen and Juniors are guaranteed work each shift. The CBA governs the terms and conditions of work for the Journeymen and Juniors.

6.  A Provisional is the term used for someone who essentially walks off the street and attempts to earn a day's pay by working in the Post Pressroom. Casuals are distinguishable from Provisionals because they have been elevated to a "Casual List," which gives Casuals the right to be hired in a certain order. As non-union employees, Casuals (or Provisionals) have no right or expectation to work on any particular shift, and are only hired when the Post does not have enough Journeymen or Juniors for a given shift. The Post's CBA with the Pressmen's Union requires the Post to hire a specific number of individuals to work on each given shift. A

copy of the pages of the Post's CBA with the Pressmen's Union which address hiring are attached as Exhibit A.

7. If there are openings on any given shift, however, the Post will hire Casuals in accordance with their sequential order on the "Casual List." If any available work assignments are left after Casuals have been hired, the Post will assign shifts to Provisionals, who receive work on a first-come, first-served basis, subject to foreman discretion.

8. A Casual will qualify for membership in the Pressmen's Union and thus leave the Casual List and become a Junior Pressmen by working a certain number of shifts in one of two six-month periods, either January 1 through June 30, or July 1 through December 31. Effective January 1, 2007, the Pressmen's Union raised the number of required shifts from 110 to 124. As such, and because the Post has a fuller compliment of Pressmen regularly working for it than it had in past years, and thus there are not as many remaining shifts in the Post Pressroom as there historically once were, fewer non-union employees will be able to obtain the requisite number of shifts in the Post Pressroom to gain entry into the Pressmen's Union; the last time an employee was able to do so was in December 2006.

**Shape Procedures Applicable To Casuals**

9. In order to actually receive work assignments, Casuals are required to participate in the Pressroom shape. The Post has both a day shift and a night shift in its Pressroom. To shape for the day shift, Casuals sign-in the night before at the Post's facility in the Bronx ("Bronx Facility"). The next day, a Post Pressroom foreman calls the Casuals who have signed-in, in the sequential order in which they are listed on the Casual List, until the remaining shifts have been assigned. In order to be deemed ready to work for the day shift, the Casual must answer the phone when he/she is called for work that day by a Pressroom foreman. If a Casual

does not answer the foreman's call, the next Casual on the list who has signed-in is called. To shape for the night shift, Casuals must physically appear at the Bronx Facility and sign-in as ready for work. If the Post has a need to hire for that shift because it does not have enough Pressmen to fill its contractual manning obligations, Casuals who have signed-in will be hired in accordance with their ranked order on the Casual List.

10. Although a Casual must sign-in and be available and able to work a given shift in order to receive a work assignment, signing-in does not guarantee the Casual will be hired. Despite signing-in, a Casual will not receive a work assignment if (a) the Post does not have a need – *i.e.*, it has enough Journeymen and Juniors to do the work; (b) he/she does not answer the phone when called during the shape; or (c) he/she is not around when assignments are actually handed out. Because signing-in during the shape signals to the Post Pressroom that a Casual is ready, willing and available for work, a Casual is prohibited from signing-in for a shift, in order to get credit for shaping, if he/she knows in advance that he/she will not be available to work the given shift. A Casual can leave the premises between the shape and work if he/she returns in time for his/her assignment. There is no rule prohibiting a Casual from working seven shifts in a given week, and no rule stating any limit to the amount of shifts a Casual may work if he/she becomes eligible for them, and abides by Pressroom and shape procedures.

11. The Post has official "Shape Procedures" which govern the terms and conditions of employment for Casuals. When a Provisional is placed on the Casual List, he/she receives a letter from me setting forth the Shape Procedures. These rules dictate, in pertinent part, that assignment of work among Casuals is based on the order in which a Casual appears on the list, that Casuals must shape at least five nights a week, that Casuals are prohibited from refusing work for a shift in which they have signed-in, and that Casuals require foremen approval of all

excused absences. On January 25, 2005, when Eva Lee was officially elevated to the Casual List, I sent her a letter containing these Shape Procedures, which is attached hereto as Exhibit B.

