**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

EVA LEE,

                    Plaintiff,

        -against-                                    07 CIV 6475 (JSR)

NYP HOLDING INC. and
RAYMOND WALSH JR.,

                    Defendants.

## DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1

Defendant NYP Holdings, Inc., incorrectly named as "NYP Holding Inc." (hereinafter the "Post" or "Company"), by and through its undersigned counsel, submits this statement of material facts about which there is no genuine issue to be tried and in support of the Post's Motion for Summary Judgment pursuant to Local Civil Rule 56.1.

**A.    Plaintiff's Employment with the Post**

1.    Eva Siu-San Lee ("Plaintiff") is a member of the New York Mailers' Union Number Six (the "Mailers' Union"), and has been since approximately 2001. (Pl. Dep. 36-37.)[1]

2.    Since approximately 2001, Plaintiff has worked, and continues to this day to work, in the New York Times (the "Times") Mailroom. (Pl. Dep. 32.)

---

[1] Reference to "Pl. Dep." refers to the Deposition of Plaintiff, reference to "Walsh Dep." refers to the Deposition of Raymond Walsh, Jr., reference to "Walsh Aff." refers to the Affidavit of Raymond Walsh, Jr., reference to "Sutherland Aff." refers to the Affidavit of Whitney Sutherland, reference to "Granito Aff." refers to the Affidavit of Michael Granito, reference to "Vazquez Aff." refers to the Affidavit of Lloyd Vazquez, and reference to "Scialdone Aff." refers to the Affidavit of Amy Scialdone. Excerpts from the transcripts of Plaintiff's and Walsh's depositions, and the afore-mentioned Affidavits with their exhibits, are attached as Exhibits 1-7 to the Declaration of Shari M. Goldsmith, Esq., in Support of Defendant's Motion of Summary Judgment, filed concurrently herewith.

3.     Plaintiff holds her Mailers' Union card with the Times.  (Compl. ¶ 18.)

4.     Plaintiff is not a member of the New York Newspapers Pressmen's Union Number 2 (the "Pressmen's Union"), or any other union besides the Mailers' Union.  (Pl. Dep. 37.)

5.     Plaintiff began working in the Post Mailroom in July 2002.  (Id. 31.)

6.     At the time Plaintiff began working in the Post Mailroom, as well as today, Plaintiff held the position of "Outside Card Holder" when working in the Post Mailroom.  (Id. 33.)

7.     Plaintiff began working in the Post Pressroom, in addition to the Post Mailroom, in May 2004.  (Id. 31.)

8.     At the time Plaintiff began working in the Post Pressroom, she held the status of being a Provisional worker.  (Id.)

9.     In January 2005, Plaintiff was placed on the Post Pressroom's Casual List, and she was promoted to the position of Casual.  (Id.)

10.     There are no other employees working in the Post Pressroom, male or female, who are members of the Mailers' Union.  (Walsh Aff. ¶ 12, 18.)

11.     There are also no other employees working in the Post Pressroom, male or female, who are members of another newspaper industry union besides the Pressmen's Union.  (Id.)

**B.     The Post Makes An Exception and Affords Plaintiff Preferential Treatment By Allowing Her To Shape and Work in its Pressroom**

12.     There are several categories of non-management employees who work in the Post Pressroom: (1) members of the Pressmen's Union ("Pressmen"), either Journeymen or Juniors, whose regular employment is with the Post; (2) outside Pressmen (Journeymen or Juniors) whose regular employment is with either the Times or the New York Daily News ("Daily News"); and (3) non-union individuals (Casuals or Provisionals).  (Walsh Aff. ¶ 5; Walsh Dep. 32, 36-37.)

13.    Generally speaking, the difference between Journeymen and Juniors is that Journeymen have been in the Pressmen's Union longer.  (Walsh Aff. ¶ 5.)

14.    Under the Post's collective bargaining agreement ("CBA") with the Pressmen's Union, a certain number of Journeymen and Juniors are guaranteed work each shift.  (Id.)

15.    A Casual or Provisional has no right or expectation to work on any particular day, night or shift, and is only hired when the Post does not have enough Journeymen or Juniors to fill its needs.  (Id. ¶ 6; Walsh Dep. 37-38.)

16.    Any individual can attempt to earn a day's pay by working in the Post Pressroom as a Provisional.  (Walsh Aff. ¶ 6; Walsh Dep. 37.)

17.    Provisionals are assigned work subject to foreman discretion.  (Walsh Aff. ¶ 7; Walsh Dep. 80-81.)

18.    Casuals are Provisionals who have worked in the Post Pressroom, and have been placed on a "Casual List," which gives them the right to be hired, when the Post has a need, in a certain order.  (Walsh Aff. ¶ 6; Walsh Dep. 42-43.)