### Ms. Lee's Employment in the Post Pressroom

12. Under my watch as Superintendent in charge of the Post's Pressroom, I am not aware of any other member of another newspaper industry craft union – besides Ms. Lee – who has been allowed to work both in that craft department and in the Post's Pressroom; employees in the Pressroom are either Pressmen, non-union employees, or employees in another union that is not an industry craft union, such as the Policemen's Benevolent Association. During my tenure in charge of the Post's Pressroom, I have not allowed anyone who I knew to be a member of one newspaper industry craft union to shape in the Post's Pressroom – that is until I was told by my boss to make an exception for Ms. Lee. In my 28 years as a Pressman, I have never known of any Casual or Provisional who was also already a member of the New York Mailers' Union Number Six ("Mailer's Union"), or of any other newspaper industry craft union, working in the Post Pressroom. That has always been my policy and thus, that has been the Post's policy. I very strongly believe that you should only work in one – just one – newspaper industry craft union. I am very proud to be a Pressman.

13. Ms. Lee began working in the Pressroom in or around May 2004, but it was not until September 2004 that I learned through one of my foremen that Ms. Lee was a member of the Mailer's Union. When I found out that she was in another industry craft union, I moved to put a stop to that. After this discovery, the next time Ms. Lee attempted to sign-in for work as a Provisional during the Pressroom shape on October 6, 2004, I informed her that she could not work in the Post Pressroom because she was a member of the Mailers' Union. Apparently Ms. Lee escalated her complaint about working in two departments to the President of her union, the

Mailers' Union, Wayne Mitchell, who then struck a deal with my former boss, Joseph Vincent ("Vincent"), the Post's Senior V.P. of Operations – the result of that deal was that I was instructed to make an exception to Post practice and allow Ms. Lee to shape. This is the only time that such an exception has been made. In other words, at this time, the Post afforded Ms. Lee with preferential treatment. Thereafter, in November 2004, Ms. Lee resumed shaping and working in the Pressroom despite her status as a Mailer.

14. As a result of Ms. Lee's working in the Pressroom as a Provisional in December 2004, she was considered, along with other Provisionals, for elevation to a new Casual List the Post was going to create in January 2005. As was the practice in past years, I met with my top foreman, at the time, Bill Bogan, Brian Walsh and Lonnie Bowles, on or around January 9, 2005, to rate each Provisional eligible for placement onto the Casual List, according to the previously established and used criteria of aptitude and attitude. The ratings are on a scale of one, for unsatisfactory, to five, for exceptional performance. Bogan, Walsh, Bowles and I rated a Provisional only if we'd had significant contact with him/her so as to allow us to rate the employee fairly. If any Provisional received a rating of one or zero in either category, he/she was automatically eliminated. The date a Provisional first starts shaping in the Post Pressroom was/is not a factor the Post considers in determining his/her elevation or placement on the Casual List.

15. During this process, Ms. Lee was rated on the same terms and according to the same criteria as all other Provisionals being considered. Because I was the only foreman in the Pressroom who had significant contact with Ms. Lee, I was the only one who rated her. I gave Ms. Lee a score of 2.5 for aptitude because I felt she showed an average interest in learning and applying herself to new tasks and concepts regarding how to work around the printing press.

- 6 -

Similarly, Ms. Lee received a rating of 2 for attitude because I believed her attitude regarding taking whatever task was assigned her and showing up in a timely manner was only fair, as compared with other Provisionals. As such, Ms. Lee's total score was 4.5, and she was placed on the Casual List as number 11, below ten Provisionals who received higher ratings, ranging from 30 (number 1) to 22.5 (number 10). There were four men who, after being rated by me and the other foremen, did not earn placement on the Casual List.

16. Since, as mentioned above, the Post Pressroom currently has less work available for non-Pressmen than in prior years, the Pressroom has not rated Provisionals for elevation to the Casual List, and therefore no additional Provisionals have been added to the Casual List, since January 2005. In other words, Ms. Lee was the last Provisional added to the Casual List.