19.    In accordance with its CBA with the Pressmen's Union, the Post is required to hire a certain number of individuals to work in its Pressroom each night; if on a given night the Post does not have enough Journeymen and Juniors to fill its contractual manning obligations, the Post will then look to hire Casuals in the order of their placement on the "Casual List."  (Walsh Aff. ¶¶ 6-7.)

20.    If there are still work assignments left in the Pressroom after Casuals have been hired, the Post will assign work to Provisionals.  (Id.)

21.    In September 2004, Raymond Walsh, Jr. ("Walsh"), the Pressroom Superintendent, discovered that Plaintiff was a member of the Mailers' Union.  (Id. ¶ 13.)

22.     As Pressroom Superintendent, Walsh was the head foreman in charge of the Pressroom. (Id. ¶ 2.)

23.     It was Walsh's belief and the Post's practice that no individual could work in the Post Pressroom if he/she was already a member of another newspaper industry union.  (Walsh Aff. ¶ 12; Walsh Dep. 107-108, 144-145.)

24.     Walsh believed Plaintiff to be in violation of this Post practice by working in the Pressroom because she was already in the Mailers' Union, and thus already in a newspaper industry union.  (Id.; Sutherland Aff. ¶ 9.)

25.     As soon as Walsh found out about Plaintiff's membership in the Mailers' Union, Walsh moved to put a stop to Plaintiff's working in the Post Pressroom.  (Walsh Aff. ¶ 13.)

26.     On October 6, 2004, the next time Plaintiff attempted to sign-in for work as a Provisional in the Post Pressroom, Walsh informed her that she was not allowed to work in the Pressroom because of her membership in the Mailers' Union.  (Id.; Walsh Dep. 108; Pl. Dep. 59.)

27.     Plaintiff understood she was not allowed to work on October 6, 2004, because she was in the Mailers' Union. (Pl. Dep. 61-62.)

28.     Plaintiff has no evidence, besides her subjective belief, that Walsh refused to allow her to work on that day on account of her gender.  (Id. 63-67.)

29.     Plaintiff brought her complaint about not being hired on October 6, 2004, to the attention of Wayne Mitchell ("Mitchell"), President of the Mailers' Union.  (Id. 77.)

30.     Both Mitchell and Joseph Vincent ("Vincent"), the Post's Senior V.P. of Operations, reiterated to Plaintiff the Post's rule and policy against newspaper industry union members working in another union's shop.  (Id. 75-77.)

31.     Plaintiff had no reason not to believe Mitchell or Vincent.  (Id. 79.)

32.    In November 2004, Vincent advised Walsh to make an exception to Post practice and allow Plaintiff to continue shaping in the Post Pressroom.  (Walsh Aff. ¶ 13.)

33.    Before Plaintiff, no other employee, man or woman, who is a member of another newspaper industry aside from the Pressmen's Union, has been allowed to work in the Post Pressroom.  (Id. ¶ 12-13.)

34.    Vincent's allowing Plaintiff to continue shaping and working in the Post Pressroom constituted preferential treatment toward Plaintiff.  (Id.)

35.    Since November 2004, Plaintiff has been the only Mailer working in the Post Pressroom.  (Id. ¶ 18.)

36.    Since November 2004, Plaintiff has been the only member of a newspaper industry union besides those in the Pressmen's Union working in the Post Pressroom.  (Id.)

37.    Dwayne Rivera, currently placed second on the Casual List, is not in any union.  (Id.)

38.    John Smith, who shaped in the Pressroom approximately four years ago, was not in any union during the time he worked in the Pressroom.  (Id.)

39.    Phil Anzalone, Apolinar Figuera and Jeff Pochter are members of the Pressmen's Union, and have worked solely in the Pressroom since they obtained their union cards in June 2005, December 2005 and December 2005, respectively.  (Id.)

40.    Chris Sullivan and Steve Ruiz have not worked in the Post Pressroom since they became Mailers on December 4, 2007.  (Id.)

41.    James Dillon has not worked in the Post Pressroom since 2004, and he was not a union member at that time.  (Id.)

42.    Todd Carroll never worked in the Post Pressroom.  (Id.)

C.    **Plaintiff was Elevated to the Casual List in January 2005 According to the Same Non-Discriminatory Criteria Used to Rate Other Provisionals**

43.    Because Plaintiff was working in the Pressroom in December 2004, she was considered, along with other Provisionals, for elevation to a new Casual List the Post was going to create in January 2005. (Id. ¶ 14.)