**Ms. Lee's Claims of Discrimination in the Post Pressroom**

17. During her employment in the Post Pressroom, I never discriminated, harassed or retaliated against Ms. Lee in the assignment of work, or otherwise, on the basis of her gender or for any other reason. Similarly, I have never known or witnessed any of the foremen who work in the Post Pressroom discriminating, harassing or retaliating against Ms. Lee in the assignment of work, or otherwise, on the basis of her gender or for any other reason. During her employment, Ms. Lee never complained to me of discrimination, harassment or retaliation in the Post Pressroom, on the basis of her gender or for any other reason. Similarly, Ms. Lee never complained to me that other employees were being treated more favorably in the Pressroom, or taking advantage of privileges that she was being refused because of her gender or for any other reason.

18. Although I understand that Ms. Lee believes other members of industry craft unions work in the Post Pressroom, the undisputable fact is that her belief is mistaken. Since Ms.

Lee began working in the Post Pressroom, in around November 2004, she has been the only Mailer, or for that matter the only member of any other industry craft union besides the Pressmen's, working in the Post Pressroom. None of the individuals who are/were on the Casual List at the same time as Ms. Lee were members of another industry craft union. For example, Dwayne Rivera, currently placed second on the Casual List, is not in a union. Likewise, John Smith, who shaped in the Pressroom approximately four years ago, was not in a union during the time he worked in the Pressroom. Phil Anzalone, Apolinar Figuera, and Jeff Pochter are members of the Pressmen's Union, and have worked solely in the Pressroom since they joined the Pressmen's Union in June 2005, December 2005 and December 2005, respectively. Steve Ruiz and Chris Sullivan worked in the Pressroom until December 4, 2007; but they then became members of the Mailers' Union and have not worked in the Pressroom since. James Dillon has not worked in the Post Pressroom since 2004, and when he did work in the Post Pressroom, he was not a union member. Todd Carroll never worked in the Post Pressroom.

19. The Post Pressroom work assignment and shape procedures are followed in a consistent, fair and nondiscriminatory manner with regards to Ms. Lee and all other Pressroom employees. When there was available work, if Ms. Lee participated in the shape and followed shape procedures, she was eligible to receive an assignment in the same manner as all other Casuals (or Provisionals). Similarly, if Ms. Lee called-in during the daily shape or signed-in during the physical shape, but then did not answer the call or remain at the shape to receive the work assignment, or told the Pressroom foreman who returned her call or attempted to assign her a shift that she could not work, Ms. Lee was not hired.

20. I am aware of several circumstances in which Ms. Lee did not answer the Pressroom foreman's return call or was assigned work after the physical shape and refused such

work because she was already assigned a shift to work in the Post Mailroom. Although this latter practice of booking work in two departments, or "sharp shooting," is against Post rules and policies, I have never disciplined Ms. Lee.

21.  In special circumstances, such as family and medical emergencies, I had authority to deviate from the written shape procedures and make special accommodations. For instance, in November 2005, Kenny Vaughan, the Casual ranked number two on the Casual List at the time, failed to show up for the shape because he had a sudden death in his family which required him to travel out of state. Mr. Vaughan's sister had died. Under these circumstances, and in light of the fact that Mr. Vaughan was a hard worker with a good attitude, I believed that the right thing to do was to not penalize Mr. Vaughan for his absence from the shape, and I excused his absence while he was away to deal with this family tragedy. I did not excuse Mr. Vaughan's absence because he is a man. At no time has Ms. Lee ever asked me (or to my knowledge, any other Pressroom foreman) if she could have permission for an extended absence due to a medical or family emergency.