44.    Walsh met with three Post Pressroom foremen, Bill Bogan, Brian Walsh and Lonnie Bowles, to rate each Provisional eligible for placement onto the 2005 Casual List. (Id.)

45.    During this process, Plaintiff was rated in accordance with the same criteria as all other Provisionals who were rated. (Id. ¶ 15.)

46.    Consistent with Post practice, Walsh and the three foremen only rated a Provisional with whom he had enough personal experience. (Id.)

47.    Consistent with Post practice, Walsh and the three foremen evaluated each Provisional according to the previously established and used criteria of aptitude and attitude, scoring a one for unsatisfactory performance and up to five for exceptional performance. (Id. ¶ 14.)

48.    The date upon which a Provisional first starts shaping in the Post Pressroom was not and is not a factor considered in determining his/her elevation or placement on the Casual List. (Id.)

49.    Plaintiff was rated by Walsh and received a score of 2.5 for aptitude and 2 for attitude. (Id. ¶ 15.)

50.    Walsh believed Plaintiff's performance was "fair" because she showed a run of the mill interest in learning and applying herself to new tasks and concepts regarding how to work around the printing press, and because her attitude regarding taking whatever task was assigned her and showing up in a timely manner was average, as compared with other Provisionals. (Id.; Walsh Dep. 82-83.)

51.     Plaintiff's total score of 4.5 earned her a place as number 11 on the 2005 Casual List, below ten Provisionals who received higher ratings, ranging from 30 (number 1) to 22.5 (number 10). (Walsh Aff. ¶ 15.)

52.     There were four men who, after being rated by Walsh and his foremen, did not earn placement on the 2005 Casual List.  (Id.)

53.     The Casual List has not been added to since January 2005.  (Id. ¶ 16.)

54.     Plaintiff is the last person who has been put on the Casual List.  (Id.)

55.     Plaintiff received a letter from Walsh, dated January 25, 2005, informing her that she had been added to the Casual List and outlining the Post Pressroom Shape Procedures.  (Id. ¶ 11.)

56.     As determined solely by the Pressmen's Union, a Casual is qualified to be elevated from the Casual List to Junior status, and to become a member of the Pressmen's Union, by working a certain number of shifts in one six-month period, either January 1 through June 30, or July 1 through December 31. (Walsh Aff. ¶ 8.)

57.     Effective January 1, 2007, the Pressmen's Union raised the number of required shifts from 110 to 124.  (Id.)

58.     The last time a Casual was elevated to Junior status from the Casual List was in December 2006.  (Id.)

**D.     Plaintiff Was Not Discriminated Against In the Pressroom Shape Procedures**

59.     In order to actually receive work assignments, Casuals (and Provisionals) are required to participate in the Pressroom shape.  (Id. ¶ 9.)

60.     The Post has both a day shift and a night shift in its Pressroom.  (Id.)

61.     To shape for the day shift, Casuals sign-in the night before a given shift.  (Id.)

62.    The next day, a Post Pressroom foreman calls the Casuals who have signed-in, in the order in which they are listed on the Casual List, until the remaining shifts have been assigned.  (Id.)

63.    In order to be deemed ready to work and eligible for the day shift, the Casual must answer the phone when he/she is called that day for assignment by a Pressroom foreman, and confirm he/she is actually available for the given work assignment.  (Id.¶¶ 9-10.)

64.    If a Casual does not answer the foreman's return call, the next Casual on the list who has signed-in is called.  (Id. ¶ 9.)

65.    To shape for the night shift, Casuals must physically appear at the Post's printing and distribution facility in the Bronx ("Bronx Facility") to sign-in as ready for work, and actually be available for the given work assignment.  (Id. ¶¶ 9-10.)

66.    During the physical shape, Casuals are required to wait for their assignments, if any, in the shape house or outside the Bronx Facility.  (Vazquez Aff. ¶ 7.)

67.    Casuals (and Provisionals) are by definition unrepresented employees and not covered by the Post's CBA with the Pressmen's Union.  (Walsh Dep. 99-100.)

68.    The Post has official "Shape Procedures" which govern the terms and conditions of employment for Casuals working in the Post Pressroom.  (Walsh Aff. ¶ 11; Walsh Dep. 49-50.)

69.    The Shape Procedures dictate, in pertinent part, that assignment of work among Casuals is based on the order in which a Casual appears on the Casual List, that Casuals must shape at least five nights a week, that Casuals are prohibited from refusing work for a shift in which they have signed-in, that Casuals require foreman approval of all excused absences, and that Provisionals are hired according to foreman discretion.  (Walsh Aff. ¶ 11.)