22.  Similarly, Ms. Lee never asked me (or to my knowledge, any other Pressroom foreman) if she could sign-in during the shape, leave the Bronx Facility after the shape, and return for work at the start of her assigned shift. Nor did Ms. Lee ever advise me that other Provisionals or Casuals were doing so, and that she wished to do so also. Ms. Lee did ask me, however, in April 2005, if she could take a vacation during which she would sign-in during the shape, and therefore get credit for shaping, although she knew in advance she was not able to work, and therefore had no intention of accepting a work assignment. I advised Ms. Lee that I would approve her for vacation, but that while on vacation she could not also shape for shifts she was not planning on accepting, as doing so would be refusing work in violation of shape

procedures. No other employee – male or female – has ever been allowed to take vacation and yet also participate in the shape.

23. At no time did I (or to my knowledge, any other Pressroom foreman) ever make any decision with regard to Ms. Lee because of her gender.

I have read the foregoing statement consisting of 23 numbered paragraphs and swear that it is true and correct to the best of my information and belief.

_____
Raymond Walsh

Sworn and subscribed to before me this 17th day of January 2008.

_____
Notary Public

My commission expires:

JOANNE VANDOROS
Notary Public, State of New York
No. 01VA6038391
Qualified in Nassau County
Commission Expires March 13, 20 / 0

- 10 -

# EXHIBIT A

press crews and related room hires can be scheduled to work at different times so long as the manning requirements of the Contract are complied with. Subject only to the terms of this Agreement, the management of the business, operation of the plants and facilities, and the authority to execute all the various duties, functions and responsibilities incident thereto, including the establishment of such rules of work and conduct as it deems necessary, is vested in the Publisher. The Publisher reserves and retains all of its normal, inherent and common law rights to manage the business, whether or not exercised, excluding only such rights which are specifically relinquished or modified by specific provisions of this Agreement.

Foremen shall hold union membership. Their wages, terms and conditions of employment shall be the product of individual negotiations with the Publisher. The Publisher agrees that foremen will be covered by the Publishers' Pressmen's Welfare Fund and the Publisher will make contributions to the Welfare Fund on behalf of foremen. Foremen will be covered by the management pension plan and the Publisher will make no contributions on behalf of foremen to the Pressmen's Publishers' Pension Fund.

11.   HIRING

SECTION 11. When it becomes necessary for the Publisher to supplement its force of regularly scheduled pressroom employees, it will do so from a shape in accordance with this Section. After a junior pressman is added to the shop priority list he will be required to complete such necessary employment forms needed by the Publisher to meet its legal obligations. The Publisher shall have the right to establish the physical fitness of all applicants.

The foreman shall notify the Chapel Chairman or his designee of the number of hires required and the Chapel Chairman or his designee shall notify listed eligibles shaping when and where to report to work through a telephone procedure to be agreed upon by the Publisher and the Union. Notwithstanding any other provision of this contract, the use of such "shape"

shall not result in any cost to the Publisher in the form of call-in-pay or otherwise. Additional casual hires required by the Publisher shall be office hires.

In hiring journeymen, they shall be selected in the following order:

(1) Journeymen appearing on the shop priority list.

(2) Journeymen appearing on the shop priority list of publishers once comprising the Publishers Association of New York City who have traditionally been the source of competent substitutes.

In hiring apprentices or junior pressmen or in advancing them to temporary apprentice or journeyman status when apprentices are not available, they shall be selected in the following order:

1. Apprentices appearing on shop priority list.

2. Industry Apprentices on shop priority list.

3. Junior Pressmen on shop priority list.

4. Outside Industry Apprentices listed by the Joint Apprenticeship Committee.

5. Outside Junior Pressmen listed by the Joint Apprenticeship Committee.

Apprentices and Junior Pressmen, from offices of employers who are not signatory to this Agreement, are to be added to the Joint Apprenticeship Committee Industry Apprentices and Junior Pressmen list in categories (4) or (5) above by employment dates as established by the Joint Apprenticeship Committee. It is expressly understood that physical incapacity may disqualify a junior otherwise deemed competent and experienced. It is agreed, however, that in decreasing the force the foreman shall lay off the last man or men employed by the office, and in re-hiring journeymen and juniors shall be selected in accordance with their

priority standing in the office, provided that priority for extras shall apply only if they are available at the office at shape-up time. The Union shall supply and maintain the office priority list of journeymen arranged in the sequence of tenure of employment. However, the office is privileged to select any member of the Union in good standing as foreman and assistant foreman. The office may select any journeymen as pressmen-in-charge provided that on the basis of priority in the pressroom they would be eligible to work that particular day or night.