70.    It is also against Post policy for Casuals to sign-in for a shift they know they cannot accept or have no intention of being available to work.  (Walsh Aff. ¶ 10.)

71.     There is no Post rule prohibiting a Casual from leaving the Bronx Facility between the shape and his/her work assignment if the Casual returns to the Bronx Facility in advance of the start time of his/her work assignment.  (Id.)

72.     There is no Post rule prohibiting a Casual from working seven shifts in a given week. (Id.)

73.     There is no Post rule stating any limit to the amount of shifts a Casual may work if he/she becomes eligible for them, and abides by Pressroom and shape procedures.  (Id.)

74.     Plaintiff has been assigned work in the Pressroom according to the proper procedures for hiring Provisionals and Casuals.  (Id. ¶ 19.)

75.     During Plaintiff's employment in the Post Pressroom, when there was available work remaining after Pressmen had been assigned, if Plaintiff participated in the shape and followed shape procedures, she was eligible to receive the assignment in the same manner as all other Casuals (or Provisionals).  (Id.)

76.     During Plaintiff's employment in the Post Pressroom, when she called-in during the daily shape or signed-in during the physical shape, but then did not answer the call or remain at the shape to receive the work assignment, or told the Pressroom foreman who returned her call or attempted to assign her a shift that she could not work, Plaintiff was not hired.  (Id.)

77.     On several occasions, Plaintiff did not answer the Pressroom foreman's return call or was assigned work after the physical shape, but refused such work because she was already assigned a shift to work in the Post Mailroom.  (Walsh Aff. ¶ 20.)

78.     Plaintiff never requested permission from the Post for an extended absence from working in the Post Pressroom due to a medical or family emergency.  (Walsh Aff. ¶ 21.)

79.    Kenny Vaughan, who was ranked number two on the Casual List in November 2005, was permitted to return to his position on the 2006 Casual List, after having taken an extended absence due to the death of his sister. (Id.; Walsh Dep. 96-97.)

80.    Walsh excused Mr. Vaughan's absence because, in light of the facts that Vaughan was suffering a family tragedy, and that he was a hard worker with a good attitude, Walsh believed that the right thing to do was to not penalize Vaughan for his absence from the shape. (Walsh Aff. ¶ 21; Pl. Dep. 165.)

81.    Plaintiff never asked the Post for permission to sign-in during the Pressroom shape, leave the Bronx Facility after the shape and return for work at the start of her assigned shift. (Walsh Aff. ¶ 22; Pl. Dep. 158-159.)

82.    Plaintiff never advised the Post that Provisionals or Casuals were leaving between the shape and their work assignment start times. (Walsh Aff. ¶ 22.)

83.    In April 2005, Plaintiff asked Walsh if she could take a vacation during which she would sign-in during the shape, and therefore get credit for shaping, although she knew in advance she was not able to work, and therefore had no intention of accepting a work assignment. (Id.; Pl. Dep. 100-102.)

84.    Walsh advised Plaintiff that he would approve her for vacation, but that while on vacation she could not also shape for shifts she was not planning on accepting, as doing so would be refusing work in violation of shape rules. (Walsh Aff. ¶ 22.)

85.    No other employee – male or female – has ever been allowed to take vacation and yet also participate in the shape. (Id.)

86.    Plaintiff never complained that she was skipped for a shift in violation of shape procedures. (Id. ¶ 17.)

87.     Plaintiff never complained to the Post that she was being discriminated in the assignment of work or during the shape, or otherwise, in the Post Pressroom, because of her gender or in retaliation for filing her EEOC charge or lawsuit.  (Id.)

**E.      Because Plaintiff is an Outside Card Holder, She is Hired in the Post Mailroom by The Mailers' Union Chapel Chairman**

88.     Plaintiff began working in the Post Mailroom as an "Outside Card Holder" in July 2002. (Pl. Dep. 31-33.)

89.     Several categories of employees work in the Post Mailroom: (1) Employees who are members of the Mailer's Union, *i.e.*, Mailers, whose primary employer is the Post (Regular Situation Holders); (2) employees picked by the Mailer's Union, with approval of the Post, to be on the "Priority Substitute List" because they have initiated the process of becoming Mailers, having their union card with the Post (Substitutes); (3) Mailers working regularly at another printing facility, such as the Times or Daily News, *i.e.*, the Post is not their primary employer (Outside Card Holders); and (4) non-union employees (Casuals).  (Sutherland Aff. ¶ 3.)