Foremen may in their discretion allow pressroom employees to go home before the expiration of their specified day or night shift hours, provided their work is finished. In such cases, each pressroom employee shall receive a full day or night shift's pay when granted permission to go home before the specified hours of work for his/her shift have expired. When pressroom employees are ordered to report for work and so report, they shall receive their day or night shift's pay so long as there has been no interruption of production in violation of Section 43 which causes or results in pressroom employees working less than the specified hours of their shift.

## MARK-UP

The Publisher agrees to post work schedules every two (2) weeks subject to weekly modification identifying the five (5) day work opportunities for regular employees in the pressroom, noting vacation or other known absences. Notices of modifications will be provided as follows:

On Friday the operating schedules for the following week will be posted, together with tentative operating schedules for the next following week. Such schedules will indicate, by day, the sizes of the press crews. The Publisher will make every effort to post accurate schedules.

# EXHIBIT B

January 25, 2005

Ms. Eva Lee

NY Post Pressroom

Dear Ms. Lee:

This letter is to advise you that your name is being placed on a Revised Pressroom Casual Hiring List, provided that you successfully pass a drug/alcohol screening.

You will be required to shape in person at the Bronx Facility located at Port Morris Print Center, East 132nd Street, Bronx, New York, unless instructed to shape at some other locale, at the shape times currently posted, which may be changed from time to time.

### SHAPE PROCEDURES

1. You must physically shape at least 5 nights per week every week. Saturday and Sunday nights are required. All other nights are optional.

2. There will be no dayside shape at this time. The first person to be called for work will be the top casual who shaped the previous night and did not work. Ex: if shapers 1 thru 5 shape and work Monday night and shapers 6, 7, 9 and 10 shape and do not work that nights, then shapers 6, 7, 9 and 10 (in that order) will be called to work the shifts available on Tuesday morning <u>provided</u> they have signed up with their phone numbers the previous evening. If a casual does not personally answer when the call is made and accept the assignment, he/she will be passed over. If a casual refuses an assignment for which he/she has signed up, he/she will be given one warning and will then be removed from the List. If a casual accepts an assignment and then fails to cover, he/she will be removed from the List. In the example above, casual number 8 will not be called to work on Tuesday because that person did not shape on Monday night.

3. Provisional shapers, if needed, (those persons not on the Pressroom Casual Hiring List) will be hired after casuals on the List based on the Foreman's judgment as to attitude and competence.

4. Any excused absences will require the Foreman's approval. Those casuals seeking to be excused for medical or other reasons must submit documentation in a timely fashion and sign any and all releases of information requested. The Foreman's decision as to whether to grant leave or other excused absence will be final. Any casual who is on an approved leave of absence in aggregate for one or more months during any six-month period will not be permitted to advance his/her position on the List.

5. The Company will periodically evaluate the performance of casuals. Casuals who do not perform competently will be counseled. If casuals do not make appropriate progress in developing pressroom skills, show the proper attitude and/or perform in a competent manner, they will be removed from the priority casual list and/or placed at the bottom of the List at the discretion of the Foreman.

6. Failure to meet the shaping requirements will result in the casual being removed from the List or at the option of the Foreman being placed at the bottom of the List.

7. Casuals are probationary employees and may be removed from the List at the discretion of the Foreman at any time for any reason not contrary to the law.

8. The Company reserves the right to add, change or delete any of the procedures, requirements or rules set forth.

Your shaping record will be revised periodically. Based on these periodic reviews, the Pressroom Casual Hiring List will be revised. If you are not interested in having your name on the List, please inform my office in writing and your name will be removed.

Yours truly,


Ray Walsh Jr.
Pressroom Superintendent

NYP 00049