90.     Work is assigned in the Post Mailroom according to union membership, as dictated by the Post's CBA with the Mailers' Union.  (Id. ¶ 4.)

91.     Regular Situation Holders are guaranteed five shifts and are first to receive work assignments, in the order of their date of hire.  (Id.)

92.     After Regular Situation Holders, shifts are assigned to Substitutes, according to their placement on the Priority Substitute List.  (Id.)

93.     If there is still work remaining, it will first be offered to Regular Situation Holders as overtime shifts, and then to Substitutes on the Priority Substitute List as overtime shifts.  (Id.)

94.     If there is still additional work available, it is assigned to Outside Card Holders, and then to Casuals. (Id.)

95.     Because of her status as an Outside Card Holder, *i.e.*, a Mailer holding her union card with another newspaper (the Times), Plaintiff must shape if she wishes to obtain work in the Post Mailroom, and will receive assignments only after Regular Situation Holders and Substitutes. (Id. ¶¶ 4-5, 11.)

96.     Outside Card Holders receive remaining assignments by participating in the daily shape, which requires them to call-in to the Post Mailroom during specified hours of 3:30 p.m. to 6:30 p.m. and leave a message indicating that they are available for a given shift. (Granito Aff. ¶ 4.)

97.     Starting at approximately 8:00 p.m., Mailroom foreman Mike Granito ("Granito") listens to the Outside Card Holders' messages, and records the names of the Outside Card Holders who called-in (in the order in which they called) on a list. (Id.)

98.     Granito then provides the list of Outside Card Holders who left messages and indicated they are available to be assigned work, to Mailers' Union Chapel Chairman Nick Vazzano ("Chairman Vazzano"), along with the number of Mailroom jobs available to be filled. (Id.; Sutherland Aff. ¶ 5.)

99.     Chairman Vazzano then decides which Outside Card Holders will be hired for the available work assignments. (Id.; Pl. Dep. 250.)

100.     Chairman Vazzano, a Mailers' Union official, is not a member of Post management. (Granito Aff. ¶ 8; Sutherland Aff. ¶ 5.)

101.     Plaintiff has been assigned work in the Mailroom according to the proper procedures for hiring Outside Card Holders. (Sutherland Aff. ¶¶ 12-14; Granito Aff. ¶¶ 8-9.)

102.     In circumstances where there have been available shifts for Outside Card Holders, and Plaintiff called-in during the Mailroom shape and left a message that she was available for the given work assignment, her name was provided to Chairman Vazzano (along with the available number of

shifts) just as any other Outside Card Holder shaping in the Post Mailroom. (Sutherland Aff. ¶ 12; Granito Aff. ¶ 8.)

103.    On several occasions, when Plaintiff shaped in the Mailroom, she refused work when it was assigned to her because she had already accepted work in the Post Pressroom. (Sutherland Aff. ¶ 12.)

104.    Plaintiff never complained to the Post that she was being discriminated in work assignments, or otherwise, in the Post Mailroom, because of her gender or in retaliation for filing her EEOC charge or lawsuit. (Sutherland Aff. ¶ 14.)

105.    If an employee is suspended from the Post Mailroom, he/she is not allowed to work until the suspension period is over. (Id. ¶ 10.)

106.    Outside Card Holder Chris Sullivan was suspended from the Post on October 25, 2007, and returned to work on November 1, 2007. (Id.)

107.    During the week of his suspension, Sullivan did not work in the Post Mailroom. (Id.)

108.    Outside Card Holder Andre Smith was never suspended from the Post Mailroom. (Id.)

109.    Outside Card Holder John Stallworth was never suspended from the Post Mailroom. (Id.)

**F.    Plaintiff Receives the Mailroom Work Assignments Available for her Position And Has Not Been Discriminated Against In Being Assigned to the Stack Down**

110.    After Chairman Vazzano decides which Outside Card Holders he will hire, Post Mailroom Superintendent Whitney Sutherland ("Sutherland"), Granito or Mailroom foreman Michael Guzy will slot the employees into particular work assignments along with the Regular Situation Holders. (Id. ¶ 6; Granito Aff. ¶ 5.)

111.    Chairman Vazzano has the authority to switch or change the assignments once a shift has started. (Sutherland Aff. ¶ 6.)

112.    Outside Card Holders are eligible for the lowest priority jobs in the Post Mailroom, namely Feeder and Combi-stack (also called the "stack down").  (Sutherland Aff. ¶ 7; Granito Aff. ¶ 6.)

113.    The Feeder and Combi-stack assignments are equal in skill and pay.  (Id.)

114.    The "stack down" during dayside shifts involves stacking newspapers in preparation to be shrink wrapped for delivery.  (Sutherland Aff. ¶ 7.)

115.    The "stack down" assignment during the nightside shift consists of monitoring the Combi-stack machine.  (Id.)

116.    Because the "stack down" (and the Feeder job) is considered the lowest priority Mailer job in the Post Mailroom, it is the work remaining available after Regular Situation Holders and Substitutes have been assigned jobs, and therefore is assigned to Outside Card Holders or Casuals.  (Id.; Granito Aff. ¶ 6.)

117.    Because Plaintiff is an Outside Card Holder, she works the lowest priority jobs of Feeder and "stack down."  (Sutherland Aff. ¶ 13; Granito Aff. ¶ 9.)

118.    Plaintiff is not always assigned the "stack down."  (Sutherland Aff. ¶ 13.)

119.    Both men and women work on the "stack down."  (Id. ¶ 8; Pl. Dep. 42; Granito Aff. ¶ 9.)

120.    On any given shift, on any given day, the number of men working the "stack down" in the Post Mailroom is almost always at least equal to, if not significantly greater than, the number of women working this job.  (Sutherland Aff. ¶ 8; Granito Aff. ¶ 9.)

121.    For example, in November 2007, there were 116 dayside "stack down" assignments; 99 of these shifts were assigned to men, while 17 were assigned to women.  (Sutherland Aff. ¶ 8.)

122.    On each day in November 2007 when "stack down" assignments were given, the number of men on the assignments were either equal to or greater than the number of women assigned; in no instance were there more women working this job than men.  (Id.)

- 14 -

123.    In October 2007, Plaintiff worked six dayside shifts in the Post Mailroom, three on the Feeder and three on the "stack down."  (Id. ¶ 13.)

124.    On each of the three days in October 2007 when Plaintiff worked the "stack down," the men given the "stack down" assignment outnumbered the women assigned to the "stack down" by at least double.  (Id.)

125.    In November 2007, Plaintiff worked nine dayside shifts, four on the Feeder and five on the "stack down."  (Id.)

126.    During the five shifts when Plaintiff worked the "stack down" in November 2007, the number of men assigned the job exceeded the number of women.  (Id.)

127.    Plaintiff does not have any evidence, besides her subjective belief, that she was discriminated against in being assigned the "stack down."  (Pl. Dep. 41-42.)

128.    Plaintiff does not have any reason to believe she should not be assigned to the "stack down."  (Id. 128.)

**G.    Plaintiff was Not Discriminated Against by Post Security**

129.    Post Security rules require that all individuals must have proper identification to enter the Bronx Facility.  (Vazquez Aff. ¶ 6.)

130.    If any employee were to appear on the Bronx Facility without identification and needed to get into an area of the facility which required identification to access, normal security procedure would be to have a security guard escort the employee to that area.  (Id.)

131.    No individuals have ever been allowed inside the Bronx Facility premises without proper identification. (Id.; Pl. Dep. 235-236.)

132.    Plaintiff never complained to the Post that other individuals were allowed on the premises without proper identification.  (Vazquez Aff. ¶ 6; Pl. Dep. 229.)

133. Post Security rules dictate that all individuals shaping for the Post Pressroom must wait either in the shape house or the area directly outside the shape house. (Vazquez Aff. ¶ 7.)

134. Vazquez observed Plaintiff waiting in her car on the Bronx Facility parking lot on August 21, 2007, in violation of this security rule, and informed her that she was required to wait in the shape house or in her car directly outside the shape house, but that she could not be inside the Post premises while she was not working. (Id. ¶ 8; Pl. Dep. 232-233, Exs. 11-12.)

135. On September 14, 2007, Vazquez again observed Plaintiff violating this rule, waiting for her work assignment during the Pressroom shape in her car inside the Bronx Facility parking lot. (Vazquez Aff. ¶ 8; Pl. Dep. 227, 232-233, Exs. 11-12.)

136. Vazquez instructed Plaintiff that she must wait in the shape house or directly outside the Bronx Facility, in accordance with Post rules. (Id.)

137. Plaintiff refused to wait for her work assignment in the shape house or outside of the shape house. (Vasquez Aff. ¶ 8.)

138. Because Plaintiff would not leave the Bronx Facility premises to wait for her work assignment, Vazquez requested her identification card and instructed her that her identification card would remain in Security custody until Monday morning. (Id.)

139. Vazquez informed Plaintiff that he was taking these actions because of the security rule that shapers cannot be on the Bronx Facility premises until they have been assigned a work shift. (Id. ¶ 9; Pl. Dep. 227, 232-233, Exs. 11-12.)

140. Vazquez did not prevent Plaintiff from working. (Vazquez Aff. ¶ 8.)

141. Plaintiff does not have any evidence, besides her subjective belief, that Vazquez took any actions against her on the basis of her gender. (Pl. Dep. 234.)

142.    Plaintiff cannot identify any employees shaping for the Pressroom who were allowed to wait on the Bronx Facility premises other than inside the shape house or on the area directly outside the shape house. (Id. 228-229.)

143.    Plaintiff never complained to the Post that other individuals were allowed to wait for work assignments during the shape inside the Bronx Facility instead of in the shape house or directly outside. (Id. 229; Vazquez Aff. ¶ 9.)

**H.    Plaintiff was Not Discriminated Against by the Post in Regards to her Union Card**

144.    Plaintiff did not in fact want her union card transferred because she thought such preferential treatment might make enemies of her co-workers. (Pl. Dep. 193.)

145.    The Mailers' Union has the sole authority to decide whether a Mailer can transfer his/her union card to another employer shop. (Id. 192-193; Granito Aff. ¶ 10.)

146.    The Mailers' Union By-laws require that every Mailer be loyal to his/her own employer shop where he/she holds his/her union card. (Granito Aff. ¶ 10.)

**I.    Plaintiff was Not Subject to Actionable Sexual Harassment**

147.    No one in Post management made any harassing or derogatory remarks towards Plaintiff based on her gender. (Pl. Dep. 98-99.)

148.    On December 15, 2006, Plaintiff had an altercation with a co-worker from the Post Mailroom, John Hom, at the Post's holiday party in Manhattan, because Hom believed that Plaintiff was disrespectful to his wife. (Id. 199-201.)

149.    Thereafter, stemming from this disagreement at the Company holiday party, Plaintiff and Hom had several interactions at the Bronx Facility, during less than one week, where they each approached each other in attempt to discuss what happened. (Id. 199-205; Vasquez Aff. ¶¶ 4-5, Ex. A.)

150.    Hom never physically assaulted Plaintiff. (Id. 209.)

151.    On December 21, 2006, Plaintiff told Vazquez about her interactions with Hom. (Id. 198, 214; Vazquez Aff. ¶ 5.)

152.    Thereafter, Vazquez followed-up with Plaintiff, told her to stay away from Hom, and instructed her to call him if any other incidents occurred.  (Vazquez ¶ 5; Pl. Dep. 214, 237.)

153.    Vazquez determined that no disciplinary action for either Hom or Plaintiff was warranted. (Vazquez Aff. ¶ 5.)

154.    Following Vazquez's investigation, there have been no further incidents between Plaintiff and Hom.  (Pl. Dep. 216.)

155.    On December 31, 2006, Vazquez drafted a report of Plaintiff's complaint about Hom, which is a true, accurate and complete report of what occurred between Plaintiff and Hom.  (Id. 198; Vazquez Aff. ¶ 5, Ex. A.)

156.    As this report reflects, at no time did Plaintiff complain or believe that she was being harassed by Hom because of her sex or gender.  (Vazquez Aff. ¶ 5, Ex. A.)

157.    Plaintiff does not believe the interaction between her and Hom was sexual harassment, and has no evidence, besides her subjective belief, that it was based on her gender.  (Pl. Dep. 214-216.)

158.    Plaintiff did not complain to the Post that she believed she was being sexually harassed or harassed because of her gender by Hom.  (Vazquez Aff. ¶ 4.)

159.    On January 5, 2007, Plaintiff had an altercation with a co-worker from the Post Pressroom, John Magalia, where Magalia approached Plaintiff off Post premises, requested to spend time with her, and told her that he would hurt her if she "mentioned any names."  (Pl. Dep. 218-220.)

160.    On January 8, 2007, Plaintiff reported this incident to Post Human Resources Manager Penny Morgan ("Morgan"), who transcribed Plaintiff's version of the incident and investigated the complaint.  (Id. 221, Ex. 10; Scialdone Aff. ¶ 4.)

161.    Morgan interviewed Magalia, who denied that he threatened Plaintiff. (Scialdone Aff. ¶ 4, Ex. A.)

162.    Plaintiff also filed a police report with the New York Police Department ("NYPD") on January 9, 2007, regarding this incident. (Pl. Dep. 238, Ex. 13.)

163.    Morgan's report and the NYPD report are true, accurate and complete accounts of what occurred between Plaintiff and Morgan. (Id. 221-223, 237-238.)

164.    Neither report mentions that Plaintiff complained or believed she was being harassed by Magalia because of her sex or gender. (Id. Exs. 10, 13.)

165.    Since Morgan's investigation, there have been no further incidents between Plaintiff and Magalia. (Id. 223.)

166.    Plaintiff does not believe the interaction between her and Magalia was sexual harassment or based on her gender. (Id. 222-223.)

167.    Plaintiff did not complain to the Post that she believed she was being sexually harassed or harassed because of her gender by Magalia. (Id.)

168.    Plaintiff testified that on an unspecified night when working in the Pressroom, union members who were not members of Post management threw paper on the floor for her to clean up. (Pl. Dep. 171-172).

169.    After Plaintiff complained to the Pressroom foreman, John Pearce, it did not happen again. (Id. 172-173.)

170.    Nowhere in Plaintiff's Complaint, in the Post's report of Plaintiff's encounter with Hom, in Morgan's transcript of Plaintiff's version of her incident with Magalia, in Plaintiff's own report regarding Magalia filed with the NYPD, nor in Plaintiff's deposition testimony, does Plaintiff state that

any of these incidents between her and her co-workers occurred because of her gender. (<u>Id</u>. 198, 221-223, 237-238, Exs. 10, 13; Compl.; Vazquez Aff. Ex. A.)

171.     The Post maintains an equal employment opportunity and unlawful harassment policy, setting forth the Company's commitment to a work environment free of discrimination or harassment based on sex, race, color, religion, national origin, age or any other category protected by federal or state law, providing various means by which employees can bring claims of alleged harassment to its attention, and prohibiting retaliation of any type against employees who provide information in connection with any such complaint. (Scialdone Aff. ¶ 5, Ex. B.)

172.     During her employment, Plaintiff was aware of the Post's discrimination policy and its reasonable avenues for complaint of workplace discrimination or harassment. (Pl. Dep. 195.)

**J.     Plaintiff was Not Retaliated Against**

173.     Granito did not know of Plaintiff's claim of discrimination until January 2007. (Granito Aff. ¶ 7.)

174.     Granito did not know that Plaintiff had filed a lawsuit in federal court, or the specifics of that lawsuit, until January 2008. (<u>Id</u>.)

175.     Plaintiff did not complain to the Post that Granito was retaliating against her because of her EEOC charge or lawsuit. (Pl. Dep. 249.)

176.     Plaintiff did not complain to the Post that Chairman Vazzano was retaliating against her because of her EEOC charge or lawsuit. (<u>Id</u>. 250.)

177.     Vincent sent Plaintiff a letter on September 4, 2007, memorializing her unique situation of being a member of the Mailers' Union who is permitted to work in both the Post Mailroom and Pressroom. (<u>Id</u>. 85.)

178.    The September 4, 2007 letter also asked Plaintiff to refrain from "sharp shooting" which "negatively impacts Post operations." (Id.)

179.    The practice of "booking" work, *i.e.*, signing-in during the shape for a work assignment, in two separate departments for the same shift, and then refusing the less desirable work assignment, or "sharp shooting," is against Post rules and policies. (Walsh Aff. ¶ 20.)

180.    Plaintiff has at times engaged in "sharp shooting" during her employment with the Post. (Id.; Pl. Dep. 105-106; Sutherland Aff. ¶ 12.)

181.    Plaintiff was never disciplined for "sharp shooting." (Walsh Aff. ¶ 20; Pl. Dep. 106.)

**K.    Plaintiff's Lawsuit Against the Post**

182.    Plaintiff filed a charge against the Post with the EEOC on October 31, 2006. (Compl. ¶ 6.)

183.    Plaintiff filed her Complaint with this Court on July 17, 2007. (Compl.)

184.    Plaintiff has not served a copy of her Complaint on Walsh. (Walsh Aff. ¶ 4.)


Dated: New York, New York
      January 18, 2008

Respectfully submitted,


s/Shari M. Goldsmith
_____
Willis J. Goldsmith (WG 1598)
Shari M. Goldsmith (SG 0909)
222 East 41st Street
New York, New York  10017-6702
(212) 326-3939

J. Jordan Lippner (JL 0064)
News America Incorporated
1211 Avenue of the Americas
New York, New York  10036
(212) 852-7000

*Attorneys for Defendant NYP Holdings, Inc.*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on January 18, 2008, the foregoing was served electronically and by U.S. first class mail upon the following counsel who have registered with ECF:

Neil M. Frank
Frank & Associates, P.C.
500 Bi-County Blvd., Suite 112N
Farmingdale, New York 11735
Tel: (631) 756-0400

*Attorney for Plaintiff Eva Lee*

s/Shari M. Goldsmith
Shari M. Goldsmith